IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
In re: : Chapter 11
:
JOHNSON BROADCASTING, INC., et : Case No. 08-36583
al., :
:
Debtors. : Jointly Administered
X
- - - - - - - - - - - - - - - - - - - - - - - - - - - - -

**MOTION OF THE DEBTORS FOR AN ORDER (I) APPROVING
THE STALKING HORSE APA, (II) APPROVING BIDDING PROCEDURES
FOR AN AUCTION OF DEBTORS' ASSETS, (III) SCHEDULING A DATE FOR THE
AUCTION, (IV) APPROVING THE PROPOSED SALE NOTICE, AND (V) SETTING
CERTAIN DATES RELATED TO THE SALE OF THE STATION ASSETS**

THIS MOTION SEEKS AN ORDER THAT MAY ADVERSELY AFFECT YOU. IF YOU OPPOSE THE MOTION, YOU SHOULD IMMEDIATELY CONTACT THE MOVING PARTY TO RESOLVE THE DISPUTE. IF YOU AND THE MOVING PARTY CANNOT AGREE, YOU MUST FILE A RESPONSE AND SEND A COPY TO THE MOVING PARTY. YOU MUST FILE AND SERVE YOUR RESPONSE WITHIN 20 DAYS OF THE DATE THIS WAS SERVED ON YOU. YOUR RESPONSE MUST STATE WHY THE MOTION SHOULD NOT BE GRANTED. IF YOU DO NOT FILE A TIMELY RESPONSE, THE RELIEF MAY BE GRANTED WITHOUT FURTHER NOTICE TO YOU. IF YOU OPPOSE THE MOTION AND HAVE NOT REACHED AN AGREEMENT, YOU MUST ATTEND THE HEARING. UNLESS THE PARTIES AGREE OTHERWISE, THE COURT MAY CONSIDER EVIDENCE AT THE HEARING AND MAY DECIDE THE MOTION AT THE HEARING.

REPRESENTED PARTIES SHOULD ACT THROUGH THEIR ATTORNEY.

TO THE UNITED STATES BANKRUPTCY JUDGE:

Johnson Broadcasting, Inc. ("JB") and Johnson Broadcasting of Dallas, Inc. ("JB-Dallas" and collectively, the "Debtors") file this Motion Under 11 U.S.C. §§ 105(a), 361, 363, 364 and Fed. R. Bankr. P. 2002, 4001, 6004 for an order (I) Approving the Stalking Horse APA, (II) Approving Bidding Procedures for an Auction of Debtors' Assets, (III) Scheduling the Date for

HOU:2907246.9

the Auction, (IV) Approving the Proposed Sale Notice, and (V) Setting Certain Dates Related to the Sale of the Station Assets (the "Motion"), and in support thereof, Debtors respectfully state as follows:

## I.  SUMMARY OF RELIEF REQUESTED

1. By this Motion, the Debtors seek approval of the asset purchase agreement (the "Stalking Horse APA") attached hereto as **Exhibit "A,"** by and among Una Vez Mas Houston, LLC (the "Stalking Horse Bidder") and Frank Higney, in his capacity as Bankruptcy Court-approved Limited Purpose Fiduciary on behalf of the Debtors (the "LPF").[1] The Debtors further seek approval of the proposed bidding procedures attached as **Exhibit "B"** hereto (the "Bidding Procedures").  The Debtors seek entry of an order substantially in the form attached hereto as **Exhibit "C"** (the "Bidding Procedures Order") approving the Bidding Procedures.

2. In connection with filing this Motion, the Debtors have also filed their Debtors' Joint Chapter 11 Plan (the "Plan") and Disclosure Statement for the Debtors' Joint Chapter 11 Plan of Reorganization (the "Disclosure Statement").

3. The Debtors also seek approval of certain hearing dates and deadlines associated with the Plan and Bidding Procedures sale process.  The Debtors will present a separate scheduling order to the Court at the hearing on this Motion requesting the relevant dates and deadlines regarding the Bidding Procedures, Plan confirmation hearing (the "Confirmation Hearing") and hearing to approve the sale of the Station Assets (the "Sale Hearing").  A proposed timeline for Plan confirmation is attached hereto as **Exhibit "D."**

---

[1]  Pursuant to the Agreed Order Appointing Limited Purpose Fiduciary entered by this Court on February 26, 2009 (the "LPF Order"), the Debtors reserve their right not to pursue entry of the Sale Approval Order and

## II.     JURISDICTION

4.     This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334.  Consideration of this Motion is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), and (O).  Venue of this proceeding is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.  The relief requested is available pursuant to 11 U.S.C. § 363.

## III.     BACKGROUND

5.     On October 13, 2008 (the "Petition Date"), each Debtors filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code").

6.     Each Debtor continues to operate its business and manage its property as a Debtor in possession pursuant to §§ 1107 and 1108 of the Bankruptcy Code.  No trustee, examiner, or creditors' committee has been appointed in the Debtors' cases.

7.     JB owns and operates KNWS-TV, a commercial UHF television station licensed to Katy, Texas, within the Houston, Texas designated market area ("DMA").  JB built the station and put it on the air in 1993.  JB is licensed for analog television service on UHF Channel 51 and digital television service on UHF Channel 52.  KNWS-TV has completed its full-power digital broadcast facility build-out and currently broadcasts in both analog and digital formats.  KNWS-TV's distribution, including its digital coverage, remains competitive with the three VHF and other UHF stations that are operating at full power in the Houston DMA.  KNWS-TV is an independent station.

8.     JB-Dallas owns and operates KLDT-DT, a commercial television station licensed to Lake Dallas, Texas, within the Dallas-Fort Worth, Texas DMA (colletively, with KNWS-TV, the "Stations").  KLDT-DT operates on a digital-only basis, having sold its analog channel to

---

pursue the "Finance Alternative" (as defined in the LPF Order).

3

Qualcomm and flash-cut to digital in January 2007. The station broadcasts on full-power digital Channel 54. KLDT-DT is an independent station.

9. JB is wholly-owned by Douglas R. Johnson ("Johnson"). Johnson owns approximately 85% of JB-Dallas and the remaining equity is owned by various of Johnson's family members and the station manager. Johnson is the sole director of each Debtors. On the Petition Date, Johnson also filed a voluntary chapter 11 petition.

## IV.   RELEVANT FACTS

10. Prior to the Petition Date, the Debtors retained the media brokerage firm of Kalil & Co., Inc. ("Kalil") to assist in valuing and marketing the stations and offering them for sale in the open market. Kalil continued this role after the Petition Date pursuant to Court order. In resolution of Merrill Lynch's motion to appoint a chapter 11 trustee, the Court entered the LPF Order appointing Frank Higney, of Kalil, as LPF with the authority to negotiate the sale of the Station Assets and execute a Stalking Horse APA on behalf of the Debtors.

11. Pursuant to the LPF Order, the LPF negotiated and executed the Stalking Horse APA by and between LPF and UVM, the Stalking Horse Bidder ("Purchaser"), attached hereto as Exhibit A. The LPF Order provides that if a Stalking Horse APA is executed by the LPF, then within ten business days of the execution date, the Debtors shall file with the Court (i) a motion to approve bidding/auction procedures and (ii) a Chapter 11 plan and disclosure statement. Simultaneously with the filing of this Motion, the Debtors are filing their Plan and Disclosure Statement. Therefore, pursuant to the LPF Order, Debtors submit this Motion.

## V.   RELIEF REQUESTED

### The Stalking Horse APA

12. The LPF and the Debtors propose to auction and sell the Station Assets (as defined in the Stalking Horse APA) in accordance with sections 363 and 365 of the Bankruptcy Code.

Pursuant to the authority granted in the LPF Order, on October 9, 2009, the LPF executed a Stalking Horse APA under which Debtors would sell the Station Assets to the Purchaser for approximately $14,825,000.00 (the "Purchase Price"), subject to the Bidding Procedures and this Court's approval of the following:

**A.    The Stalking Horse APA[2]**

    a.    **General Terms.**  The Purchaser would acquire the Station Assets.

    b.    **Bankruptcy Court Approval.**  The sale of the Station Assets would be subject to approval by this Court and competitive bidding pursuant to the Bidding Procedures.

    c.    **FCC Applications.**  The Parties shall file an application with the FCC requesting that the FCC consent to the assignment of the FCC licenses for the Stations from Debtors to Purchaser.

    d.    **Purchase Price.**  The Purchase Price to be paid by the Purchaser for the Station Assets would be $14,825,000.00.  The Houston Purchase Price (as defined in the Stalking Horse APA) to be paid by the Purchaser would be $9,000,000.00.  The Dallas Purchase Price (as defined in the Stalking Horse APA) to be paid by the Purchaser would $5,825,000.00.  The Purchase Price is subject to certain adjustments set forth in the APA.

    e.    **Deposit.**  In accordance with the Stalking Horse APA, the Purchaser will pay $1,000,000.00 into the Escrow Account (as defined in the Stalking Horse APA) as deposit (the "Deposit").   Upon closing of the sale of the Station Assets (the "Closing"), or if the Stalking Horse APA is terminated prior to Closing because of the Purchaser's breach of the Stalking Horse APA, the Debtors would be entitled to that percentage of the Deposit as provided in Article 9.4 of the Stalking Horse APA.  Retention of the Deposit would constitute the Debtors' sole recourse in such event.

    f.    **Termination.**  The Stalking Horse APA contains certain termination provisions (see Article 9 of the Stalking Horse APA).

**B.    The Break-Up Fee**

    a.    In the event the Stalking Horse APA is terminated by Debtors pursuant to Debtors' right to terminate, the Purchaser shall receive a break-up fee of up to $700,000 (the "Break-Up Fee") upon those conditions and percentages provided under Article 9.3 of the Stalking Horse APA.

---

[2] The following is intended for summary purposes only.  To the extent the description in this Motion is inconsistent in any way from the APA, the terms of the APA shall govern.

b. The amount of the Break-Up Fee, the conditions under which the Break-Up Fee is payable to the Purchaser, and the protections afforded the Purchaser to assure payment of the Break-Up Fee if such payment becomes due, are reasonable under the circumstances. The Purchaser has devoted substantial resources to the proposed transaction and will continue to be conducting extensive due diligence. The protections and covenants contained in the Stalking Horse APA for the benefit of the Purchaser reflect the amount of time and money that the Purchaser has invested in making its bid, and are commensurate with the benefits conferred upon the estates as a result of the bid.

**The Proposed Bidding Procedures for the Auction**

13. The sale of the Station Assets would be subject to higher or otherwise better offers pursuant to the Bidding Procedures. The Debtors believe that the proposed structure of the Bidding Procedures is the one most likely to maximize the realizable value of the Station Assets for the benefit of the Debtors' estate, its stakeholders and other interested parties.

14. Accordingly, the Debtors seek approval of the following Bidding Procedures for the sale of the Station Assets:

A. **Bidding Procedures**

   a. **Assets to be Sold**. The Auction shall consist of all of the Station Assets.

   b. **Confidentiality Agreements**. Upon execution of a valid confidentiality agreement, in form and substance satisfactory to the LPF and the Debtors, any party that wishes to conduct due diligence on the Station Assets may be granted access to information that has been or will be provided to the other bidders.

   c. **Qualifying Bidders**. In order to participate in the bidding process and be deemed a "Qualifying Bidder," each potential bidder must submit a "Qualifying Bid" by the Bid Deadline (defined below). To constitute a Qualifying Bid, a bid must:

   i. Be in writing;

   ii. State that such bidder offers to purchase the Station Assets upon the terms and conditions substantially as set forth in the Stalking Horse APA;

   iii. State that such bidder is prepared to enter into a legally binding purchase and sale agreement or similar agreement for the acquisition of the Station Assets on terms and

        conditions no less favorable to the Debtors than the terms and conditions contained in the Stalking Horse APA;

iv. Include a clean and duly executed Asset Purchase Agreement (the "Modified APA") and a "blacklined" comparison against the Stalking Horse APA to show any changes requested by the bidder. All Modified Purchase Agreements must be on substantially the same terms and subject to the same conditions as set forth in the Stalking Horse APA;

v. State that such bidder is financially capable of consummating the transactions contemplated by the Modified APA;

vi. Include such financial and other information that will allow the LPF and Debtors to make a reasonable determination as to the bidder's financial and other capabilities to consummate the transactions contemplated by the Modified APA;

vii. Identify with particularity each and every executory contract and unexpired lease that is to be assumed and assigned pursuant to the Modified APA;

viii. Not request or entitle the bidder to any transaction or break-up fee, expense reimbursement, or similar type of payment;

ix. Fully disclose the identity of each entity that will be bidding for the Station Assets or otherwise participating in connection with such bid, and the complete terms of any such participation;

x. Not contain any due diligence or financing contingencies of any kind;

xi. Include evidence of authorization and approval from the bidders' board of directors (or comparable governing body) with respect to the submission, execution, delivery, and closing of the Modified APA;

xii. Include a cash deposit equal to ten (10%) percent of the amount offered to purchase the Station Assets (the "Good Faith Deposit").

xiii. Be in an amount at least $800,000 greater than the Purchase Price (*i.e.*, $15,625,000.00)

7

d. The LPF (following consultation with the Debtors and consideration of their views) shall make a determination regarding whether a bid is a Qualifying Bid and shall notify bidders whether their bids have been determined to be Qualifying Bids by no later than 5:00 p.m. (Central Time) on a date to be set by the Court consistent with the timeline set forth on Exhibit D.[3]

e. **Bid Deadline**. Any person or entity interested in participating in the Auction must submit a Qualifying Bid on or before a date to be set by the Court consistent with the timeline set forth on Exhibit D(the "Bid Deadline") in writing, to (1) counsel to the Sellers, Timothy A. Davidson II, Andrews Kurth LLP, 600 Travis, Suite 4200, Houston, Texas 77002; (2) LPF for the Seller, Frank J. Higney, Kalil & Co., Inc., 6363 N. Swan Road, Suite 200, Tucson, AZ 85718; (3) counsel to the Stalking Horse Bidder, Toby L. Gerber, Fulbright & Jaworski LLP, 2200 Ross Ave., Suite 2800, Dallas, Texas 75201; and (4) counsel to Merrill Lynch Commercial Finance Corp., Leslie M. Luttrell, Morgan & Luttrell, L.L.P., 711 Navarro, Suite 210, San Antonio, Texas 78205.

f. **Purchaser as Qualifying Bidder**. Notwithstanding clause (c) above, for the purposes of determining eligibility to attend and place bids at the Auction, the Purchaser shall be considered a Qualifying Bidder.

g. **Auction**. In the event that the LPF and the Debtors timely receives one or more Qualifying Bids, in addition to the bid of the Stalking Horse Bidder, the LPF shall conduct the Auction with respect to the Station Assets. The Auction shall be conducted on a date to be set by the Court consistent with the timeline set forth on Exhibit D at a location so ordered by the Court or such other location as designated by the LPF and the Debtors in a notice to all Qualifying Bidders. The Auction shall be governed by the following procedures:

　　i. The Qualifying Bidders shall appear in person at the Auction, or through a duly authorized representative;

　　ii. Only representatives of the LPF, the Debtors, and the Qualifying Bidders shall be entitled to be present at the Auction;

　　iii. Only the Qualifying Bidders shall be entitled to make any subsequent bids at the Auction;

　　iv. Each Qualifying Bidder shall be required to confirm that it has not engaged in any collusion with respect to the bidding or the sale;

---

[3] The exact dates and times will be set forth in a separate scheduling order to be presented to the Court at the hearing on this Motion.

8

      v.      Bidding shall commence at the amount of the highest Qualifying Bid submitted by the Qualifying Bidders prior to the Auction;

      vi.      Qualifying Bidders may then submit successive bids in increments of at least $100,000 higher than the previous bid;

      vii.      All Qualifying Bidders shall have the right to submit additional bids, subject to clause (vi) above, and make additional modifications to the Stalking Horse APA or Modified APA, as applicable, at the Auction;

      viii.      The Auction will be conducted to achieve the maximum value for the assets and may include individual negotiations with the Qualifying Bidders and/or open bidding in the presence of all other Qualifying Bidders; and

      ix.      The Auction shall continue until there is only one offer that the LPF and the Debtors determine, subject to Court approval, is the highest or best offer from among the Qualifying Bidders submitted at the Auction (the "Successful Bid"). In making this decision, the LPF and the Debtors may consider, without limitation, the amount of the purchase price, the form of consideration being offered, the likelihood of the Qualifying Bidder's ability to close a transaction and the timing thereof, the number, type and nature of any changes to the Stalking Horse APA requested by each Qualifying Bidder, and the net benefit to the Debtors' estates. The Qualifying Bidder submitting such Successful Bid shall become the "Successful Bidder," and shall have such rights and responsibilities of a purchaser, as set forth in the applicable Modified APA.

h.      Within three (3) days after adjournment of the Auction, the LPF, in the exercise of its business judgment, shall make a determination whether to accept or reject a Successful Bid of a Successful Bidder. If a Successful Bid is approved, within three (3) days of approval, the Successful Bidder shall complete and execute all agreements, contracts, instruments or other documents evidencing and containing the terms and conditions upon which the Successful Bid was made and make and pay for all necessary filings with all applicable governmental or other authorities. Bids made after the close of the Auction shall not be considered by the LPF and the Debtors.

9

**B.      Proposed Notice of the Sale Hearing and Assumption and Assignment Schedule Process**

15.     Pursuant to Rule 2002(a) of the Federal Rules of Bankruptcy Procedure, the Debtors are required to provide their creditors with 20 days' notice of the Sale Hearing.  Pursuant to Bankruptcy Rule 2002(c), such notice must include the date, time and place of the Auction and the Sale Hearing, and the deadline for filing any objections to the relief requested herein.

16.     The Debtors will serve a notice containing the information required by Bankruptcy Rule 2002(a) in substantially the form attached hereto as **Exhibit "E"** (the "Sale Notice").  The Sale Notice will be served on those parties indicated on the Debtors' master service list and those parties indicated on the Debtors' creditor matrix.  The Debtors propose to publish the information contained in the Sale Notice in such publications as the LPF and the Debtors so choose.  The Debtors will promptly file notice of such publication with the Court.

17.     The Debtors propose that no later than 20 days prior to the Sale Hearing/Confirmation Hearing they will file:  (a) a schedule (the "Assumption and Assignment Schedule") of the executory contracts and unexpired leases that the Debtors propose to assume and assign in connection with the sale of the Station Assets (collectively, the "Assumed Contracts and Leases"), which shall include for each Assumed Contract and Lease the Debtors' proposed amount to be paid as a cure cost under section 365 of the Bankruptcy Code (the "Cure Cost"); and (b) a schedule of the executory contracts and unexpired leases that the Debtors previously have assumed and propose to assign in connection with the sale of the Station Assets (collectively, the "Assigned Contracts and Leases").

18.     Objections to either (i) the assignment of an Assumed Contract and Lease or an Assigned Contract and Lease or (ii) a Cure Cost shall be filed with the Bankruptcy Court by a contract-counter party within 10 days after the Debtors file the Assumption and Assignment

Schedule.  If the parties are unable to consensually resolve the dispute prior to the Sale Hearing, all such disputes would be resolved at the Sale Hearing.  If no objection to a Cure Cost or to the proposed assumption and assignment of any Assumed Contract and Lease is filed and served timely, the Cure Cost set forth in the Assumption and Assignment Schedule shall be binding upon the respective non-Debtor party; the non-Debtor party shall be forever barred from objecting to the Cure Cost and from asserting any additional cure or other amount with respect to its contract or lease; and the non-Debtor party will be deemed to have consented to the proposed assumption and assignment of its executory contract or unexpired lease.  Similarly, if no objection to the assignment of an Assigned Contract and Lease is filed and served timely, the non-Debtor party will be deemed to have consented to the proposed assignment of its contract or lease.

19. The Debtors submit that the notice of the Sale Motion, the Auction, and the Sale Hearing as provided for herein complies fully with Bankruptcy Rule 2002 and constitutes good and adequate notice of the sale of substantially all of their assets and the proceedings with respect thereto.  Therefore, the Debtors respectfully request that the Court approve the notice procedures described herein.

## VI. AUTHORITY

### The Sale of the Station Assets and the Bidding Procedures

20. Section 363(b)(1) of the Bankruptcy Code provides that a debtor, "after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. §363(b)(1).  Section 105(a) of the Bankruptcy Code provides in pertinent part that the "[t]he Court may issue any order, process, or judgment that is necessary and appropriate to carry out the provisions of this title."  11 U.S.C. §105(a).

21. The paramount goal of any proposed sale of property of a Debtors is to maximize the proceeds received by the estate.  *See, e.g., Official Comm. of Subordinated Bondholders v.*

*Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 659 (Bankr. S.D.N.Y. 1992) ("It is a well established principle of bankruptcy law that the Debtors' duty with respect such sales is to obtain the highest price or greatest overall benefit possible for the estate.)

22. To that end, courts uniformly recognize that procedures intended to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate and thus are appropriate in the context of bankruptcy sales. *See e.g. id.* (noting that such procedures "encourage bidding and maximize the value of the Debtors' assets").

23. The Debtors believe that the Bidding Procedures proposed herein establish the parameters under which the value of the Station Assets may be tested at the Auction. Such procedures will increase the likelihood that Debtors' estates will receive the greatest possible consideration for the Station Assets because they will ensure a competitive and fair biding process.

### The Break-Up Fee

24. In connection with the Auction, the Court should authorize the Debtors to pay the Break-Up Fee identified herein in the event that the Purchaser is outbid at the Auction. In *Capline Corp. v. O'Brien Envt'l. Energy, Inc. (In re O'Brien Envt'l. Energy, Inc.)*, 181 F.3d 527 (3d Cir. 1999), the Untied States Court of Appeals for the Third Circuit held that even though bidding incentives are measured against a business judgment standard in non-bankruptcy transactions, the administrative expense provisions of Bankruptcy Code section 503(b) govern in the bankruptcy context. Accordingly, to be approved, bidding incentives must provide some postpetition benefit.

25. The *O'Brien* Court identified at least two instances in which bidding incentives may provide benefit to the estate. First, benefit may be found if the "assurance of a break-up fee promoted more competitive bidding, such as by inducing a bid that otherwise would not have been made and without which bidding would have been limited." *Id*. at 537. Second, when the

availability of bidding incentives induce a bidder to research the value of the Debtors and submit a bid that serves as a minimum or floor bid on which other bidders can rely, "the bidder may have provided a benefit to the estate by increasing the likelihood that the price at which the Debtor is sold will reflect its true worth." *Id*.

26. The proposed Break-Up Fee is appropriate under an "administrative expense" standard. Upon information and belief, without the assurance of the Break-Up Fee, the stalking horse offer would not have been made. The Break-Up Fee has induced the Purchaser to carefully analyze the value of the Station Assets and to submit a bid that will serve as a minimum bid upon which other bidders can rely. The Purchaser has provided a benefit to the bankruptcy estates by increasing the likelihood that the consideration paid for the Station Assets will reflect their true worth.

27. The Debtors' ability to offer the Break-Up Fee will provide the Debtors with the potential of even greater benefit to the bankruptcy estates. Thus, the Break-Up Fee provision should be approved.

## VII.  RESERVATION OF RIGHTS

28. This Motion is not intended as a waiver of any of Debtors' rights under the Bankruptcy Code, or other applicable law. Specifically, Debtors reserve their right, as established in the LPF Order, to not pursue approval of this sale, and, instead, seek approval of the Financing Alternative.

## VIII. CONCLUSION

WHEREFORE, Debtors respectfully requests that the Court (i) enter an order (I) Approving the Stalking Horse APA, (II) Approving Bidding Procedures for an Auction of Debtors' Assets, (III) Scheduling the Date for the Auction, (IV) Approving the Proposed Sale

Notice, and (V) Setting Deadlines to Object to the Sale of the Station Assets, and (ii) grant the Debtors such other and further relief as is just and proper.

Dated: October 19, 2009.

Respectfully submitted,

By: /s/ Timothy A. Davidson II
John J. Sparacino
State Bar No. 18873700
Timothy A. Davidson II
State Bar No. 24012503
600 Travis, Suite 4200
Houston, Texas 77002
(713) 220-4200 (Telephone)
(713) 220-4285 (Facsimile)

**COUNSEL FOR THE ABOVE-REFERENCED DEBTORS**

## CERTIFICATE OF SERVICE

    The undersigned hereby certifies that the foregoing document was served via first class regular mail on all of the parties on the attached service list on October 19, 2009.

                                                      /s/ David L. Curry, Jr.
                                                  David L. Curry, Jr.

HOU:2907246.9