**Exhibit A**

EXECUTION VERSION

ASSET PURCHASE AGREEMENT

by and among

UNA VEZ MAS, LP

as Buyer

and

FRANK HIGNEY,

in his capacity as Bankruptcy Court-approved Limited Purpose Fiduciary on behalf of

JOHNSON BROADCASTING, INC.,

and

JOHNSON BROADCASTING OF DALLAS, INC.

collectively as Seller

October 9, 2009

65317456.8

# TABLE OF CONTENTS

**Page**

ARTICLE 1     DEFINITIONS, RULES OF CONSTRUCTION..................................1
 1.1     Certain Defined Terms ..............................................................1
 1.2     Rules of Construction ...............................................................2
 1.3     Sections.....................................................................................2

ARTICLE 2     PURCHASE AND SALE..................................................................2
 2.1     Purchase and Sale of the Station Assets. ................................2
 2.2     Excluded Assets........................................................................4
 2.3     Assumption of Liabilities and Obligations...............................5
 2.4     Purchase Price...........................................................................5
 2.5     Prorations and Closing Adjustment..........................................7
 2.6     Allocation of Purchase Price ....................................................7
 2.7     Assignment and Assumption .....................................................8
 2.8     Transfer and Other Taxes .........................................................8

ARTICLE 3     REPRESENTATIONS AND WARRANTIES OF SELLER ............8
 3.1     Authorization ............................................................................8
 3.2     Organization; Qualification ......................................................8
 3.3     Absence of Conflicting Agreements; Consents........................9
 3.4     Licenses ....................................................................................9
 3.5     Real Property; Leases .............................................................10
 3.6     Tower Facilities ......................................................................11
 3.7     Contracts.................................................................................11
 3.8     Sufficiency of Assets..............................................................11
 3.9     Insurance.................................................................................11
 3.10    Claims and Legal Actions.......................................................11
 3.11    Compliance with Laws ...........................................................12
 3.12    Good Title Conveyed...............................................................12
 3.13    No Broker ................................................................................12
 3.14    No Restrictions .......................................................................12
 3.15    Certain Limitations on Representations and Warranties .........12

ARTICLE 4     REPRESENTATIONS AND WARRANTIES OF BUYER...............12
 4.1     Organization, Standing and Authority.....................................12

**TABLE OF CONTENTS**

(continued)

**Page**

| | | | |
|---|---|---|---|
| | 4.2 | Authorization and Binding Obligation | 12 |
| | 4.3 | Absence of Conflicting Agreements | 13 |
| | 4.4 | Funds | 13 |
| | 4.5 | Qualification as a Broadcast Licensee | 13 |
| | 4.6 | No Broker | 13 |
| ARTICLE 5 | | OPERATION OF THE STATIONS PRIOR TO CLOSING | 13 |
| | 5.1 | General | 13 |
| | 5.2 | Insurance | 15 |
| | 5.3 | Financial Information | 15 |
| | 5.4 | Notice of Certain Matters | 15 |
| | 5.5 | Schedules | 15 |
| | 5.6 | Notice of Proceedings | 15 |
| | 5.7 | WARN Act | 16 |
| ARTICLE 6 | | SPECIAL COVENANTS AND AGREEMENTS | 16 |
| | 6.1 | FCC Matters | 16 |
| | 6.2 | Confidentiality | 17 |
| | 6.3 | Cooperation | 18 |
| | 6.4 | Control of the Stations | 18 |
| | 6.5 | Access to Information | 18 |
| | 6.6 | Further Assurances | 19 |
| | 6.7 | Limit on Solicitation | 19 |
| | 6.8 | Third Party Consents | 19 |
| | 6.9 | Executory Contracts and Unexpired Leases | 19 |
| | 6.10 | Bankruptcy Motions | 20 |
| | 6.11 | Bidding Matters; Auction | 20 |
| | 6.12 | Digital Upgrade Capital Expenditures | 21 |
| | 6.13 | Financing | 21 |
| | 6.14 | Supplemental Disclosure; Knowledge; Investigation | 21 |
| ARTICLE 7 | | CONDITIONS TO OBLIGATIONS OF BUYER AND SELLER | 22 |
| | 7.1 | Conditions to Obligations of Buyer | 22 |
| | 7.2 | Conditions to Obligations of Seller | 24 |

**TABLE OF CONTENTS**
(continued)

**Page**

| | | |
|---|---|---|
| ARTICLE 8 | CLOSING AND CLOSING DELIVERIES | 25 |
| 8.1 | Closing | 25 |
| 8.2 | Closing Place | 26 |
| 8.3 | Deliveries by Seller | 26 |
| 8.4 | Deliveries by Buyer | 27 |
| ARTICLE 9 | TERMINATION | 28 |
| 9.1 | Termination of Agreement | 28 |
| 9.2 | Procedure and Effect of Termination | 32 |
| 9.3 | Break-Up Fee | 33 |
| 9.4 | Seller's Remedies; Return of Buyer's Deposit | 34 |
| ARTICLE 10 | MISCELLANEOUS | 35 |
| 10.1 | Fees and Expenses | 35 |
| 10.2 | Notices | 35 |
| 10.3 | Benefit and Binding Effect | 36 |
| 10.4 | Further Assurances | 36 |
| 10.5 | Governing Law; Venue | 36 |
| 10.6 | Waiver of Compliance; Consents | 36 |
| 10.7 | Severability | 37 |
| 10.8 | Specific Performance | 37 |
| 10.9 | Entire Agreement | 37 |
| 10.10 | Counterparts; Delivery of Signature Pages | 37 |

# TABLE OF CONTENTS

<u>Exhibits</u>:

A – Definitions

B – Deposit Escrow Agreement

C – Section 6.9 Escrow Agreement

D – Sale Approval Order

E – Bidding Procedures Order

F – Digital Upgrade

G – LPF Order

<u>Schedules</u>:

2.1(a)(xii) –   Certain Insurance Policies Associated with Houston Stations

2.1(a)(xiii) –  Certain Houston Station Assets

2.1(b)(xii) –   Certain Insurance Policies Associated with Dallas Stations

2.1(b)(xiii) –  Certain Dallas Station Assets

2.2(g) –    Certain Excluded Assets

2.3(a) –    Assumed Contracts, Leases and Agreements – Houston Station

2.3(b) –    Assumed Contracts, Leases and Agreements – Dallas Station

3.3 –    Absence of Conflicting Agreements; Consents; Required Consents

3.4 –    Licenses; Applications Filed with the FCC

3.5 –    Real Property and Leases

3.6 –    Tower Facilities, Equipment Not Considered Tower Facilities

3.7 –    Material Contracts

3.9 –    Insurance Policies

3.10 –    Claims and Legal Actions

3.12 –    Title

3.14 –    Restrictions

6.9(a) –    Executory Contracts and Unexpired Leases – Houston Station

6.9(b) –    Executory Contracts and Unexpired Leases – Dallas Station

# ASSET PURCHASE AGREEMENT

This ASSET PURCHASE AGREEMENT (this "Agreement") is made and entered into to be effective as of October 9, 2009, by and among UNA VEZ MAS, LP, a Delaware limited partnership ("Buyer"), and Frank Higney, in his capacity as the Bankruptcy Court-approved Limited Purpose Fiduciary (the "LPF"), on behalf of JOHNSON BROADCASTING, INC., a Michigan corporation ("JBI"), and JOHNSON BROADCASTING OF DALLAS, INC., a Texas corporation (("JBDI") and collectively with JBI, "Seller").  Buyer and Seller are also referred to individually as a "Party" and collectively as the "Parties".

## RECITALS

Seller holds the licenses, permits and other authorizations issued by the Federal Communications Commission (the "FCC") for the operation of television stations KLDT(TV), Lake Dallas, Texas (Facility I.D. 17433) (the "Dallas Station") and KNWS-TV, Katy, Texas (Facility I.D. 3180) (the "Houston Station", and together with the Dallas Station, the "Stations").

On October 13, 2008, JBI and JBDI filed voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code (as now in effect or hereafter amended, the "Bankruptcy Code").

On February 26, 2009, the LPF was appointed as a limited purpose fiduciary by the Bankruptcy Court pursuant to the Agreed Order Appointing Limited Purpose Fiduciary, a copy of which is attended hereto as Exhibit G (the "LPF Order"), which describes, among other things, the role of the LPF and provides the LPF authority to sell the Station Assets (as defined below).

Subject to the terms and conditions set forth herein, and pursuant to, *inter alia,* Sections 363, 364 and 365 of the Bankruptcy Code, Seller desires to sell to Buyer, and Buyer desires to purchase from Seller, all tangible and intangible assets, personal properties, executory contracts, unexpired leases, licenses, permits, authorizations, insurance proceeds, intellectual property, inventory, equipment and ownership interests and any other rights associated with, used or useful in, or otherwise related to the business and operation of (a) the Houston Station (the "Houston Station Assets") and (b) the Dallas Station (the "Dallas Station Assets", and together with the Houston Station Assets, the "Station Assets").

## AGREEMENT

In consideration of the premises and the mutual agreements and covenants contained in this Agreement, the Parties, intending to be legally bound, hereby agree as follows:

## ARTICLE 1
## DEFINITIONS, RULES OF CONSTRUCTION

**1.1    *Certain Defined Terms.*** Capitalized terms used herein and not otherwise defined herein have the meanings set forth in Exhibit A or in the Sections hereto cross-referenced in Exhibit A.

**1.2** **_Rules of Construction._** A reference to one gender will include any other gender. The Parties agree that any rule of construction to the effect that ambiguities are to be resolved against the drafting Party will not be applied in the construction or interpretation of this Agreement. Except as specifically otherwise provided in this Agreement, a reference to a Section, the Schedules or any Exhibit is a reference to a Section of this Agreement or the Schedules or Exhibits hereto, and the terms "hereof," "herein," and other like terms refer to this Agreement as a whole, including the Schedules and Exhibits to this Agreement. All references to "Dollars" and "$" refer to the currency of the United States. All references to "including" (and any correlative terms meaning "include") will mean including without limiting the generality of any description preceding such term.

**1.3** **_Sections._** The division of this Agreement into Sections and the insertion of headings are for convenience of reference only and will not affect the construction or interpretation of this Agreement.

**ARTICLE 2**
**PURCHASE AND SALE**

**2.1** **_Purchase and Sale of the Station Assets._**

(a)    Subject to the terms and conditions set forth in this Agreement, Seller hereby agrees to sell, transfer, convey, assign and deliver to Buyer at the Houston Closing, and Buyer agrees to purchase, in accordance with Sections 363, 364 and 365 of the Bankruptcy Code and pursuant to the Sale Approval Order, all of the Houston Station Assets, which include:

(i)    the Houston FCC Licenses;

(ii)    any and all furniture, fixtures and equipment used or held for use in the operation and control of the Houston Station at each of the studio locations and transmitter sites;

(iii)    all broadcast tower site leasehold estates and improvements thereon, including generators, antennas, main and back-up transmitters, antennas, studio transmitter links and transmission lines associated with the Houston Station, unless otherwise designated by Buyer;

(iv)    all capital expenditures, including related expense items, made to the Houston Station for the Digital Upgrade;

(v)    all books, files, and records specifically relating to the Houston Station Assets, including proprietary information, schematics, technical information and engineering data, maps, computer discs and tapes, programming information, the Houston Station's public inspection files and other records relating to the Houston FCC Licenses and other filings with the FCC;

(vi)    all trademarks, copyrights and other intellectual property, software, rights to use telephone numbers and domain names associated with the Houston Station Assets;

(vii)     drawings, blueprints, plans, and processes developed or acquired and used or intended for use in connection with the Houston Station Assets;

(viii)     all warranties associated with the Houston Station Assets, to the extent transferable;

(ix)     all right, title and interest in and to all call letters used with respect to the Houston Station, together with the goodwill associated therewith;

(x)     any leases, Contracts or legal rights of Seller associated with the Houston Station Assets, including those relating to carriage of the Houston Station on any cable, satellite or similar distribution system, as may be designated by Buyer for assumption and assignment to Buyer;

(xi)     any and all Nextel digital equipment and rights relating to operation of the equipment relating to operation of the Houston Station;

(xii)     all rights under those certain insurance policies set forth on Schedule 2.1(a)(xii); and

(xiii)     the assets shown on Schedule 2.1(a)(xiii).

(b)     Subject to the terms and conditions set forth in this Agreement, Seller hereby agrees to sell, transfer, convey, assign and deliver to Buyer at the Dallas Closing, and Buyer agrees to purchase, in accordance with Sections 363, 364 and 365 of the Bankruptcy Code and pursuant to the Sale Approval Order, all of the Dallas Station Assets, which include:

(i)     the Dallas FCC Licenses;

(ii)     any and all furniture, fixtures and equipment used or held for use in the operation and control of the Dallas Station at each of the studio locations and transmitter sites;

(iii)     all broadcast tower site leasehold estates and improvements thereon, including generators, antennas, main and back-up transmitters, antennas, studio transmitter links and transmission lines associated with the Dallas Station, unless otherwise designated by Buyer;

(iv)     all capital expenditures, including related expense items, made to the Dallas Station for the Digital Upgrade;

(v)     all books, files, and records specifically relating to the Dallas Station Assets, including proprietary information, schematics, technical information and engineering data, maps, computer discs and tapes, programming information, the Dallas Station's public inspection files and other records relating to the Dallas FCC Licenses and other filings with the FCC;

(vi)     all trademarks, copyrights and other intellectual property, software, rights to use telephone numbers and domain names associated with the Dallas Station Assets;

(vii)    drawings, blueprints, plans, and processes developed or acquired and used or intended for use in connection with the Dallas Station Assets;

(viii)   all warranties associated with the Dallas Station Assets, to the extent transferable;

(ix)     all right, title and interest in and to all call letters used with respect to the Dallas Station, together with the goodwill associated therewith;

(x)      any leases, Contracts or legal rights of Seller associated with the Dallas Station Assets, including those relating to carriage of the Dallas Station on any cable, satellite or similar distribution system, as may be designated by Buyer for assumption and assignment to Buyer;

(xi)     any and all Nextel digital equipment and rights relating to operation of the equipment relating to operation of the Dallas Station;

(xii)    all rights under those certain insurance policies set forth on Schedule 2.1(b)(xii); and

(xiii)   the assets shown on Schedule 2.1(b)(xiii).

**2.2    *Excluded Assets.*** Notwithstanding the foregoing, all of the assets of Seller set forth below are expressly not assumed by Buyer at either the Houston Closing or the Dallas Closing, and will be retained by Seller (the "Excluded Assets"):

(a)      any cash and cash equivalents on hand or on deposit in banks, marketable securities, or inter-company or inter-affiliate accounts;

(b)      any promissory notes, amounts due from employees, bonds, letters of credit, certificates of deposit, other similar items, and any cash surrender value in regard thereto;

(c)      any pension, profit-sharing, or employee benefit plans, including Seller's interest in any welfare plan, pension plan, or benefit arrangement;

(d)      any collective bargaining agreements;

(e)      any interest in and to any refunds of federal, state, or local franchise, income, or other taxes for periods prior to the later of (i) the Houston Closing Date or (ii) the Dallas Closing Date;

(f)      any accounts receivable of Seller and any refund or reimbursement claim of Seller;

(g)     assets owned personally by principals of Seller or their employees and other miscellaneous assets not used exclusively in the operation of the Stations, in each case which are not individually or in the aggregate material to the operation of broadcast television business and such assets are set forth on Schedule 2.2(g);

(h)     any contract, lease, or agreement other than those specifically designated by Buyer for assumption and assignment to Buyer;

(i)     all studio and office space leases used in the operation of the Stations; and

(j)     any cause of action held by Seller, including any cause of action under Chapter 5 of the Bankruptcy Code.

After the execution of this Agreement, (y) prior to the Houston Closing, Buyer may revise the Excluded Assets at its sole option and election such that any item previously included as a Houston Station Asset will not be purchased by Buyer and (z) prior to the Dallas Closing, Buyer may revise the Excluded Assets at its sole option and election such that any item previously included as a Dallas Station Asset will not be purchased by Buyer.

**2.3     *Assumption of Liabilities and Obligations.*** Notwithstanding anything to the contrary in this Agreement,

(a)     except for contracts, leases or agreements specifically designated by Buyer for assumption and assignment to Buyer as set forth on Schedule 2.3(a) (which Schedule may be updated by Buyer at its sole option and election at any time prior to the Houston Closing), Buyer will not assume any liabilities of Seller or its Affiliates or estate, or related to the business or operations of the Houston Station including any liabilities associated with any Taxes, nor shall Buyer be deemed to be a successor to the business or operations of the Houston Station or Seller or its estate for any purpose; and

(b)     except for contracts, leases or agreements specifically designated by Buyer for assumption and assignment to Buyer as set forth on Schedule 2.3(b) (which Schedule may be updated by Buyer at its sole option and election at any time prior to the Dallas Closing), Buyer will not assume any liabilities of Seller or its Affiliates or estate, or related to the business or operations of the Dallas Station including any liabilities associated with any Taxes, nor shall Buyer be deemed to be a successor to the business or operations of the Dallas Station or Seller or its estate for any purpose.

**2.4     *Purchase Price.***

(a)     Upon the later of (i) 15 days after the date of this Agreement and (ii) entry of the Bidding Procedures Order, Buyer will deposit by wire transfer of immediately available funds to the account of JPMorgan Chase Bank, N.A. (the "Escrow Agent") $1,000,000 (the "Buyer's Deposit") to be held by the Escrow Agent. The Buyer's Deposit will be held and disbursed by Escrow Agent in accordance with the terms of that certain escrow agreement, in the form of Exhibit B attached hereto (the "Deposit Escrow Agreement"), which Buyer, the LPF and the Escrow Agent will execute and deliver prior to or simultaneously with the deposit of the Buyer's Deposit. The Buyer's Deposit will be held and disbursed by the Escrow Agent in

accordance with the joint written instructions of Buyer and the LPF, and Buyer and the LPF hereby covenant and agree to provide such joint written instructions promptly in accordance with the terms hereof.  All earnings, interest and gains on the Buyer's Deposit will be for the benefit of Buyer and will not be part of the Buyer's Deposit for any purpose hereunder.

(b)    As consideration for the sale of the Houston Station Assets pursuant to the terms and subject to the conditions hereof, Buyer is paying Seller the sum of $9,000,000, as such sum may be adjusted pursuant to Section 2.5 (collectively, the "Houston Purchase Price") as follows:

(i)    $7,400,000, as such sum may be adjusted pursuant to Sections 2.5 and 2.7(a) (the "Houston Closing Payment"); and

(ii)    $1,000,000, which amount represents the release of the Buyer's Deposit from the Escrow Agent to Seller (and Buyer and Seller agree to provide joint written instructions to the Escrow Agent instructing the Escrow Agent to release the Buyer's Deposit to Seller at the Houston Closing); and

(iii)    $600,000 (the "Houston Section 6.9 Escrow Amount") of the Purchase Price will be deposited at the Houston Closing by wire transfer of immediately available funds to the account of the Escrow Agent, with such funds to be held in escrow for up to 30 days pursuant to the terms of an escrow agreement in the form of Exhibit C attached hereto (the "Section 6.9 Escrow Agreement") which Buyer, the LPF and the Escrow Agent will execute and deliver prior to the earlier to occur of the Houston Closing or the Dallas Closing.  Such amount (A) is to cover any and all cure payments that may be necessary as contemplated by Section 6.9 with respect to the Houston Station Assets, and (B) will be held and disbursed by the Escrow Agent in accordance with the joint written instructions of Buyer and the LPF, and Buyer and the LPF hereby covenant and agree to provide such joint written instructions promptly in accordance with the terms hereof.  All earnings, interest and gains on the Houston Section 6.9 Escrow Amount will be for the benefit of Buyer and will not be part of the Houston Section 6.9 Escrow Amount for any purpose hereunder.

(c)    As consideration for the sale of the Dallas Station Assets pursuant to the terms and subject to the conditions hereof, Buyer is paying Seller the sum of $5,825,000, as such sum may be adjusted pursuant to Section 2.5 (collectively, the "Dallas Purchase Price") as follows:

(i)    $5,425,000, as such sum may be adjusted pursuant to Sections 2.5 and 2.7(b) (the "Dallas Closing Payment"); and

(ii)    $400,000 (the "Dallas Section 6.9 Escrow Amount") of the Purchase Price will be deposited at the Dallas Closing by wire transfer of immediately available funds to the account of the Section 6.9 Escrow Agreement.  Such amount (A) is to cover any and all cure payments that may be necessary as contemplated by Section 6.9 with respect to the Dallas Station Assets, and (B) will be held and disbursed by the Escrow Agent in accordance with the joint written instructions of Buyer and the LPF, and Buyer and the LPF hereby covenant and agree to provide such joint written instructions promptly in accordance with the terms

hereof. All earnings, interest and gains on the Dallas Section 6.9 Escrow Amount will be for the benefit of Buyer and will not be part of the Dallas Section 6.9 Escrow Amount for any purpose hereunder.

**2.5**     ***Prorations and Closing Adjustment.***

(a)     All expenses arising from the Houston Station and the Dallas Station shall be allocated between Buyer and Seller in accordance with generally accepted accounting principles, consistently applied, and to effect the principle that (i) Seller shall be responsible for all expenses, costs and liabilities related to the period prior to the Houston Closing, and Buyer shall be responsible for all expenses, costs and obligations related to the period on and after the Houston Closing and arising out of events related to Buyer's ownership of the Houston Station Assets after the Houston Closing and (ii) Seller shall be responsible for all expenses, costs and liabilities related to the period prior to the Dallas Closing, and Buyer shall be responsible for all expenses, costs and obligations related to the period on and after the Dallas Closing and arising out of events related to Buyer's ownership of the Dallas Station Assets after the Dallas Closing. Notwithstanding anything else in this Section 2.5 to the contrary, there shall be no prorations or adjustment pursuant to this Section 2.5(a) for, and Seller shall remain solely liable with respect to, the Excluded Assets and all liabilities of Seller, its Affiliates or estate.

(b)     All adjustments with respect to (i) the Houston Station will be apportioned as of the date of Houston Closing and (ii) the Dallas Station will be apportioned as of the date of the Dallas Closing.   Notwithstanding the preceding sentence, if any adjustment cannot be accurately calculated as of the respective closing, then such adjustment of cost will be calculated as soon as reasonably possible thereafter and the Party owing the other Party a sum as a result of such calculation will promptly pay said sum to the other Party.

(c)     In the event Seller and Buyer fail to agree on any or all of the proposed adjustments within 30 days of either the Houston Closing or the Dallas Closing, the Parties may retain a nationally-recognized independent public accounting firm as may be mutually agreed upon by the Parties (the "Independent Auditor").  The Independent Auditor will be instructed to make the final determination with respect to the proposed adjustments within 30 days of the submission thereof.  The Parties will equally share the costs and expenses of the Independent Auditor, but each Party will bear its own legal and other expenses related thereto.

**2.6**     ***Allocation of Purchase Price.***  Buyer will prepare an allocation of the Houston Purchase Price among the Houston Station Assets (the "Houston Allocation"), no less than five days prior to the Houston Closing Date.  Buyer will prepare an allocation of the Dallas Purchase Price among the Dallas Station Assets (the "Dallas Allocation"), no less than five days prior to the Dallas Closing Date.  Each such allocation will be subject to Seller's consent, which consent will not be unreasonably withheld or delayed.  Seller and Buyer hereby agree that (a) the Houston Allocation will be final and conclusive with respect to the allocation of the Houston Purchase Price among the Houston Station Assets and (b) the Dallas Allocation will be final and conclusive with respect to the allocation of the Dallas Purchase Price among the Dallas Station Assets.  Seller and Buyer hereby further agree (i) to use the Houston Allocation and the Dallas Allocation for all accounting, financial reporting and Tax purposes, (ii) that any Tax Returns or other Tax information they may file or cause to be filed with any Governmental Authority or

fiscal intermediary will be prepared and filed in a manner consistent with the Houston Allocation and the Dallas Allocation, and (iii) in furtherance of the foregoing and to the extent required, they will each properly and timely file Form 8594 in accordance with Section 1060 of the Code.

**2.7    *Assignment and Assumption.***

(a)    On the Houston Closing Date, Seller will, pursuant to the Sale Approval Order, assume the contracts set forth on Schedule 2.3(a) and assign such contracts to Buyer and, subject to payment by Seller of any cure amounts due in connection with such assumption and assignment, Buyer will assume and agree to perform and discharge such contracts.  In the event that any cure cost under any contract which (i) has been agreed to by Seller or determined by the Bankruptcy Court and (ii) has not been paid by Seller prior to the Houston Closing Date, Buyer may pay such cure cost and reduce the Houston Purchase Price by the amount of such cure cost as provided in Section 2.4(b)(i).

(b)    On the Dallas Closing Date, Seller will, pursuant to the Sale Approval Order, assume the contracts set forth on Schedule 2.3(b) and assign such contracts to Buyer and, subject to payment by Seller of any cure amounts due in connection with such assumption and assignment, Buyer will assume and agree to perform and discharge such contracts.  In the event that any cure cost under any contract which (i) has been agreed to by Seller or determined by the Bankruptcy Court and (ii) has not been paid by Seller prior to the Dallas Closing Date, Buyer may pay such cure cost and reduce the Dallas Purchase Price by the amount of such cure cost as provided in Section 2.4(c)(i).

**2.8    *Transfer and Other Taxes.***  All recordation, transfer, documentary, excise, sales, value added, use, stamp, conveyance or other similar Taxes, duties or governmental charges, and all recording or filing fees or similar costs, imposed or levied by reason of, in connection with or attributable to this Agreement or the transactions contemplated hereby, which are not specifically exempt under law (collectively, "Transfer Taxes") and all income Taxes and other fees based upon gain realized by Seller as a result of the sale of the Houston Station Assets or the Dallas Station Assets will be borne by Seller.

## ARTICLE 3
## REPRESENTATIONS AND WARRANTIES OF SELLER

Seller hereby represents and warrants to Buyer as follows:

**3.1    *Authorization.***  Subject to entry by the Bankruptcy Court of the Sale Approval Order, Seller has all requisite power and authority to enter into this Agreement and to sell, assign, transfer and convey the Station Assets to Buyer under this Agreement.  Subject to approval of the Bankruptcy Court, this Agreement constitutes, and, when executed by Seller, any documents or instruments to be executed and delivered by Seller pursuant hereto will constitute, legal, valid and binding obligations of Seller, enforceable in accordance with their terms, except as may be limited by applicable bankruptcy, insolvency, moratorium, reorganization or other laws affecting the enforcement of creditors' rights generally or by general equitable principles.

**3.2    *Organization; Qualification.***  JBI is a corporation, duly formed, validly existing and in good standing under the laws of the State of Michigan and duly qualified to do business

and is in good standing as a foreign corporation in the State of Texas.  JBDI is a corporation, duly formed, validly existing and in good standing under the laws of the State of Texas and duly qualified to do business and is in good standing as a foreign corporation in the State of Texas. Seller has the requisite power and authority to own and operate the Station Assets and to carry on the business and operation of the Stations.

**3.3**    ***Absence of Conflicting Agreements; Consents.***   Except as set forth in <u>Schedule 3.3</u>, and subject to the receipt of the FCC Consent, the FCC Approval, and the Required Consents, and the approval and entry by the Bankruptcy Court of the Bidding Procedures Order and the Sale Approval Order (and any related order of the Bankruptcy Court relating solely to matters of procedure), the execution, delivery and performance by Seller of this Agreement (with or without the giving of notice, the lapse of time, or both), and the consummation by Seller of the transactions contemplated hereby (a) will not conflict with the organizational or governing documents of Seller; (b) will not conflict in any material respect with, result in a material breach of, or constitute a material default under any Applicable Law; and (c) will not result in the creation of any Encumbrance on the Station Assets other than Permitted Liens.  Seller is not a party to, nor is Seller bound by, any agreement or commitment that prohibits the execution and delivery by Seller of this Agreement or the consummation of the transactions by Seller contemplated hereby.  All Required Consents are listed in <u>Schedule 3.3</u>.

**3.4**    ***Licenses.***

(a)    <u>Schedule 3.4(a)</u> identifies and includes an accurate and complete list of all licenses, permits, authorizations, consents and approvals issued by the FCC that are required for or otherwise material to the operation of the Stations, and Seller has made available to Buyer true and complete copies of the FCC Licenses.  Each of the FCC Licenses is validly issued in the name of the authorized legal holder set forth on <u>Schedule 3.4(a)</u>.  The FCC Licenses are in full force and effect and have not been revoked, suspended, cancelled, rescinded or terminated and have not expired; and are not subject to any conditions except conditions applicable to broadcast licenses generally or as otherwise disclosed on the face of the license.  There is not pending or threatened any action by or before the FCC to revoke, suspend, cancel, rescind or materially and adversely modify any of the FCC Licenses.  To the LPF's Knowledge after due inquiry, there is not issued or outstanding any FCC order, judgment, decree, notice of violation, notice of apparent liability, order of forfeiture, investigation or other proceeding pending or threatened by or before the FCC, against the Stations or the FCC Licenses or against Seller with respect to the Stations or the FCC Licenses.  Except as set forth on <u>Schedule 3.4(a)</u>, the Stations are operating in compliance in all material respects with the FCC Licenses and the Communications Laws.

(b)    <u>Schedule 3.4(b)</u> sets forth a true, correct and complete list of any and all pending applications filed with the FCC with respect to the Stations, true, correct and complete copies of which have been delivered by Seller to Buyer.

(c)    Seller is currently providing digital television ("<u>DTV</u>") service on the Stations (i) pursuant to special temporary authority to operate KLDT-DT on channel 39 (FCC File. No. BDSTA-20081211AAL) and (ii) pursuant to special temporary authority to operate KNWS-DT on channel 47 (FCC File. No. BDSTA-20081211AAQ), each of which is included in the FCC Licenses.   Except as set forth on <u>Schedule 3.4(c)</u>, Seller intends to complete

construction of its post-transition DTV facilities for the Stations (the "Post-Transition Facilities") in accordance with construction permits validly issued by the FCC (BPCDT-20080619AEY and BPCDT-20080619AFI, respectively) (the "DTV Construction Permits"). The Stations are in compliance with the FCC's rules, policies and deadlines concerning construction of DTV facilities and each is broadcasting a DTV signal in accordance with such authorization in all material respects and is in compliance in all material respects with the FCC's build-out and operational requirements for digital television. The Stations' election of a channel on which to provide DTV service following the end of the DTV transition has been approved by the FCC. Seller has not leased, licensed, assigned, conveyed or otherwise encumbered the Stations' digital spectrum or any portion thereof or granted rights to any party to broadcast on Stations' digital spectrum of any portion thereof for the provision of any "ancillary or supplementary services" (as the term is defined by the Communications Act of 1934, as amended).

(d)     Seller made no election for must carry or retransmission consent for the three-year period beginning January 1, 2009 with any cable system located within each Station's designated market area ("DMA"), as defined by Nielsen. Seller has not taken any actions or failed to take any actions which would relinquish or impair its rights to carriage pursuant to the must carry default provisions of the FCC's rules in its DMAs.

(e)     Except as set forth on Schedule 3.4(e), all material reports and filings required to be filed with the FCC or Federal Aviation Administration ("FAA") by Seller with respect to the Stations have been filed. All FCC annual regulatory fees assessed with respect to the FCC Licenses and any other material licenses have been paid.

(f)     To the LPF's Knowledge, the antenna support structures, if any, used in connection with the operation of the Stations have been registered with the FCC, if registration is required, and comply with all other requirements of the FCC and the FAA.

(g)     The operation of the Stations by Seller does not cause or result in exposure of workers or the general public to levels of radio frequency radiation in excess of the applicable limits stated in 47 C.F.R. § 1.1310.

(h)     Except as set forth on Schedule 3.4(h), other than the filing by Seller of a Chapter 11 case pending in the Bankruptcy Court and issues arising therefrom, or as otherwise set forth herein, no fact or circumstance exists relating to the FCC qualifications of Seller that could reasonably be expected to prevent or delay the FCC from granting the Assignment Application or any other applications that may be filed in connection with this Agreement.

### 3.5     *Real Property; Leases.*

(a)     Schedule 3.5 contains an accurate and complete list of all leased real property (including broadcast tower sites) leased that is used or useful in connection with the Tower Facilities (the "Real Property"), and all leases (i) with Seller as tenant with respect to Real Property that is not owned by Seller, and all improvements located on such leasehold estates, and (ii) with Seller as landlord with respect to the Real Property (the "Leases"). Seller has good and marketable fee simple title or leasehold title to the Real Property, free and clear of all Encumbrances, except Permitted Liens.

(b)     There are (i) no actual, pending or, to the LPF's Knowledge, threatened impositions or assessments for public improvements with respect to any Real Property for which Seller would be liable or which would be an Encumbrance on the Real Property, other than Permitted Liens; (ii) no improvements constructed or, to the LPF's Knowledge, planned that would be paid for by means of public assessments upon any Real Property for which Seller would be liable or which would be an Encumbrance on the Real Property; and (iii) no completed, pending or, to the LPF's Knowledge, threatened or contemplated condemnation proceeding affecting any Real Property or any part thereof or of any sale or any disposition of any Real Property or any portion thereof in lieu of condemnation.

(c)     All of the Tower Facilities are located on the Real Property.

**3.6     *Tower Facilities.***

(a)     Schedule 3.6(a) lists all non-de minimis equipment located at, or otherwise used and useful in the operation of each of the transmitter site facilities of the Houston Station and the Dallas Station, including all antennas, transmitters, transmission lines, auxiliary generators, ancillary equipment, racks, spare parts, and maintenance tools used for all full-service, Class A and low-power analog stations, and auxiliary broadcast (including both transmit and received ends) stations (the "Tower Facilities"). Seller owns and has good title to the Tower Facilities and none of the Tower Facilities is subject to any conditional sale or other title retention agreement or any Encumbrances, except for Permitted Liens. All items of the Tower Facilities are in operating condition (ordinary wear and tear excepted), except as otherwise set forth in Schedule 3.6(a).

(b)     Schedule 3.6(b) lists equipment and other items which are specifically not included as part of the Tower Facilities.

**3.7     *Contracts*.** Schedule 3.7 lists all material Contracts used or useful in the operation of the Stations and Seller has delivered to Buyer true, correct and complete copies of all such material Contracts.

**3.8     *Sufficiency of Assets*.** Except for the Excluded Assets, the Station Assets (a) constitute all of the assets, tangible and intangible, of any nature whatsoever, used or useful to operate Seller's business as it is currently being operated, and (b) include all of the operating assets of Seller.

**3.9     *Insurance*.** Schedule 3.9 is a true, correct and complete list of all insurance policies with respect to the Stations. To the LPF's Knowledge, all policies of insurance listed in Schedule 3.9 are in full force and effect and Seller is not in default of any provision thereof.

**3.10     *Claims and Legal Actions*.** Except for Seller's filing of the Chapter 11 case pending in the Bankruptcy Court and Claims arising therein and except as set forth on Schedule 3.10, there is no claim, legal action, counterclaim, suit, arbitration, or other legal, administrative or Tax proceeding, nor any order, decree or judgment, in progress or pending, or to the LPF's Knowledge, threatened against the Station Assets.

**3.11** ***Compliance with Laws.*** Seller is in compliance with the FCC Licenses and Seller has complied with all Applicable Law with respect to the Stations.

**3.12** ***Good Title Conveyed.*** Subject to the receipt of the FCC Approval and FCC Consent and the Required Consents, and the approval of the Sale Motion, Seller has complete and unrestricted power and the unqualified right to sell, transfer, assign, convey and deliver to Buyer, and upon consummation of the transactions contemplated by this Agreement, Buyer will acquire, good and marketable title to, the Station Assets, in each case free and clear of all Encumbrances other than Permitted Liens. Except as noted on Schedule 3.12, Seller is in sole and exclusive possession, and is the sole and exclusive owner of, the Station Assets, free and clear of all Encumbrances.

**3.13** ***No Broker.*** Other than the LPF and any other professionals retained with the approval of the Bankruptcy Court in Seller's pending Chapter 11 case, neither Seller nor any other Person acting on Seller's behalf has incurred any liability for any finders' or brokers' fees or commissions in connection with the transactions contemplated by this Agreement.

**3.14** ***No Restrictions.*** Other than as listed and described in Schedule 3.14, there are no contracts, agreements, arrangements or other documents to which Seller is a party that materially prohibit or restrict the Stations' ability to compete in any business anywhere in the Dallas, Texas or Katy, Texas areas.

**3.15** ***Certain Limitations on Representations and Warranties.*** Except as expressly set forth in this Agreement or in any documents, agreements or certificates delivered in connection herewith, Seller makes no representation or warranty, express or implied, as to any matter whatsoever relating to the Station Assets.

## ARTICLE 4
## REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer hereby represents and warrants to Seller as follows:

**4.1** ***Organization, Standing and Authority.*** Buyer is a Delaware limited partnership duly organized, validly existing and in good standing under the laws of the State of Delaware. Buyer is duly qualified to conduct business in each jurisdiction in which such qualification is necessary for Buyer to own the Station Assets and operate the Stations and conduct the business of the Stations. Buyer has the requisite power and authority to (a) execute, deliver and perform this Agreement and consummate the transactions contemplated hereby, (b) own the Station Assets, subject to obtaining the FCC Consent, and (c) hold the FCC Licenses, subject to obtaining the FCC Consent.

**4.2** ***Authorization and Binding Obligation.*** The execution, delivery and performance of this Agreement and the consummation of the transactions contemplated hereby by Buyer have been duly and validly authorized by all necessary limited partnership action on the part of Buyer. This Agreement has been duly executed and delivered by Buyer and constitutes a legal, valid and binding obligation of Buyer, enforceable against Buyer in accordance with its terms, except as the enforceability of this Agreement may be affected by bankruptcy, insolvency or similar laws

affecting creditors' rights generally and by judicial discretion in the enforcement of equitable remedies.

**4.3     *Absence of Conflicting Agreements.*** Subject to the receipt of the FCC Consent, the FCC Approval, the necessary or desirable amendments, consents, authorizations or waivers with or from the lenders or equity holders of Buyer and its Affiliates, and the approvals of the Sale Motion, the execution, delivery and performance by Buyer of this Agreement and the documents contemplated hereby (with or without the giving of notice, the lapse of time or both): (a) do not require the consent of any other Person; (b) will not conflict with the certificate of limited partnership or the limited partnership agreement of Buyer; and (c) will not conflict in any material respect with, result in a material breach of or constitute a material default under any Applicable Law or any material contract or agreement to which Buyer is a party.

**4.4     *Funds.*** From and after acceptance by Buyer of the Financing Commitment and subject to the terms and conditions thereof, Buyer will have available (a) on the Houston Closing Date, sufficient funds to satisfy its obligations to purchase the Houston Stations Assets and (b) on the Dallas Closing Date, sufficient funds to satisfy its obligations to purchase the Dallas Station Assets.

**4.5     *Qualification as a Broadcast Licensee.*** Buyer knows of no fact that would, as of the Houston Closing Date or the Dallas Closing Date, disqualify Buyer as owner, operator and licensee of the Stations.

**4.6     *No Broker.*** Neither Buyer nor any other Person acting on behalf of Buyer has incurred any liability for any finders' or brokers' fees or commissions in connection with this Agreement or the transactions contemplated hereby.

## ARTICLE 5
## OPERATION OF THE STATIONS PRIOR TO CLOSING

**5.1     *General.***

(a)      During the period commencing on the date hereof and ending on the earlier of the Houston Closing Date or the Houston Termination Date, Seller will operate and control the Houston Stations and the Houston FCC Licenses in all material respects in the ordinary course of business and refrain from any extraordinary transactions (except where such conduct would conflict with the other express covenants set forth in this Section 5.1 or with Seller's other express obligations under this Agreement, including Seller's obligations pursuant to Section 6.12) in all cases in accordance with the covenants contained in this Article 5. During the period commencing on the date hereof and ending on the earlier of the Dallas Closing Date or the Dallas Termination Date, Seller will operate and control the Dallas Stations and the Dallas FCC Licenses in all material respects in the ordinary course of business and refrain from any extraordinary transactions (except where such conduct would conflict with the other express covenants set forth in this Section 5.1 or with Seller's other express obligations under this Agreement, including Seller's obligations pursuant to Section 6.12) in all cases in accordance with the covenants contained in this Article 5.

(b)      Seller will maintain and repair the Station Assets, maintain inventory of supplies, parts and other materials and keep books of account, records and files, in each case in the ordinary course of business consistent with past practice.

(c)      Seller will (i) continue to operate the Stations and maintain actual (*de facto*) and legal (*de jure*) control of the FCC Licenses in accordance with the terms thereof and in compliance with all Applicable Law, (ii) execute and file promptly all necessary applications for renewal of the FCC Licenses and timely file with the FCC all required reports, including any applications, reports, and other documents required by the FCC in connection with the conversion to digital television; (iii) take all other steps necessary to complete each Station's Post-Transition Facilities in accordance with the schedule established by the FCC; (iv), pay all required annual FCC regulatory fees for the operation of the Stations; and (v) deliver to Buyer, within five Business Days after filing, copies of any reports, applications or responses to the FCC related to the Stations which are filed prior to the later to occur of the Houston Closing Date or the Dallas Closing Date.

(d)      Seller shall use its commercially reasonable best efforts to maintain existing carriage of each Station's signal by MVPDs located in the Station's DMA and by DirecTV and DISH Network, and to secure carriage of each Station's signal by additional MVPDs where feasible. Seller shall negotiate new or extended retransmission consent agreements in the ordinary course of business. Between the date hereof and the Houston Closing Date, Seller (y) shall continue to negotiate new or extended retransmission consent agreements for the Houston Station in the ordinary course of business; and (z) will promptly provide Buyer with copies of all correspondence between the Houston Station and/or Seller and any MVPD concerning the Houston Station's signal carriage. Between the date hereof and the Dallas Closing Date, Seller (i) shall continue to negotiate new or extended retransmission consent agreements for the Dallas Station in the ordinary course of business; and (ii) will promptly provide Buyer with copies of all correspondence between the Dallas Station and/or Seller and any MVPD concerning the Dallas Station's signal carriage.

(e)      Prior to the Houston Closing Date, except as otherwise expressly permitted by this Article 5, Seller will not, without the prior written consent of Buyer: (x) incur any receivables relating to the Houston Station other than in the ordinary course of business of the Houston Station consistent with past practice, including in respect of the amount and nature of such receivables; (y) apply to the FCC for, or seek to amend, any construction permit or other pending application that would restrict the Houston Station's operation or make any material change to the Houston Station Assets that is not in the ordinary course of business consistent with past practice, except when such change is necessary to maintain or continue the transmission of the Houston Station's signal at substantially the same power and strength and interference level as transmitted on the date hereof; or (z) assign, lease or otherwise transfer or dispose of any of the Houston Station Assets, except in connection with the acquisition of replacement property of equivalent kind and use. Prior to the Dallas Closing Date, except as otherwise expressly permitted by this Article 5, Seller will not, without the prior written consent of Buyer: (i) incur any receivables relating to the Dallas Station other than in the ordinary course of business of the Dallas Station consistent with past practice, including in respect of the amount and nature of such receivables; (ii) apply to the FCC for, or seek to amend, any construction permit or other pending application that would restrict the Dallas Station's operation or make any

material change to the Dallas Station Assets that is not in the ordinary course of business consistent with past practice, except when such change is necessary to maintain or continue the transmission of the Dallas Station's signal at substantially the same power and strength and interference level as transmitted on the date hereof; or (iii) assign, lease or otherwise transfer or dispose of any of the Dallas Station Assets, except in connection with the acquisition of replacement property of equivalent kind and use.

**5.2    *Insurance.***  Seller will (a) maintain the existing insurance policies on (i) the Houston Station Assets or other policies providing substantially similar coverages until the Houston Closing and (ii) the Dallas Station Assets or other policies providing substantially similar coverages until the Dallas Closing, (b) name Buyer as an additional insured on such policies, and (c) provide a true and complete copy of certificate(s) of insurance for such policies to Buyer.

**5.3    *Financial Information.***  Seller will furnish Buyer, within 30 days after the end of each month ending between the date of this Agreement and the Houston Closing, an unaudited statement of income and expense for the Houston Station and such other financial and tax information relating to the Houston Station as Buyer may reasonably request. Seller will furnish Buyer, within 30 days after the end of each month ending between the date of this Agreement and the Dallas Closing, an unaudited statement of income and expense for the Dallas Station and such other financial and tax information relating to the Dallas Station as Buyer may reasonably request.

**5.4    *Notice of Certain Matters.***  Seller will give prompt written notice to Buyer and Buyer will give prompt written notice to Seller of any failure of such Party giving notice to comply with or satisfy any representation, warranty, covenant, condition or agreement to be complied with or satisfied by it hereunder

**5.5    *Schedules.***

(a)    The Schedules to this Agreement must be delivered by Seller to Buyer within five Business Days after the date of this Agreement, which Schedules must be in form and substance acceptable to Buyer in Buyer's sole and absolute discretion.

(b)    Seller may (i) at any time prior to the Houston Closing, deliver written notice to Buyer in the event of any updates to the Schedules with respect to the Houston Station or (ii) at any time prior to the Dallas Closing, deliver written notice to Buyer in the event of any updates to the Schedules with respect to the Dallas Station, but, in the case of each of clauses (i) and (ii), only with respect to events arising after the date of this Agreement. No such updates will be deemed to amend the Schedules or this Agreement for purposes of determining whether the conditions set forth in <u>Section 7.1(a)</u> or <u>Section 7.1(b)</u> have been satisfied with respect to a breach of the representation, warranty or convent to which such revisions or updates relate unless Seller obtains the prior written consent of Buyer, which consent may be withheld in Buyer's sole and absolute discretion.

**5.6    *Notice of Proceedings.***  Seller and Buyer will promptly notify the other in writing upon becoming aware of any order or decree or any complaint praying for an order or decree

restraining or enjoining the consummation of this Agreement or any of the transactions contemplated hereunder, or upon receiving any notice from any Governmental Authority of its intention to institute an investigation into, or institute a suit or proceeding to restrain or enjoin, the consummation of this Agreement or any of the transactions contemplated hereby. Seller and Buyer will each use commercially reasonable efforts to contest, defend and resolve any such suit, proceeding or injunction so as to permit the consummation of the transactions contemplated hereby. Seller will notify Buyer promptly of any material action filed or threatened against the Stations or any of the Station Assets.

      **5.7**    *WARN Act.*  Seller will determine whether any notification may be required under the WARN Act, as a result of the transactions contemplated under this Agreement and, if such notices are required, Seller will notify Buyer of such requirement and provide such notice in accordance with all Applicable Laws.

**ARTICLE 6**
**SPECIAL COVENANTS AND AGREEMENTS**

      **6.1**    *FCC Matters.*

      (a)    The assignment of the Houston FCC Licenses and the Dallas FCC Licenses from Seller to Buyer as contemplated by this Agreement is subject to the prior consent and approval of the FCC.

      (b)    Within five Business Days after entry of the Sale Approval Order, Seller and Buyer will jointly prepare and file with the FCC (i) the Assignment Application on FCC Form 314 requesting the FCC's consent to the assignment of the Houston FCC Licenses from Seller to Buyer (the "Houston Assignment Application") and the consummation of the transactions contemplated thereby and (ii) the Assignment Application on FCC Form 314 requesting the FCC's consent to the assignment of the Dallas FCC Licenses from Seller to Buyer (the "Dallas Assignment Application" and together with the Houston Assignment Application, the "Assignment Application"). The FCC filing fees associated with the Assignment Application will be paid equally by Buyer, on the one hand, and Seller, on the other hand. The Parties will thereafter prosecute the Assignment Application with commercially reasonable diligence and otherwise use their commercially reasonable efforts to obtain the FCC Consent as expeditiously as practicable. Each Party will promptly provide to the other Party a copy of any pleading, order or other document served on it relating to the Assignment Application. The Parties shall use their commercially reasonable efforts to undertake all actions and file such materials as shall be reasonably necessary or required to obtain any necessary waivers or other authority in connection with the Assignment Application. Buyer and Seller will cooperate with each other in deciding whether to oppose and in opposing any petitions to deny or other objections filed with respect to the Assignment Application and any requests for reconsideration or review of any FCC Consent.

      (c)    Upon completion of construction of the Post-Transition Facilities consistent with the DTV Construction Permits, Seller will immediately file all necessary applications with the FCC to license such facilities (the "FCC Approval").

(d)     Each Party agrees to comply with any condition imposed on it by the FCC Consent, except that no Party will be required to comply with a condition if compliance with the condition would have a material adverse effect upon such Party.

(e)     If either the Houston Closing and/or the Dallas Closing has not occurred for any reason within the original effective period of the FCC Consent, and none of the Parties have terminated their obligations under this Agreement pursuant to Article 9 with respect to the Houston Closing and the Dallas Closing, the Parties will jointly request an extension of the effective period of such FCC Consent.  No extension of the effective period of any FCC Consent will limit the exercise by any Party of its right to terminate this Agreement under Article 9.

**6.2**     *Confidentiality.*

(a)     Other than with respect to the Sale Motion in Seller's Chapter 11 case pending in the Bankruptcy Court, none of the Parties will use or disclose to any other Person (except as may be necessary for the consummation of the transactions contemplated hereby, or as required by Applicable Law, and then only with prior notice to the other Party) this Agreement or any information received from the other Party or their representatives in the course of investigating, negotiating and performing the transactions contemplated by this Agreement; *provided, however,* that each Party may disclose such information to such Party's officers, directors, employees, lenders, advisors, attorneys, accountants and financial advisors in connection with the consummation of the transactions contemplated by this Agreement who are informed by such Party of the confidential nature of such information.  Nothing will be deemed to be confidential information that: (i) is already in such Party's possession, provided that such information is not known by such Party to be subject to another confidentiality agreement with or other obligation of secrecy to the other Party or another third party, (ii) becomes generally available to the public other than as a result of a disclosure by such Party or such Party's officers, directors, employees, lenders, advisors, attorneys or accountants in violation of this Section 6.2(a), (iii) becomes available to such Party on a nonconfidential basis from a source other than the other Party or its advisors, provided that such source is not known by such Party to be bound by a confidentiality agreement with, or other obligation of secrecy to, the other Party, or (iv) is developed independently by any Party without resort to the confidential information of the other Party.   In the event this Agreement is terminated and the transactions contemplated hereby abandoned, each Party will return to the other Party all information, including all documents and other written confidential material, obtained by such Party from the other Party in connection with the transactions contemplated by this Agreement.

(b)     Other than the Sale Motion, including the necessary marketing process needed to solicit higher and better offers concerning the sale of the Station Assets in Seller's Chapter 11 case pending in the Bankruptcy Court, no Party will publish any press release or make any other public announcement concerning this Agreement or the transactions contemplated hereby without the prior written consent of the other Party, which will not be withheld unreasonably; *provided, however,* that nothing contained in this Agreement will prevent any Party hereto from making any filings with Governmental Authorities, including in respect of filings or public announcements in accordance with federal securities laws and the Communications Laws, that, in the judgment of the disclosing Party, may be required or advisable in connection with the execution and delivery of this Agreement or the consummation

of the transactions contemplated hereby.  The Parties acknowledge that this Agreement will be filed with the Bankruptcy Court and that the transaction is subject to higher and better offers in accordance with Sections 6.7 and 6.11.

**6.3**    *Cooperation.*  In addition to the filing of the Sale Motion in accordance with Section 6.10, Buyer and Seller will cooperate fully with each other and their respective counsel and accountants in connection with any actions required to be taken as part of their respective obligations under this Agreement, and Buyer and Seller will execute such other documents as may be necessary or desirable to implement and consummate this Agreement, and otherwise use their commercially reasonable efforts to consummate the transactions contemplated hereby and to fulfill their obligations under this Agreement.  The Parties will cooperate to obtain any FCC approval necessary to complete construction and licensing of the Post-Transition Facilities consistent with the Communications Laws.

**6.4**    *Control of the Stations.*  Prior to the Houston Closing Date, Buyer will not, directly or indirectly, assume or attempt to assume either legal (*de jure*) or actual (*de facto*) of the Houston FCC Licenses, the Houston Station or the operation thereof.  Prior to the Dallas Closing Date, Buyer will not, directly or indirectly, assume or attempt to assume either legal (*de jure*) or actual (*de facto*) of the Dallas FCC Licenses, the Dallas Station or the operation thereof.

**6.5**    *Access to Information.*

(a)    From the date hereof until the earlier to occur of the Houston Closing or Houston Termination Date, Seller will use good faith efforts to provide Buyer and its legal and financial advisors, accountants and funding sources reasonable access to (i) all pertinent financial, legal and operational documents and information pertaining to the Houston Station Assets and the business or operations of the Houston Station, (ii) all of Seller's property and (iii) all information related to the Digital Upgrade of the Houston Station.  Prior to the Houston Closing and for two years after the Houston Closing, Seller will provide to Buyer copies of such accounting information and reports relating to the Houston Station that are reasonably available to Seller in the ordinary course of business as Buyer deems reasonably necessary to enable Buyer to satisfy disclosure requirements of lenders, investors, accountants, or other reasonable business purposes.

(b)    From the date hereof until the earlier to occur of the Dallas Closing or the Dallas Termination Date, Seller will use good faith efforts to provide Buyer and its legal and financial advisors, accountants and funding sources reasonable access to (i) all pertinent financial, legal and operational documents and information pertaining to the Dallas Station Assets and the business or operations of the Dallas Station, (ii) all of Seller's property and (iii) all information related to the Digital Upgrade of the Dallas Station.  Prior to the Dallas Closing and for two years after the Dallas Closing, Seller will provide to Buyer copies of such accounting information and reports relating to the Dallas Station that are reasonably available to Seller in the ordinary course of business as Buyer deems reasonably necessary to enable Buyer to satisfy disclosure requirements of lenders, investors, accountants, or other reasonable business purposes.

(c)    Seller will make its outside independent accountants available to Buyer and its accountants, advisors and funding sources.

65317456.8 / 10614547                                      - 18 -

**6.6** *Further Assurances.* From and after the Houston Closing, each Party will from time to time, at the request of any other Party and without further cost or expense to such requesting Party, execute and deliver such other instruments of conveyance and transfer and take such other actions as such other Party may reasonably request in order more effectively to carry out this Agreement and the other agreements specified in this Agreement and to vest in Buyer good title to the Houston Station Assets, in all cases free and clear of all Encumbrances, except Permitted Liens. From and after the Dallas Closing, each Party will from time to time, at the request of any other Party and without further cost or expense to such requesting Party, execute and deliver such other instruments of conveyance and transfer and take such other actions as such other Party may reasonably request in order more effectively to carry out this Agreement and the other agreements specified in this Agreement and to vest in Buyer good title to the Dallas Station Assets, in all cases free and clear of all Encumbrances, except Permitted Liens.

**6.7** *Limit on Solicitation.*

(a)     Except as set forth in Section 6.7(b), Seller will not (and will use its commercially reasonable efforts to ensure that none of its officers, directors, agents, advisors or Affiliates will), directly or indirectly, (x) solicit, initiate, encourage or accept any inquiries, proposals or offers from, negotiate with, execute agreements with, or provide nonpublic information to, any third party, other than Buyer, with respect to an Acquisition Proposal, (y) enter into any agreement providing for or relating to any Acquisition Proposal, or (z) make or authorize any statement, recommendation or solicitation in support of any Acquisition Proposal, (provided that Seller may sell any Excluded Asset) until the first to occur of (i) the entry by the Bankruptcy Court of the Bidding Procedures Order, and (ii) the Termination Date.

(b)     The commitments and agreements contained in Section 6.7(a) will expire and be of no further force and effect upon the entry of the Bidding Procedures Order by the Bankruptcy Court. Thereafter, the Bidding Procedures Order will govern all actions and proceedings relating to the consideration by Seller (and its officers, directors, agents, advisors and Affiliates) of any Acquisition Proposal.

**6.8** *Third Party Consents.* Seller will use commercially reasonable efforts to obtain the Required Consents in a form and substance reasonably acceptable to Buyer. In addition, Seller will use commercially reasonable efforts to obtain from the lessors under all of the Leases, estoppels and consents in form and substance reasonably acceptable to Buyer. If a Required Consent is not obtained, or if an attempted assignment of the related Contracts would be ineffective, Seller will provide to Buyer the benefits of such Contracts and, to the extent Buyer is provided with the benefits of such Contracts, Buyer will perform or discharge on behalf of Seller the obligations and liabilities under such Contracts in accordance with the provisions thereof. Notwithstanding anything to the contrary, Seller will assume and assign the Contracts pursuant to Section 365 of the Bankruptcy Code, and following payment of any Cure Costs in connection therewith, Seller will have no further liability (a) under the Contracts associated with the Dallas Station after the Dallas Closing and (b) under the Contracts associated with the Houston Station after the Houston Closing.

**6.9** *Executory Contracts and Unexpired Leases.* Schedule 6.9 sets forth the executory Contracts and unexpired leases of Seller that are included in the Station Assets, which

schedule may be updated by Buyer in its sole discretion prior to the Auction without the consent of Seller or the LPF.  Upon a timely filed motion, Seller will assume and assign to Buyer (a) the executory Contracts associated with the Houston Station and unexpired leases set forth on Schedule 6.9(a) pursuant to Section 365 of the Bankruptcy Code (subject to the statutory cures required by the Bankruptcy Code, the cost of which will be paid by Seller or deducted from the Houston Purchase Price pursuant to Section 2.4(b)) and (b) the executory Contracts associated with the Dallas Station and unexpired leases set forth on Schedule 6.9(b) pursuant to Section 365 of the Bankruptcy Code (subject to the statutory cures required by the Bankruptcy Code, the cost of which will be paid by Seller or deducted from the Dallas Purchase Price pursuant to Section 2.4(c)).  Seller will cooperate with Buyer in promptly obtaining orders of the Bankruptcy Court approving such assumptions and assignments.  Buyer agrees that it will have the burden to establish adequate assurance of future performance relative to the assumed Contract or lease counter-parties.

      **6.10** *Bankruptcy Motions.*

      (a)    On or before October 19, 2009 (no later than 10 Business Days after the date of execution of this Agreement), Seller, at the LPF's direction, will file with the Bankruptcy Court appropriate pleadings in form and substance reasonably acceptable to Buyer (the "Sale Motion") seeking authority for approval, on an expedited basis, of (i) the Bidding Procedures Order, (ii) the Sale Approval Order, and (iii) Seller's authority, at the LPF's direction, to assume and assign certain executory contracts and unexpired leases to Buyer as set forth in this Agreement.

      (b)    Buyer's bid is made expressly contingent upon the entry of the Sale Approval Order acceptable to Buyer and the LPF.  The Sale Approval Order will be entered no later than 45 days after the Bidding Procedures Order is filed with the Bankruptcy Court.

      (c)    The LPF, Seller, at the LPF's direction if necessary, and Buyer will each use their commercially reasonable efforts, and will cooperate, assist and consult with each other, and take all actions reasonably necessary, in order to secure the Bankruptcy Court's approval of the Bidding Procedures Order, the Sale Approval Order, and any other order that could reasonably be anticipated to effect the transactions contemplated by this Agreement.  None of the LPF, Seller or Buyer will file any pleading or take any position that is inconsistent with obtaining the Bankruptcy Court's approval of the Bidding Procedures Order or the Sale Approval Order.  The LPF, or Seller at the LPF's direction, will provide notice to Buyer of all the pleadings filed by Seller in their Chapter 11 case pending in the Bankruptcy Court pertaining to this Agreement.

      **6.11** *Bidding Matters; Auction.*  Seller will provide all Qualified Bidders with a summary of all other bid packages.  Buyer will be deemed for all purposes to be a Qualified Bidder.  Buyer will be entitled (but not required) to submit a topping bid over the highest Qualified Bidder's last bid, provided that Buyer's topping bid may exclude the amount of the Break-Up Fee.  The date of the auction for the Station Assets (the "Auction") will be within 35 days of the filing date of the Sale Motion.  Only Qualified Bidders may bid for the Station Assets. The Bankruptcy Court hearing approving the highest and best offer must be held within five Business Days of the Auction.  Notwithstanding the foregoing, such 35-day period to hold

the Auction may be extended to no more than 60 days in the event that upon the entry of the Bidding Procedures Order, Seller has obtained alternative financing for the Digital Upgrade on terms and conditions approved by the Bankruptcy Court.

**6.12**    ***Digital Upgrade Capital Expenditures.***    Upon the entry of the Bidding Procedures Order, Seller will commence taking all steps necessary to make the capital expenditures for completion of construction of the Post-Transition Facilities consistent with the DTV Construction Permits (the "Digital Upgrade"). The Digital Upgrade will be in accordance with the budget and schedule as set forth in Exhibit F hereto (the "Conversion Plan"); provided that Buyer and Seller may, if agreed to in writing signed by both Buyer and Seller, amend or modify (a) the Conversion Plan with respect to the Houston Station at any time prior to the Houston Closing and (b) the Conversion Plan with respect to the Dallas Station at any time prior to the Dallas Closing. Seller will provide Buyer with specifications, orders, weekly updates of progress and status and such other information regarding the Digital Upgrade as Buyer may reasonably request from time to time.

**6.13**    ***Financing.***    Within 14 days after the date of this Agreement, Buyer shall provide the LPF evidence (the "Financing Commitment") of Buyer's financing for the purchase of the Station Assets (the "Financing"), which Financing shall be subject to the terms and conditions set forth in the Financing Commitment.

**6.14**    ***Supplemental Disclosure; Knowledge; Investigation.***

(a)    Seller and the LPF will promptly notify Buyer in writing with respect to any fact, event, condition or circumstance that arises or is discovered after the date hereof that causes any of the representations or warranties of the Seller in Article 3 to be inaccurate or incomplete in any material respect, to the LPF's Knowledge. Prior to the later to occur of the Houston Closing or the Dallas Closing, Seller will from time to time make a reasonable inquiry of the individuals having primary responsibility of the matters that are the subject of the representations and warranties of Seller set forth herein.

(b)    Notwithstanding anything herein to the contrary, no investigation, notice to or knowledge acquired (or capable of being acquired) by Buyer, its counsel or its other representatives at any time, whether before or after the date of this Agreement, with respect to the untruth, inaccuracy, incorrectness or breach of or compliance or noncompliance with any representation, warranty, covenant or agreement of any Seller or the LPF, will affect (i) the closing conditions to Buyer's obligations to consummate the Houston Closing and the Dallas Closing, set forth in Sections 7.1(a)(i) and (ii) and Sections 7.1(b)(i) and (ii), respectively; (ii) the requirement that Seller deliver the certificates set forth in Section 8.3(a)(ii) with respect to the Houston Closing and Section 8.3(b)(ii) with respect to the Dallas Closing; or (iii) Buyer's right to terminate this Agreement with respect to the Houston Closing, the Dallas Closing, or both pursuant to Section 9.1.

## ARTICLE 7
## CONDITIONS TO OBLIGATIONS OF BUYER AND SELLER

### 7.1    *Conditions to Obligations of Buyer.*

(a)    All obligations of Buyer at the Houston Closing are subject at Buyer's sole option to the satisfaction or waiver on or prior to the Houston Closing Date of each of the following conditions:

(i)    All representations and warranties of Seller contained in this Agreement, if specifically qualified by materiality, will be true and accurate in all respects, and, if not so qualified, will be true and accurate in all material respects, at and as of the Houston Closing Date as though made at and as of that time.

(ii)    Seller and the LPF will have performed and complied in all material respects with all covenants, agreements and conditions required by this Agreement to be performed or complied with by them prior to or on the Houston Closing Date.

(iii)    There will not have been any modification of any Houston FCC License that could have a Material Adverse Effect. Excluding any proceeding relating to the FCC Consent or disclosed on Schedule 3.3, no proceeding will be pending, the effect of which could be to revoke, cancel, fail to renew, suspend or modify adversely any Houston FCC License.

(iv)    Seller will have delivered the items required to be delivered pursuant to Section 8.3(a).

(v)    No injunction, order, judgment or decree of any nature of any Governmental Authority of competent jurisdiction will be in effect that restrains or prohibits the consummation of the transactions contemplated by this Agreement.

(vi)    There will not have been a Material Adverse Effect with respect to the Houston Station or the Houston Station Assets.

(vii)    The FCC Consent with respect to the Houston Assignment Application will have become a Final Order and shall contain no provisions materially adverse to Buyer or any of its Affiliates or the Houston Station.

(viii)    The Digital Upgrade of the Houston Station will have been completed consistent with the Communications Laws and in accordance with the Conversion Plan, or otherwise satisfactory to Buyer, and the Houston Station will be on the air providing DTV service, or the expiration dates for the DTV Construction Permits for the Houston Station shall have been extended by the FCC, and such extensions will be in full force and effect.

(ix)    The Bankruptcy Court will have entered the Bidding Procedures Order and Sale Approval Order, and each such order will be in full force and effect and will not have been stayed, modified, reversed or amended.

(x)     Buyer shall have delivered to Seller a written waiver of Buyer's intention to seek approval of a sale and purchase of the Station Assets pursuant to the terms of a plan of reorganization confirmed by order of the Bankruptcy Court.

(xi)     Buyer will have obtained the Financing.

(b)     All obligations of Buyer at the Dallas Closing are subject at Buyer's sole option to the satisfaction or waiver on or prior to the Dallas Closing Date of each of the following conditions:

(i)     All representations and warranties of Seller contained in this Agreement, if specifically qualified by materiality, will be true and accurate in all respects, and, if not so qualified, will be true and accurate in all material respects, at and as of the Dallas Closing Date as though made at and as of that time.

(ii)     Seller and the LPF will have performed and complied in all material respects with all covenants, agreements and conditions required by this Agreement to be performed or complied with by them prior to or on the Dallas Closing Date.

(iii)     There will not have been any modification of any Dallas FCC License that could have a Material Adverse Effect.  Excluding any proceeding relating to the FCC Consent or disclosed on Schedule 3.3, no proceeding will be pending, the effect of which could be to revoke, cancel, fail to renew, suspend or modify adversely any Dallas FCC License.

(iv)     Seller will have delivered the items required to be delivered pursuant to Section 8.3(b).

(v)     No injunction, order, judgment or decree of any nature of any Governmental Authority of competent jurisdiction will be in effect that restrains or prohibits the consummation of the transactions contemplated by this Agreement.

(vi)     There will not have been a Material Adverse Effect with respect to the Dallas Station or the Dallas Station Assets.

(vii)     The FCC Consent with respect to the Dallas Assignment Application will have become a Final Order and shall contain no provisions materially adverse to Buyer or any of its Affiliates or the Dallas Station.

(viii)     The Digital Upgrade of the Dallas Station will have been completed consistent with the Communications Laws and in accordance with the Conversion Plan, or otherwise satisfactory to Buyer, and the Dallas Station will be on the air providing DTV service, or the expiration dates for the DTV Construction Permits for the Dallas Station shall have been extended by the FCC, and such extensions will be in full force and effect.

(ix)     The Bankruptcy Court will have entered the Bidding Procedures Order and Sale Approval Order, and each such order will be in full force and effect and will not have been stayed, modified, reversed or amended.

(x)     Buyer shall have delivered to Seller a written waiver of Buyer's intention to seek approval of a sale and purchase of the Station Assets pursuant to the terms of a plan of reorganization confirmed by order of the Bankruptcy Court.

(xi)     The Houston Closing shall (A) have occurred or (B) occur simultaneously with the Dallas Closing.

(xii)     Buyer will have obtained the Financing.

**7.2     *Conditions to Obligations of Seller.***

(a)     All obligations of Seller at the Houston Closing hereunder are subject at Seller's option to the satisfaction or waiver on or prior to the Houston Closing Date of each of the following conditions:

(i)     All representations and warranties of Buyer with respect to or pertaining to the Dallas Station Assets contained in this Agreement, if specifically qualified by materiality, will be true and accurate in all respects, and, if not so qualified, will be true and accurate in all material respects, at and as of the Houston Closing Date as though made at and as of that time.

(ii)     Buyer will have performed and complied in all material respects with all covenants, agreements and conditions with respect to or pertaining to the Dallas Station Assets required by this Agreement to be performed or complied with by it prior to or on the Houston Closing Date.

(iii)     Buyer will have delivered the items required to be delivered pursuant to Section 8.4(a).

(iv)     No injunction, order, judgment or decree of any nature of any Governmental Authority of competent jurisdiction will be in effect that restrains or prohibits the consummation of the transactions contemplated by this Agreement.

(v)     The Bankruptcy Court will have entered the Sale Approval Order, and such order will be in full force and effect and will not have been stayed, modified, reversed or amended.

(b)     All obligations of Seller at the Dallas Closing hereunder are subject at Seller's option to the satisfaction or waiver on or prior to the Dallas Closing Date of each of the following conditions:

(i)     All representations and warranties of Buyer with respect to or pertaining to the Dallas Station Assets contained in this Agreement, if specifically qualified by materiality, will be true and accurate in all respects, and, if not so qualified, will be true and accurate in all material respects, at and as of the Dallas Closing Date as though made at and as of that time.

(ii)     Buyer will have performed and complied in all material respects with all covenants, agreements and conditions with respect to or pertaining to the Dallas Station Assets required by this Agreement to be performed or complied with by it prior to or on the Dallas Closing Date.

(iii)    Buyer will have delivered the items required to be delivered pursuant to Section 8.4(b).

(iv)    No injunction, order, judgment or decree of any nature of any Governmental Authority of competent jurisdiction will be in effect that restrains or prohibits the consummation of the transactions contemplated by this Agreement.

(v)     The Bankruptcy Court will have entered the Sale Approval Order, and such order will be in full force and effect and will not have been stayed, modified, reversed or amended.

## ARTICLE 8
## CLOSING AND CLOSING DELIVERIES

**8.1**   *Closing.*

(a)     Subject to the satisfaction or waiver (by the Party for whose benefit the condition is imposed) of the conditions described in Article 7, the Houston Closing will take place as of 12:01 a.m., Dallas, Texas time, on a date that is not later than 10 Business Days after the last to occur of (i) the FCC Consent having become a Final Order and (ii) issuance of the FCC Approval, including the FCC issuance of broadcast licenses to the Houston Station for digital television and all ancillary licenses consistent with the construction permits previously filed on their behalf, and as Buyer will specify in writing to Seller at least five Business Days in advance or, if Buyer fails to so specify, on the last date in the time period provided for in the foregoing (the "Houston Closing Date"); provided that Buyer may waive the requirement set forth in clause (i) in its sole discretion.  The risk of any loss, damage, impairment, confiscation or condemnation of any of the Houston Station Assets from any cause whatsoever will be borne by Seller at all times prior to the Houston Closing.  If the regular broadcast transmission in the normal and usual manner is interrupted for a continuous period of 72 hours or more at any time prior to the Houston Closing for reasons not caused by or within the control of Buyer, then Buyer, in its sole discretion, by providing written notice to Seller, may postpone the Houston Closing to a date that is no more than 15 days after the end of such interruption and, if applicable, Seller's completion of the restoration and replacement of any of the Houston Station Assets at Seller's sole expense.  If any Houston Station Assets suffer any material damage or destruction prior to the Houston Closing Date, Seller will promptly notify Buyer in writing of such damage and destruction, and will advise Buyer in writing of the estimated cost to complete such restoration, repair or replacement.

(b)     Subject to the satisfaction or waiver (by the Party for whose benefit the condition is imposed) of the conditions described in Article 7, the Dallas Closing will take place as of 12:01 a.m., Dallas, Texas time, on a date that is not later than 10 Business Days after the last to occur of (i) the FCC Consent having become a Final Order and (ii) issuance of the FCC

Approval, including the FCC issuance of broadcast licenses to the Dallas Station for digital television and all ancillary licenses consistent with the construction permits previously filed on their behalf, and as Buyer will specify in writing to Seller at least five Business Days in advance or, if Buyer fails to so specify, on the last date in the time period provided for in the foregoing (the "Dallas Closing Date"); provided that Buyer may waive the requirement set forth in clause (i) in its sole discretion. The risk of any loss, damage, impairment, confiscation or condemnation of any of the Dallas Station Assets from any cause whatsoever will be borne by Seller at all times prior to the Dallas Closing. If the regular broadcast transmission in the normal and usual manner is interrupted for a continuous period of 72 hours or more at any time prior to the Dallas Closing for reasons not caused by or within the control of Buyer, then Buyer, in its sole discretion, by providing written notice to Seller, may postpone the Dallas Closing to a date that is no more than 15 days after the end of such interruption and, if applicable, Seller's completion of the restoration and replacement of any of the Dallas Station Assets at Seller's sole expense. If any Dallas Station Assets suffer any material damage or destruction prior to the Dallas Closing Date, Seller will promptly notify Buyer in writing of such damage and destruction, and will advise Buyer in writing of the estimated cost to complete such restoration, repair or replacement.

**8.2** *Closing Place.* Each of the Dallas Closing and the Houston Closing will be held at such place that is agreed in writing by Buyer and Seller, and in the absence of agreement, as determined by Buyer.

**8.3** *Deliveries by Seller.*

(a) Prior to or on the Houston Closing Date, Seller will deliver to Buyer (or to such other Person as instructed by Buyer in writing) the following, in form and substance reasonably satisfactory to Buyer and its counsel:

(i) Duly executed assignments and other conveyancing documents to convey and vest good title in and to the Houston Station Assets to Buyer, free and clear of all Encumbrances, except for Permitted Liens. Such documents will include, without limitation, the following (A) an Assignment and Assumption Agreement (the "Houston Assignment and Assumption Agreement"), duly executed by Seller; (B) an Assignment and Acceptance Agreement of the Houston FCC Licenses (the "Houston Assignment and Acceptance Agreement"), duly executed by Seller; and (C) a Bill of Sale for the Houston Station Assets (the "Houston Bill of Sale"), duly executed by Seller.

(ii) A certificate, dated as of the Houston Closing Date, executed by Seller, certifying to the fulfillment of the conditions set forth in Sections 7.1(a)(i) and (ii).

(iii) An acknowledgement of receipt of the Houston Closing Payment.

(iv) A copy of the Sale Approval Order conveying the Houston Station Assets free and clear of all Encumbrances other than the Permitted Liens.

(v) All Required Consents in reasonable form and substance acceptable to Buyer.

(vi) Such other documents as may reasonably be requested by Buyer.

(b)     Prior to or on the Dallas Closing Date, Seller will deliver to Buyer (or to such other Person as instructed by Buyer in writing) the following, in form and substance reasonably satisfactory to Buyer and its counsel:

(i)     Duly executed assignments and other conveyancing documents to convey and vest good title in and to the Dallas Station Assets to Buyer, free and clear of all Encumbrances, except for Permitted Liens.  Such documents will include, without limitation, the following (A) an Assignment and Assumption Agreement (the "Dallas Assignment and Assumption Agreement"), duly executed by Seller; (B) an Assignment and Acceptance Agreement of the Dallas FCC Licenses (the "Dallas Assignment and Acceptance Agreement"), duly executed by Seller; and (C) a Bill of Sale for the Dallas Station Assets (the "Dallas Bill of Sale"), duly executed by Seller.

(ii)     A certificate, dated as of the Dallas Closing Date, executed by Seller, certifying to the fulfillment of the conditions set forth in Sections 7.1(b)(i) and (ii).

(iii)     An acknowledgement of receipt of the Dallas Closing Payment.

(iv)     A copy of the Sale Approval Order conveying the Dallas Station Assets free and clear of all Encumbrances other than the Permitted Liens.

(v)     All Required Consents in reasonable form and substance acceptable to Buyer.

(vi)     Such other documents as may reasonably be requested by Buyer.

**8.4     *Deliveries by Buyer.***

(a)     Prior to or on the Houston Closing Date, Buyer will deliver to Seller the following, in form and substance reasonably satisfactory to Seller and its counsel:

(i)     The Houston Closing Payment.

(ii)     Appropriate assumption and acceptance agreements pursuant to which Buyer will assume and undertake to perform Seller's obligations with respect to the Houston Real Property and under the Houston FCC Licenses to the extent such obligations arise after the Houston Closing, including the following: (A) the Houston Assignment and Assumption Agreement, duly executed by Buyer; (B) the Houston Assignment and Acceptance Agreement, duly executed by Buyer; and (C) the Houston Bill of Sale, duly executed by Buyer.

(iii)     A certificate, dated as of the Houston Closing Date, executed by Buyer, certifying to the fulfillment of the conditions set forth in Sections 7.2(a)(i) and (ii).

(iv)     A certificate, dated as of the Houston Closing Date, executed by Buyer, certifying that the resolutions, as attached to such certificate, were duly adopted by the members of Buyer, authorizing and approving the execution of this Agreement and the consummation of the transactions contemplated hereby and that such resolutions remain in full force and effect.

(v)      Certificates of incumbency for the officers of Buyer duly authorized to execute and deliver this Agreement and the agreements contemplated hereby.

(b)      Prior to or on the Dallas Closing Date, Buyer will deliver to Seller the following, in form and substance reasonably satisfactory to Seller and its counsel:

(i)      The Dallas Closing Payment.

(ii)      Appropriate assumption and acceptance agreements pursuant to which Buyer will assume and undertake to perform Seller's obligations with respect to the Dallas Real Property and under the Dallas FCC Licenses to the extent such obligations arise after the Dallas Closing, including the following: (A) the Dallas Assignment and Assumption Agreement, duly executed by Buyer; (B) the Dallas Assignment and Acceptance Agreement, duly executed by Buyer; and (C) the Dallas Bill of Sale, duly executed by Buyer.

(iii)      A certificate, dated as of the Dallas Closing Date, executed by Buyer, certifying to the fulfillment of the conditions set forth in Sections 7.2(b)(i) and (ii).

(iv)      A certificate, dated as of the Dallas Closing Date, executed by Buyer, certifying that the resolutions, as attached to such certificate, were duly adopted by the members of Buyer, authorizing and approving the execution of this Agreement and the consummation of the transactions contemplated hereby and that such resolutions remain in full force and effect.

(v)      Certificates of incumbency for the officers of Buyer duly authorized to execute and deliver this Agreement and the agreements contemplated hereby.

## ARTICLE 9
## TERMINATION

**9.1**      *Termination of Agreement.*  This Agreement may be terminated only as follows:

(a)      by mutual written consent of Seller and Buyer (i) at any time prior to the earliest to occur of the Dallas Closing or the Houston Closing; (ii) after the Dallas Closing, only with respect to the Parties' obligations to consummate the Houston Closing (if the Houston Closing has not yet occurred); and (iii) after the Houston Closing, only with respect to the Parties' obligation to consummate the Dallas Closing (if the Dallas Closing has not yet occurred).

(b)      at any time prior to the Houston Closing and solely with respect to the Houston Closing

(i)      by Buyer in the event of a breach by Seller or the LPF of any representation, warranty, covenant or other obligation contained herein that (A) would give rise to the failure of a condition set forth in Section 7.1(a)(i) or (ii), (B) if capable of being cured, has not been cured within 15 days after the giving of written notice to Seller of such breach, and (C) is not caused in whole or in part, directly or indirectly, by Buyer or its Affiliates

(ii)     by Seller in the event of a breach by Buyer of any representation, warranty, covenant or other obligation contained herein that (A) would give rise to the failure of a condition set forth in Section 7.2(a)(i) or (ii), (B) if capable of being cured, has not been cured within 10 days after the giving of written notice to Buyer of such breach, and (C) is solely the result of action or inaction by Buyer and is not caused in whole or in part, directly or indirectly, by Seller, the LPF or any of Seller's Affiliates;

(iii)     by Buyer in the event (i) Seller does not complete the Digital Upgrade with respect to the Houston Station in accordance with the Conversion Plan or otherwise satisfactory to Buyer and FCC rules or (ii) the Digital Upgrade with respect to the Houston Station is not completed on or before October 12, 2009 and the FCC has not granted an extension of the construction permit, to a date following March 31, 2010;

(iv)     by either Party, upon written notice to the other Party, if any Governmental Authority of competent jurisdiction will have issued a final and permanent order enjoining or otherwise prohibiting the consummation of the transactions contemplated by this Agreement;

(v)     by Buyer, if: (A) within 15 days of the filing of the Sale Motion, the Bidding Procedures Order will not have been approved by the Bankruptcy Court; or within 60 days of the filing of the Sale Motion, the Sale Approval Order will not have been approved by the Bankruptcy Court;

(vi)     by Buyer, if: (A) Seller (1) prior to approval of the Bidding Procedures Order, accepts any Acquisition Proposal or seeks the approval by the Bankruptcy Court of any Acquisition Proposal (whether pursuant to Section 363 of the Bankruptcy Code, in a Chapter 11 plan of reorganization or otherwise), or (2) following approval of the Bidding Procedures Order, takes any action to pursue any Acquisition Proposal other than as expressly permitted by the Bidding Procedures Order; (B) any Person or group will have entered into a definitive agreement or any agreement in principle with Seller with respect to any Acquisition Proposal; (C) the LPF, the board of directors of Seller, or any other authorized Person, will have resolved to do any of the foregoing; or (D) the Bankruptcy Court will have entered an order approving (1) an Acquisition Proposal, (2) any sale of the Station Assets (or any material portion thereof, from a quantitative or qualitative perspective) other than to Buyer or its assigns (as permitted by this Agreement) or (3) any of the foregoing;

(vii)     by Buyer if Seller breached any of its obligations under Section 6.7;

(viii)     by Buyer if any restoration, repair or replacement referenced in Section 8.1(b) exceeds $200,000 and is not accomplished prior to the Houston Closing Date, as the same may be extended by the Parties;

(ix)     by Seller or Buyer, upon written notice to the other Party, in the event that the Houston Closing has not taken place on or before the date that is 12 months from the date on which the Assignment Application was accepted for filing by the FCC (other than as a result of any failure on the part of Buyer to comply with or perform in any material respect any

covenant or obligations set forth in this Agreement), or if Seller has not obtained the FCC Consent within one year of filing the Assignment Application;

(x)    by Buyer upon (A) the dismissal of Seller's Chapter 11 case pending in the Bankruptcy Court or the conversion of such Chapter 11 cases to a case under Chapter 7 of the Bankruptcy Code or (B) the filing of a plan of reorganization for Seller that is in any manner or respect materially inconsistent with, or would otherwise reasonably be expected, directly or indirectly, to delay materially, affect materially adversely, or materially conflict with the transactions contemplated or the benefits reasonably expected to be gained by Buyer under this Agreement; *provided that* Seller will be entitled to include a "Finance Alternative" as such term is defined in the LPF Order in the plan of reorganization filed with the Bankruptcy Court solely to the extent contemplated by the LPF Order; or

(xi)    by Buyer if Buyer's obligations to consummate the Dallas Closing have been terminated pursuant to this Section 9.1.

(c)    at any time prior to the Dallas Closing and solely with respect to the Dallas Closing

(i)    by Buyer in the event of a breach by Seller or the LPF of any representation, warranty, covenant or other obligation contained herein that (A) would give rise to the failure of a condition set forth in Section 7.1(b)(i) or (ii), (B) if capable of being cured, has not been cured within 15 days after the giving of written notice to Seller of such breach, and (C) is not caused in whole or in part, directly or indirectly, by Buyer or its Affiliates

(ii)    by Seller in the event of a breach by Buyer of any representation, warranty, covenant or other obligation contained herein that (A) would give rise to the failure of a condition set forth in Section 7.2(b)(i) or (ii), (B) if capable of being cured, has not been cured within 10 days after the giving of written notice to Buyer of such breach, and (C) is solely the result of action or inaction by Buyer and is not caused in whole or in part, directly or indirectly, by Seller, the LPF or any of Seller's Affiliates

(iii)    by Buyer in the event (i) Seller does not complete the Digital Upgrade with respect to the Dallas Station in accordance with the Conversion Plan or otherwise satisfactory to Buyer and FCC rules or (ii) the Digital Upgrade with respect to the Dallas Station is not completed on or before October 12, 2009 and the FCC has not granted an extension of the construction permit, to a date following March 31, 2010;

(iv)    by either Party, upon written notice to the other Party, if any Governmental Authority of competent jurisdiction will have issued a final and permanent order enjoining or otherwise prohibiting the consummation of the transactions contemplated by this Agreement;

(v)    by Buyer, if: (A) within 15 days of the filing of the Sale Motion, the Bidding Procedures Order will not have been approved by the Bankruptcy Court; or within 60 days of the filing of the Sale Motion, the Sale Approval Order will not have been approved by the Bankruptcy Court;

(vi)    by Buyer, if: (A) Seller (1) prior to approval of the Bidding Procedures Order, accepts any Acquisition Proposal or seeks the approval by the Bankruptcy Court of any Acquisition Proposal (whether pursuant to Section 363 of the Bankruptcy Code, in a Chapter 11 plan of reorganization or otherwise), or (2) following approval of the Bidding Procedures Order, takes any action to pursue any Acquisition Proposal other than as expressly permitted by the Bidding Procedures Order; (B) any Person or group will have entered into a definitive agreement or any agreement in principle with Seller with respect to any Acquisition Proposal; (C) the LPF, the board of directors of Seller, or any other authorized Person, will have resolved to do any of the foregoing; or (D) the Bankruptcy Court will have entered an order approving (1) an Acquisition Proposal, (2) any sale of the Station Assets (or any material portion thereof, from a quantitative or qualitative perspective) other than to Buyer or its assigns (as permitted by this Agreement) or (3) any of the foregoing;

(vii)    by Buyer if Seller breached any of its obligations under Section 6.7;

(viii)    by Buyer if any restoration, repair or replacement referenced in Section 8.1(b) exceeds $200,000 and is not accomplished prior to the Dallas Closing Date, as the same may be extended by the Parties;

(ix)    by Seller or Buyer, upon written notice to the other Party, in the event that the Dallas Closing has not taken place on or before the date that is 12 months from the date on which the Assignment Application was accepted for filing by the FCC (other than as a result of any failure on the part of Buyer to comply with or perform in any material respect any covenant or obligations set forth in this Agreement), or if Seller has not obtained the FCC Consent within one year of filing the Assignment Application;

(x)    by Buyer upon (A) the dismissal of Seller's Chapter 11 case pending in the Bankruptcy Court or the conversion of such Chapter 11 cases to a case under Chapter 7 of the Bankruptcy Code or (B) the filing of a plan of reorganization for Seller that is in any manner or respect materially inconsistent with, or would otherwise reasonably be expected, directly or indirectly, to delay materially, affect materially adversely, or materially conflict with the transactions contemplated or the benefits reasonably expected to be gained by Buyer under this Agreement; *provided that* Seller will be entitled to include a "Finance Alternative" as such term is defined in the LPF Order in the plan of reorganization filed with the Bankruptcy Court solely to the extent contemplated by the LPF Order; or

(xi)    by Buyer if Buyer's obligations to consummate the Houston Closing have been terminated pursuant to this Section 9.1.

(d)    by either Buyer or Seller if the Financing Commitment is not provided to LPF within 14 days after the date of this Agreement;

(e)    by Buyer if Seller does not deliver the Schedules to Buyer within five Business Days after the date of this Agreement in form and substance acceptable to Buyer in Buyer's sole and absolute discretion; or

(f)      by Seller if (i) all of the conditions to the obligations of Buyer to consummate the Houston Closing and/or the Dallas Closing have been satisfied, including those conditions set forth in Section 7.1 and Section 8.1 (other than Buyer having obtained the Financing), (ii) Seller is ready, willing and able to consummate the Houston Closing and/or the Dallas Closing and Seller is not then in breach of any of its representations or warranties and has not failed to perform its covenants or other agreements contained in this Agreement; and (iii) Buyer does not consummate the Houston Closing and/or the Dallas Closing, as applicable.

The date of a termination of the Parties' obligations pursuant to (1) Section 9.1(b) shall be the "Houston Termination Date" (2) Section 9.1(c) shall be the "Dallas Termination Date" and (3) (A) Section 9.1(a), (B) Section 9.1(d), (C) Section 9.1(e), (D) Section 9.1(f) or (E) each of Sections 9.1(b) *and* 9.1(c) shall be the "Termination Date".

**9.2      *Procedure and Effect of Termination.***

(a)      In the event of termination of this Agreement by any Party pursuant to Section 9.1, written notice thereof will be given promptly to the other Party and this Agreement will terminate and the transactions contemplated hereby will be abandoned without further action by any of the Parties, but subject to and without limiting any of the rights of the Parties specified herein in the event a Party is in material default or breach of its obligations under this Agreement; *provided however*, that (i) in the event this Agreement is terminated pursuant to Section 9.1(b) and not also Section 9.1(c), the Parties' obligations with respect to the Dallas Closing shall continue in full force and effect and (ii) in the event this Agreement is terminated pursuant to Section 9.1(c) and not also Section 9.1(b), the Parties' obligations with respect to the Houston Closing shall continue in full force and effect.  In the event that this Agreement is terminated pursuant to the terms and subject to the conditions hereof, if this Agreement is terminated (A) pursuant to Section 9.1(a), (d), (e) or (f), then upon the Termination Date, except for the obligations of Seller and Buyer as stated in Sections 6.2, 9.2, 9.3, 9.4 and Article 10 (which will survive termination of this Agreement), none of the Parties nor any of their respective partners, directors, officers, shareholders, employers, agents, retained professionals or Affiliates (each, a "Related Party") will have any liability or further obligation to the other Party or any of their respective Related Parties pursuant to this Agreement with respect to which termination has occurred; and all filings, applications and other submissions relating to the transactions contemplated hereby as to which termination has occurred will, to the extent practicable, be withdrawn by the Parties from the agency or other Person to which made (B) pursuant to Section 9.1(b), but not also Section 9.1(c), then upon the Houston Termination Date, the obligations of Seller and Buyer to consummate the Houston Closing shall terminate except for the obligations of Seller and Buyer as stated in Sections 6.2, 9.2, 9.3, 9.4 and Article 10 (which will survive termination of this Agreement), none of the Parties nor any of their Related Parties will have any liability or further obligation to the other Party or any of their respective Related Parties pursuant to this Agreement with respect to which such termination has occurred; and all filings, applications and other submissions relating to such transactions contemplated hereby as to which termination has occurred will, to the extent practicable, be withdrawn by the Parties from the agency or other Person to which made; or (C) pursuant to Section 9.1(c), but not also Section 9.1(b), then upon the Dallas Termination Date, the obligations of Seller and Buyer to consummate the Dallas Closing shall terminate except for the obligations of Seller and Buyer as stated in Sections 6.2, 9.2, 9.3, 9.4 and Article 10 (which will survive termination of this

Agreement), none of the Parties nor any of their Related Parties will have any liability or further obligation to the other Party or any of their respective Related Parties pursuant to this Agreement with respect to which such termination has occurred; and all filings, applications and other submissions relating to such transactions contemplated hereby as to which termination has occurred will, to the extent practicable, be withdrawn by the Parties from the agency or other Person to which made.

(b)    Nothing in this Agreement will require that the Bankruptcy Court approve the termination of this Agreement or any of the Parties' obligations to consummate any of the closings hereunder, in order for such termination to be effective.

**9.3    *Break-Up Fee.***

(a)    Seller acknowledges that (i) Buyer has made a substantial investment of management time and incurred substantial out-of-pocket expenses in connection with the negotiation and execution of this Agreement, its due diligence of the Stations, and its effort to consummate the transactions contemplated hereby, (ii) Buyer's efforts have substantially benefited Seller and will benefit Seller and the bankruptcy estate of Seller through the submission of the offer that is reflected in this Agreement, that will serve as a minimum bid on which other potential interested bidders can rely, thus increasing the likelihood that the price at which the Station Assets are sold will reflect their true worth and (iii) Buyer's right to receive the Break-Up Fee, if any, pursuant to the terms of this Section 9.3 will survive termination of this Agreement.   Therefore, as compensation for entering into this Agreement, taking action to consummate the transactions hereunder and incurring the costs and expenses related thereto and other losses and damages, including foregoing other opportunities, Seller agrees to pay to Buyer, in accordance with the provisions of this Section 9.3 the amount of $700,000 as an administrative priority expense (the "Break-Up Fee").

(b)    In the event of a termination by Buyer (i) pursuant to Sections 9.1(b)(i), (iii), (v), (vi), (vii) or (viii), Seller will pay to Buyer, by wire transfer of immediately available funds to an account designated by Buyer, an amount equal to 60% of the Break-Up Fee upon the earlier to occur of (A) the closing of an Acquisition Proposal or the sale by Seller of the Station Assets (or any material portion thereof) other than to Buyer or its assigns (as permitted under this Agreement) and (B) the close of business on the fifth Business Day following such termination; and/or (i) pursuant to Sections 9.1(c)(i), (iii), (v), (vi), (vii) or (viii), Seller will pay to Buyer, by wire transfer of immediately available funds to an account designated by Buyer, an amount equal to 40% of the Break-Up Fee upon the earlier to occur of (A) the closing of an Acquisition Proposal or the sale by Seller of the Station Assets (or any material portion thereof) other than to Buyer or its assigns (as permitted under this Agreement) and (B) the close of business on the fifth Business Day following such termination

(c)    The Break-Up Fee and the return to Buyer of the Buyer's Deposit in accordance with Section 9.5, until indefeasibly paid in full in cash, will constitute an expense of a super priority expense claim specified in Sections 503(b) and 507(b) of the Bankruptcy Code in Seller's Chapter 11 case pending in the Bankruptcy Court.

(d)      Nothing in this Section 9.3 will be deemed to prevent or in any manner limit any claims for any equitable remedies available under this Agreement.

**9.4      *Seller's Remedies; Return of Buyer's Deposit.***

(a)      If Seller terminates its obligation to consummate the Houston Closing or the Dallas Closing pursuant to Section 9.l(b)(ii) or (c)(ii), respectively, and at the time of such termination, Seller is not otherwise in breach of this Agreement, Buyer will not be entitled to receive the Break-Up Fee and Seller will have the right to an amount equal to (a) 60% of the Buyer's Deposit with respect to Section 9.1(b)(ii) and (b) 40% of the Buyer's Deposit with respect to Section 9.1(c)(ii).  Seller's receipt of an amount equal to the percentage of the Buyer's Deposit in accordance with the preceding sentence shall be the sole and exclusive remedy that Seller shall have in the event of such termination and shall constitute liquidated damages and a waiver of any and all other legal or equitable rights or remedies that Seller or the LPF may otherwise have as a result of such termination.  Seller agrees and acknowledges that such amount is a reasonable estimate of damages that Seller would suffer as a result of such termination.  In such event, Buyer and the LPF will provide joint written instructions to the Escrow Agent instructing the Escrow Agent to pay the remaining amount of the Buyer's Deposit (up to the applicable percentage) held by the Escrow Agent to Seller.  In the event this Agreement is terminated (x) pursuant to Section 9.1(a), Buyer and the LPF will provide joint written instructions to the Escrow Agent instructing the Escrow Agent to pay the remaining amount of the Buyer's Deposit to Buyer not later than the close of business on the fifth Business Day following such termination; (y) pursuant to Section 9.1(b)(i) or (iii)-(xi), Buyer and the LPF will provide joint written instructions to the Escrow Agent instructing the Escrow Agent to pay the remaining amount of the Buyer's Deposit (up to 60% of the Buyer's Deposit) to Buyer not later than the close of business on the fifth Business Day following such termination and (z) pursuant to Section 9.1(c)(i) or (iii)-(xi), Buyer and the LPF will provide joint written instructions to the Escrow Agent instructing the Escrow Agent to pay the remaining amount of the Buyer's Deposit (up to 40% of the Buyer's Deposit) to Buyer not later than the close of business on the fifth Business Day following such termination.

(b)      If Seller exercises its termination right pursuant to Section 9.1(f), Buyer will not be entitled to receive the Break-Up Fee and Seller will have the right to the Buyer's Deposit.  Seller's receipt of the Buyer's Deposit in accordance with the preceding sentence shall be the sole and exclusive remedy that Seller shall have in the event of such termination and shall constitute a waiver of any and all other legal or equitable rights or remedies that Seller or the LPF may otherwise have as a result of such termination.  Seller agrees and acknowledges that such amount is a reasonable estimate of damages that Seller would suffer as a result of such termination.  In such event, Buyer and the LPF will provide joint written instructions to the Escrow Agent instructing the Escrow Agent to pay the Buyer's Deposit held by the Escrow Agent to Seller not later than the close of business on the fifth Business Day following such termination.

## ARTICLE 10
## MISCELLANEOUS

**10.1** *Fees and Expenses.* Except as otherwise provided in this Agreement with respect to the Break-Up Fee, each Party will pay its own expenses incurred in connection with the authorization, preparation, execution and performance of this Agreement, including all fees and expenses of counsel, accountants, agents and representatives.

**10.2** *Notices.* All notices, demands and requests required or permitted to be given under the provisions of this Agreement will be (a) in writing, (b) delivered by personal delivery or sent by commercial delivery service or certified mail, return receipt requested, (c) deemed to have been given the date of personal delivery or the date set forth in the records of the delivery service or on the return receipt and (d) addressed as follows:

    (a)    If to Seller:

> Johnson Broadcasting, Inc.
> 8440 Westpark Drive
> Houston, TX 77063
> Attention:     Douglas Johnson

> with a copy to (which will not constitute notice):

> Andrews Kurth, LLP
> 600 Travis, Suite 4200
> Houston, TX 77002
> Attention:     Tad Davidson

> If to the LPF:

> Kalil & Co., Inc.
> 6363 N. Swan Road, Suite 200
> Tucson, AZ 85718
> Attention: Frank Higney

> with a copy to (which will not constitute notice):

> Thomas A. Zlaket PLLC
> 310 South Williams Boulevard, Suite 170
> Tucson, AZ 85711
> Attention: Thomas A. Zlaket, Sr.

(b)    If to Buyer:

UNA VEZ MAS, LP
703 McKinney Avenue, Suite 240
Dallas, TX  75202
Attention:    Terry Crosby and Randy Nonberg

with a copy to (which will not constitute notice):

Fulbright & Jaworski L.L.P.
2200 Ross Avenue, Suite 2800
Dallas, TX  75201
Attention:    Toby Gerber

or to any other or additional Persons and addresses as the Parties may from time to time designate in a writing delivered in accordance with this Section 10.2.

**10.3    *Benefit and Binding Effect.*** No Party may assign this Agreement without the prior written consent of the other Party, except that Buyer will have the right to assign its rights and obligations under this Agreement, in whole or in part, to an Affiliate of Buyer without the consent of Seller, the LPF or the Bankruptcy Court. This Agreement will be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns.

**10.4    *Further Assurances.*** Subject to the terms and conditions of this Agreement, from time to time prior to, at and after each of the Houston Closing Date and the Dallas Closing Date, each Party will use commercially reasonable efforts to take, or cause to be taken, all such actions and to do or cause to be done, all things necessary, proper or advisable under Applicable Law to consummate and make effective the transactions contemplated by this Agreement.

**10.5    *Governing Law; Venue.*** This Agreement and the rights and obligations of the Parties hereunder will be governed by, and construed and enforced in accordance with, the Bankruptcy Code, and to the extent that the Bankruptcy Code does not address the matter at hand, then in accordance with the laws of the State of Texas without regard to its conflict of law rules. Any action or proceeding seeking to enforce any provision of, or based on any right arising out of, this Agreement may be brought by either Party in the Bankruptcy Court, and each of the Parties consents to the jurisdiction of such court (and of the appropriate appellate courts) in any action or proceeding and waives any objection to venue laid therein. Process in any action or proceeding referred to in this Section may be served on either party hereto anywhere in the world.

**10.6    *Waiver of Compliance; Consents.*** Except as otherwise provided in this Agreement, any failure of any of the Parties to comply with any obligation, representation, warranty, covenant, agreement or condition herein may be waived by the Party entitled to the benefits thereof only by a written instrument signed by the Party or granting such waiver, but such waiver will not operate as a waiver of, or estoppel with respect to, any subsequent or other failure. Whenever this Agreement requires or permits consent by or on behalf of any Party, such

65317456.8 / 10614547                          - 36 -

consent will be given in writing in a manner consistent with the requirements for a waiver of compliance as set forth in this Section 10.6.

10.7    *Severability.*  If any provision of this Agreement will be invalid or unenforceable to any extent, the remainder of this Agreement and the application of such provision to other Persons or circumstances will not be affected thereby and will be enforced to the greatest extent permitted by Applicable Law so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any Party.  Upon such determination that any term or other provision is invalid or unenforceable, the Parties will negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in an acceptable manner to the end that the transactions contemplated hereby are fulfilled to the greatest extent possible.

10.8    *Specific Performance.*  The Parties recognize and agree that the Station Assets are unique and that if, prior to either the Houston Closing and/or the Dallas Closing, Seller breaches this Agreement and refuses to perform under the provisions hereof, Buyer would be damaged irreparably and the award of monetary damages alone would not be adequate to compensate Buyer for its injury.  Buyer will therefore be entitled to obtain specific performance of the terms of this Agreement, and to injunctive or other equitable relief as remedies or any such breach or failure to perform and will not be required to (a) plead or prove irreparable harm or lack of an adequate remedy at law or (b) post any bond.  If any action for specific performance is brought by Buyer to enforce this Agreement, Seller will waive the defense that there is adequate remedy at law.

10.9    *Entire Agreement.*  This Agreement, the Schedules and Exhibits hereto, and all documents, certificates and other documents to be delivered by the Parties pursuant hereto, collectively represent the entire understanding and agreement between Buyer and Seller with respect to the subject matter of this Agreement.   This Agreement supersedes all prior negotiations between the Parties and cannot be amended, supplemented or changed except by an agreement in writing that is signed by the parties hereto.

10.10    *Counterparts; Delivery of Signature Pages.*  This Agreement may be executed in multiple counterparts, each of which will be deemed an original, but all of which together will constitute one and the same document.  Each Party agrees that the delivery of this Agreement by facsimile, portable document format (pdf) or other electronic transmission will be deemed to be an original of this Agreement so transmitted.

*[Signature Page Follows]*

**IN WITNESS WHEREOF**, this Asset Purchase Agreement has been executed by the duly authorized officers of Buyer and Seller.

UNA VEZ MAS, LP

By: UNA VEZ MAS GP, LLC, its general partner

By: _____
Name: Randy E. Nonberg
Title: President

JOHNSON BROADCASTING INC.

AND

JOHNSON BROADCASTING OF DALLAS, INC.

By: _____
Name: Frank Higney
Title: in the capacity as Limited Purpose Fiduciary

65317456.8 / 10614547          *[Signature Page to Asset Purchase Agreement]*

**IN WITNESS WHEREOF**, this Asset Purchase Agreement has been executed by the duly authorized officers of Buyer and Seller.

UNA VEZ MAS, LP

By: UNA VEZ MAS GP, LLC, its general partner

By: _____
Name: _____
Title: _____

JOHNSON BROADCASTING INC.

AND

JOHNSON BROADCASTING OF DALLAS, INC.

By: _____
Name: Frank Higney
Title:   in the capacity as Limited Purpose Fiduciary