(ii)     Buyer will have performed and complied in all material respects with all covenants, agreements and conditions with respect to or pertaining to the Dallas Station Assets required by this Agreement to be performed or complied with by it prior to or on the Dallas Closing Date.

(iii)     Buyer will have delivered the items required to be delivered pursuant to Section 8.4(b).

(iv)     No injunction, order, judgment or decree of any nature of any Governmental Authority of competent jurisdiction will be in effect that restrains or prohibits the consummation of the transactions contemplated by this Agreement.

(v)     The Bankruptcy Court will have entered the Sale Approval Order, and such order will be in full force and effect and will not have been stayed, modified, reversed or amended.

## ARTICLE 8
## CLOSING AND CLOSING DELIVERIES

**8.1**     *Closing.*

(a)     Subject to the satisfaction or waiver (by the Party for whose benefit the condition is imposed) of the conditions described in Article 7, the Houston Closing will take place as of 12:01 a.m., Dallas, Texas time, on a date that is not later than 10 Business Days after the last to occur of (i) the FCC Consent having become a Final Order and (ii) issuance of the FCC Approval, including the FCC issuance of broadcast licenses to the Houston Station for digital television and all ancillary licenses consistent with the construction permits previously filed on their behalf, and as Buyer will specify in writing to Seller at least five Business Days in advance or, if Buyer fails to so specify, on the last date in the time period provided for in the foregoing (the "Houston Closing Date"); provided that Buyer may waive the requirement set forth in clause (i) in its sole discretion.  The risk of any loss, damage, impairment, confiscation or condemnation of any of the Houston Station Assets from any cause whatsoever will be borne by Seller at all times prior to the Houston Closing.  If the regular broadcast transmission in the normal and usual manner is interrupted for a continuous period of 72 hours or more at any time prior to the Houston Closing for reasons not caused by or within the control of Buyer, then Buyer, in its sole discretion, by providing written notice to Seller, may postpone the Houston Closing to a date that is no more than 15 days after the end of such interruption and, if applicable, Seller's completion of the restoration and replacement of any of the Houston Station Assets at Seller's sole expense.  If any Houston Station Assets suffer any material damage or destruction prior to the Houston Closing Date, Seller will promptly notify Buyer in writing of such damage and destruction, and will advise Buyer in writing of the estimated cost to complete such restoration, repair or replacement.

(b)     Subject to the satisfaction or waiver (by the Party for whose benefit the condition is imposed) of the conditions described in Article 7, the Dallas Closing will take place as of 12:01 a.m., Dallas, Texas time, on a date that is not later than 10 Business Days after the last to occur of (i) the FCC Consent having become a Final Order and (ii) issuance of the FCC

Approval, including the FCC issuance of broadcast licenses to the Dallas Station for digital television and all ancillary licenses consistent with the construction permits previously filed on their behalf, and as Buyer will specify in writing to Seller at least five Business Days in advance or, if Buyer fails to so specify, on the last date in the time period provided for in the foregoing (the "Dallas Closing Date"); provided that Buyer may waive the requirement set forth in clause (i) in its sole discretion. The risk of any loss, damage, impairment, confiscation or condemnation of any of the Dallas Station Assets from any cause whatsoever will be borne by Seller at all times prior to the Dallas Closing. If the regular broadcast transmission in the normal and usual manner is interrupted for a continuous period of 72 hours or more at any time prior to the Dallas Closing for reasons not caused by or within the control of Buyer, then Buyer, in its sole discretion, by providing written notice to Seller, may postpone the Dallas Closing to a date that is no more than 15 days after the end of such interruption and, if applicable, Seller's completion of the restoration and replacement of any of the Dallas Station Assets at Seller's sole expense. If any Dallas Station Assets suffer any material damage or destruction prior to the Dallas Closing Date, Seller will promptly notify Buyer in writing of such damage and destruction, and will advise Buyer in writing of the estimated cost to complete such restoration, repair or replacement.

    **8.2**    ***Closing Place.***  Each of the Dallas Closing and the Houston Closing will be held at such place that is agreed in writing by Buyer and Seller, and in the absence of agreement, as determined by Buyer.

    **8.3**    ***Deliveries by Seller.***

        (a)    Prior to or on the Houston Closing Date, Seller will deliver to Buyer (or to such other Person as instructed by Buyer in writing) the following, in form and substance reasonably satisfactory to Buyer and its counsel:

        (i)    Duly executed assignments and other conveyancing documents to convey and vest good title in and to the Houston Station Assets to Buyer, free and clear of all Encumbrances, except for Permitted Liens. Such documents will include, without limitation, the following (A) an Assignment and Assumption Agreement (the "Houston Assignment and Assumption Agreement"), duly executed by Seller; (B) an Assignment and Acceptance Agreement of the Houston FCC Licenses (the "Houston Assignment and Acceptance Agreement"), duly executed by Seller; and (C) a Bill of Sale for the Houston Station Assets (the "Houston Bill of Sale"), duly executed by Seller.

        (ii)    A certificate, dated as of the Houston Closing Date, executed by Seller, certifying to the fulfillment of the conditions set forth in Sections 7.1(a)(i) and (ii).

        (iii)    An acknowledgement of receipt of the Houston Closing Payment.

        (iv)    A copy of the Sale Approval Order conveying the Houston Station Assets free and clear of all Encumbrances other than the Permitted Liens.

        (v)    All Required Consents in reasonable form and substance acceptable to Buyer.

        (vi)    Such other documents as may reasonably be requested by Buyer.

(b)     Prior to or on the Dallas Closing Date, Seller will deliver to Buyer (or to such other Person as instructed by Buyer in writing) the following, in form and substance reasonably satisfactory to Buyer and its counsel:

(i)     Duly executed assignments and other conveyancing documents to convey and vest good title in and to the Dallas Station Assets to Buyer, free and clear of all Encumbrances, except for Permitted Liens. Such documents will include, without limitation, the following (A) an Assignment and Assumption Agreement (the "Dallas Assignment and Assumption Agreement"), duly executed by Seller; (B) an Assignment and Acceptance Agreement of the Dallas FCC Licenses (the "Dallas Assignment and Acceptance Agreement"), duly executed by Seller; and (C) a Bill of Sale for the Dallas Station Assets (the "Dallas Bill of Sale"), duly executed by Seller.

(ii)     A certificate, dated as of the Dallas Closing Date, executed by Seller, certifying to the fulfillment of the conditions set forth in Sections 7.1(b)(i) and (ii).

(iii)     An acknowledgement of receipt of the Dallas Closing Payment.

(iv)     A copy of the Sale Approval Order conveying the Dallas Station Assets free and clear of all Encumbrances other than the Permitted Liens.

(v)     All Required Consents in reasonable form and substance acceptable to Buyer.

(vi)     Such other documents as may reasonably be requested by Buyer.

**8.4     _Deliveries by Buyer._**

(a)     Prior to or on the Houston Closing Date, Buyer will deliver to Seller the following, in form and substance reasonably satisfactory to Seller and its counsel:

(i)     The Houston Closing Payment.

(ii)     Appropriate assumption and acceptance agreements pursuant to which Buyer will assume and undertake to perform Seller's obligations with respect to the Houston Real Property and under the Houston FCC Licenses to the extent such obligations arise after the Houston Closing, including the following: (A) the Houston Assignment and Assumption Agreement, duly executed by Buyer; (B) the Houston Assignment and Acceptance Agreement, duly executed by Buyer; and (C) the Houston Bill of Sale, duly executed by Buyer.

(iii)     A certificate, dated as of the Houston Closing Date, executed by Buyer, certifying to the fulfillment of the conditions set forth in Sections 7.2(a)(i) and (ii).

(iv)     A certificate, dated as of the Houston Closing Date, executed by Buyer, certifying that the resolutions, as attached to such certificate, were duly adopted by the members of Buyer, authorizing and approving the execution of this Agreement and the consummation of the transactions contemplated hereby and that such resolutions remain in full force and effect.

65317456.8 / 10614547                                    - 27 -

(v)     Certificates of incumbency for the officers of Buyer duly authorized to execute and deliver this Agreement and the agreements contemplated hereby.

(b)     Prior to or on the Dallas Closing Date, Buyer will deliver to Seller the following, in form and substance reasonably satisfactory to Seller and its counsel:

(i)     The Dallas Closing Payment.

(ii)     Appropriate assumption and acceptance agreements pursuant to which Buyer will assume and undertake to perform Seller's obligations with respect to the Dallas Real Property and under the Dallas FCC Licenses to the extent such obligations arise after the Dallas Closing, including the following: (A) the Dallas Assignment and Assumption Agreement, duly executed by Buyer; (B) the Dallas Assignment and Acceptance Agreement, duly executed by Buyer; and (C) the Dallas Bill of Sale, duly executed by Buyer.

(iii)     A certificate, dated as of the Dallas Closing Date, executed by Buyer, certifying to the fulfillment of the conditions set forth in <u>Sections 7.2(b)(i)</u> and <u>(ii)</u>.

(iv)     A certificate, dated as of the Dallas Closing Date, executed by Buyer, certifying that the resolutions, as attached to such certificate, were duly adopted by the members of Buyer, authorizing and approving the execution of this Agreement and the consummation of the transactions contemplated hereby and that such resolutions remain in full force and effect.

(v)     Certificates of incumbency for the officers of Buyer duly authorized to execute and deliver this Agreement and the agreements contemplated hereby.

## ARTICLE 9
## TERMINATION

**9.1     *Termination of Agreement.*** This Agreement may be terminated only as follows:

(a)     by mutual written consent of Seller and Buyer (i) at any time prior to the earliest to occur of the Dallas Closing or the Houston Closing; (ii) after the Dallas Closing, only with respect to the Parties' obligations to consummate the Houston Closing (if the Houston Closing has not yet occurred); and (iii) after the Houston Closing, only with respect to the Parties' obligation to consummate the Dallas Closing (if the Dallas Closing has not yet occurred).

(b)     at any time prior to the Houston Closing and solely with respect to the Houston Closing

(i)     by Buyer in the event of a breach by Seller or the LPF of any representation, warranty, covenant or other obligation contained herein that (A) would give rise to the failure of a condition set forth in <u>Section 7.1(a)(i)</u> or <u>(ii)</u>, (B) if capable of being cured, has not been cured within 15 days after the giving of written notice to Seller of such breach, and (C) is not caused in whole or in part, directly or indirectly, by Buyer or its Affiliates

(ii)    by Seller in the event of a breach by Buyer of any representation, warranty, covenant or other obligation contained herein that (A) would give rise to the failure of a condition set forth in Section 7.2(a)(i) or (ii), (B) if capable of being cured, has not been cured within 10 days after the giving of written notice to Buyer of such breach, and (C) is solely the result of action or inaction by Buyer and is not caused in whole or in part, directly or indirectly, by Seller, the LPF or any of Seller's Affiliates;

(iii)    by Buyer in the event (i) Seller does not complete the Digital Upgrade with respect to the Houston Station in accordance with the Conversion Plan or otherwise satisfactory to Buyer and FCC rules or (ii) the Digital Upgrade with respect to the Houston Station is not completed on or before October 12, 2009 and the FCC has not granted an extension of the construction permit, to a date following March 31, 2010;

(iv)    by either Party, upon written notice to the other Party, if any Governmental Authority of competent jurisdiction will have issued a final and permanent order enjoining or otherwise prohibiting the consummation of the transactions contemplated by this Agreement;

(v)    by Buyer, if: (A) within 15 days of the filing of the Sale Motion, the Bidding Procedures Order will not have been approved by the Bankruptcy Court; or within 60 days of the filing of the Sale Motion, the Sale Approval Order will not have been approved by the Bankruptcy Court;

(vi)    by Buyer, if: (A) Seller (1) prior to approval of the Bidding Procedures Order, accepts any Acquisition Proposal or seeks the approval by the Bankruptcy Court of any Acquisition Proposal (whether pursuant to Section 363 of the Bankruptcy Code, in a Chapter 11 plan of reorganization or otherwise), or (2) following approval of the Bidding Procedures Order, takes any action to pursue any Acquisition Proposal other than as expressly permitted by the Bidding Procedures Order; (B) any Person or group will have entered into a definitive agreement or any agreement in principle with Seller with respect to any Acquisition Proposal; (C) the LPF, the board of directors of Seller, or any other authorized Person, will have resolved to do any of the foregoing; or (D) the Bankruptcy Court will have entered an order approving (1) an Acquisition Proposal, (2) any sale of the Station Assets (or any material portion thereof, from a quantitative or qualitative perspective) other than to Buyer or its assigns (as permitted by this Agreement) or (3) any of the foregoing;

(vii)    by Buyer if Seller breached any of its obligations under Section 6.7;

(viii)    by Buyer if any restoration, repair or replacement referenced in Section 8.1(b) exceeds $200,000 and is not accomplished prior to the Houston Closing Date, as the same may be extended by the Parties;

(ix)    by Seller or Buyer, upon written notice to the other Party, in the event that the Houston Closing has not taken place on or before the date that is 12 months from the date on which the Assignment Application was accepted for filing by the FCC (other than as a result of any failure on the part of Buyer to comply with or perform in any material respect any

covenant or obligations set forth in this Agreement), or if Seller has not obtained the FCC Consent within one year of filing the Assignment Application;

(x)      by Buyer upon (A) the dismissal of Seller's Chapter 11 case pending in the Bankruptcy Court or the conversion of such Chapter 11 cases to a case under Chapter 7 of the Bankruptcy Code or (B) the filing of a plan of reorganization for Seller that is in any manner or respect materially inconsistent with, or would otherwise reasonably be expected, directly or indirectly, to delay materially, affect materially adversely, or materially conflict with the transactions contemplated or the benefits reasonably expected to be gained by Buyer under this Agreement; *provided that* Seller will be entitled to include a "Finance Alternative" as such term is defined in the LPF Order in the plan of reorganization filed with the Bankruptcy Court solely to the extent contemplated by the LPF Order; or

(xi)      by Buyer if Buyer's obligations to consummate the Dallas Closing have been terminated pursuant to this Section 9.1.

(c)      at any time prior to the Dallas Closing and solely with respect to the Dallas Closing

(i)      by Buyer in the event of a breach by Seller or the LPF of any representation, warranty, covenant or other obligation contained herein that (A) would give rise to the failure of a condition set forth in Section 7.1(b)(i) or (ii), (B) if capable of being cured, has not been cured within 15 days after the giving of written notice to Seller of such breach, and (C) is not caused in whole or in part, directly or indirectly, by Buyer or its Affiliates

(ii)      by Seller in the event of a breach by Buyer of any representation, warranty, covenant or other obligation contained herein that (A) would give rise to the failure of a condition set forth in Section 7.2(b)(i) or (ii), (B) if capable of being cured, has not been cured within 10 days after the giving of written notice to Buyer of such breach, and (C) is solely the result of action or inaction by Buyer and is not caused in whole or in part, directly or indirectly, by Seller, the LPF or any of Seller's Affiliates

(iii)      by Buyer in the event (i) Seller does not complete the Digital Upgrade with respect to the Dallas Station in accordance with the Conversion Plan or otherwise satisfactory to Buyer and FCC rules or (ii) the Digital Upgrade with respect to the Dallas Station is not completed on or before October 12, 2009 and the FCC has not granted an extension of the construction permit, to a date following March 31, 2010;

(iv)      by either Party, upon written notice to the other Party, if any Governmental Authority of competent jurisdiction will have issued a final and permanent order enjoining or otherwise prohibiting the consummation of the transactions contemplated by this Agreement;

(v)      by Buyer, if: (A) within 15 days of the filing of the Sale Motion, the Bidding Procedures Order will not have been approved by the Bankruptcy Court; or within 60 days of the filing of the Sale Motion, the Sale Approval Order will not have been approved by the Bankruptcy Court;

(vi)    by Buyer, if: (A) Seller (1) prior to approval of the Bidding Procedures Order, accepts any Acquisition Proposal or seeks the approval by the Bankruptcy Court of any Acquisition Proposal (whether pursuant to Section 363 of the Bankruptcy Code, in a Chapter 11 plan of reorganization or otherwise), or (2) following approval of the Bidding Procedures Order, takes any action to pursue any Acquisition Proposal other than as expressly permitted by the Bidding Procedures Order; (B) any Person or group will have entered into a definitive agreement or any agreement in principle with Seller with respect to any Acquisition Proposal; (C) the LPF, the board of directors of Seller, or any other authorized Person, will have resolved to do any of the foregoing; or (D) the Bankruptcy Court will have entered an order approving (1) an Acquisition Proposal, (2) any sale of the Station Assets (or any material portion thereof, from a quantitative or qualitative perspective) other than to Buyer or its assigns (as permitted by this Agreement) or (3) any of the foregoing;

(vii)    by Buyer if Seller breached any of its obligations under Section 6.7;

(viii)    by Buyer if any restoration, repair or replacement referenced in Section 8.1(b) exceeds $200,000 and is not accomplished prior to the Dallas Closing Date, as the same may be extended by the Parties;

(ix)    by Seller or Buyer, upon written notice to the other Party, in the event that the Dallas Closing has not taken place on or before the date that is 12 months from the date on which the Assignment Application was accepted for filing by the FCC (other than as a result of any failure on the part of Buyer to comply with or perform in any material respect any covenant or obligations set forth in this Agreement), or if Seller has not obtained the FCC Consent within one year of filing the Assignment Application;

(x)    by Buyer upon (A) the dismissal of Seller's Chapter 11 case pending in the Bankruptcy Court or the conversion of such Chapter 11 cases to a case under Chapter 7 of the Bankruptcy Code or (B) the filing of a plan of reorganization for Seller that is in any manner or respect materially inconsistent with, or would otherwise reasonably be expected, directly or indirectly, to delay materially, affect materially adversely, or materially conflict with the transactions contemplated or the benefits reasonably expected to be gained by Buyer under this Agreement; *provided that* Seller will be entitled to include a "Finance Alternative" as such term is defined in the LPF Order in the plan of reorganization filed with the Bankruptcy Court solely to the extent contemplated by the LPF Order; or

(xi)    by Buyer if Buyer's obligations to consummate the Houston Closing have been terminated pursuant to this Section 9.1.

(d)    by either Buyer or Seller if the Financing Commitment is not provided to LPF within 14 days after the date of this Agreement;

(e)    by Buyer if Seller does not deliver the Schedules to Buyer within five Business Days after the date of this Agreement in form and substance acceptable to Buyer in Buyer's sole and absolute discretion; or

(f)     by Seller if (i) all of the conditions to the obligations of Buyer to consummate the Houston Closing and/or the Dallas Closing have been satisfied, including those conditions set forth in Section 7.1 and Section 8.1 (other than Buyer having obtained the Financing), (ii) Seller is ready, willing and able to consummate the Houston Closing and/or the Dallas Closing and Seller is not then in breach of any of its representations or warranties and has not failed to perform its covenants or other agreements contained in this Agreement; and (iii) Buyer does not consummate the Houston Closing and/or the Dallas Closing, as applicable.

The date of a termination of the Parties' obligations pursuant to (1) Section 9.1(b) shall be the "Houston Termination Date" (2) Section 9.1(c) shall be the "Dallas Termination Date" and (3) (A) Section 9.1(a), (B) Section 9.1(d), (C) Section 9.1(e), (D) Section 9.1(f) or (E) each of Sections 9.1(b) *and* 9.1(c) shall be the "Termination Date".

**9.2     Procedure and Effect of Termination.**

(a)     In the event of termination of this Agreement by any Party pursuant to Section 9.1, written notice thereof will be given promptly to the other Party and this Agreement will terminate and the transactions contemplated hereby will be abandoned without further action by any of the Parties, but subject to and without limiting any of the rights of the Parties specified herein in the event a Party is in material default or breach of its obligations under this Agreement; *provided however*, that (i) in the event this Agreement is terminated pursuant to Section 9.1(b) and not also Section 9.1(c), the Parties' obligations with respect to the Dallas Closing shall continue in full force and effect and (ii) in the event this Agreement is terminated pursuant to Section 9.1(c) and not also Section 9.1(b), the Parties' obligations with respect to the Houston Closing shall continue in full force and effect.  In the event that this Agreement is terminated pursuant to the terms and subject to the conditions hereof, if this Agreement is terminated (A) pursuant to Section 9.1(a), (d), (e) or (f), then upon the Termination Date, except for the obligations of Seller and Buyer as stated in Sections 6.2, 9.2, 9.3, 9.4 and Article 10 (which will survive termination of this Agreement), none of the Parties nor any of their respective partners, directors, officers, shareholders, employers, agents, retained professionals or Affiliates (each, a "Related Party") will have any liability or further obligation to the other Party or any of their respective Related Parties pursuant to this Agreement with respect to which termination has occurred; and all filings, applications and other submissions relating to the transactions contemplated hereby as to which termination has occurred will, to the extent practicable, be withdrawn by the Parties from the agency or other Person to which made (B) pursuant to Section 9.1(b), but not also Section 9.1(c), then upon the Houston Termination Date, the obligations of Seller and Buyer to consummate the Houston Closing shall terminate except for the obligations of Seller and Buyer as stated in Sections 6.2, 9.2, 9.3, 9.4 and Article 10 (which will survive termination of this Agreement), none of the Parties nor any of their Related Parties will have any liability or further obligation to the other Party or any of their respective Related Parties pursuant to this Agreement with respect to which such termination has occurred; and all filings, applications and other submissions relating to such transactions contemplated hereby as to which termination has occurred will, to the extent practicable, be withdrawn by the Parties from the agency or other Person to which made; or (C) pursuant to Section 9.1(c), but not also Section 9.1(b), then upon the Dallas Termination Date, the obligations of Seller and Buyer to consummate the Dallas Closing shall terminate except for the obligations of Seller and Buyer as stated in Sections 6.2, 9.2, 9.3, 9.4 and Article 10 (which will survive termination of this

Agreement), none of the Parties nor any of their Related Parties will have any liability or further obligation to the other Party or any of their respective Related Parties pursuant to this Agreement with respect to which such termination has occurred; and all filings, applications and other submissions relating to such transactions contemplated hereby as to which termination has occurred will, to the extent practicable, be withdrawn by the Parties from the agency or other Person to which made.

(b)     Nothing in this Agreement will require that the Bankruptcy Court approve the termination of this Agreement or any of the Parties' obligations to consummate any of the closings hereunder, in order for such termination to be effective.

### 9.3    *Break-Up Fee.*

(a)     Seller acknowledges that (i) Buyer has made a substantial investment of management time and incurred substantial out-of-pocket expenses in connection with the negotiation and execution of this Agreement, its due diligence of the Stations, and its effort to consummate the transactions contemplated hereby, (ii) Buyer's efforts have substantially benefited Seller and will benefit Seller and the bankruptcy estate of Seller through the submission of the offer that is reflected in this Agreement, that will serve as a minimum bid on which other potential interested bidders can rely, thus increasing the likelihood that the price at which the Station Assets are sold will reflect their true worth and (iii) Buyer's right to receive the Break-Up Fee, if any, pursuant to the terms of this Section 9.3 will survive termination of this Agreement. Therefore, as compensation for entering into this Agreement, taking action to consummate the transactions hereunder and incurring the costs and expenses related thereto and other losses and damages, including foregoing other opportunities, Seller agrees to pay to Buyer, in accordance with the provisions of this Section 9.3 the amount of $700,000 as an administrative priority expense (the "Break-Up Fee").

(b)     In the event of a termination by Buyer (i) pursuant to Sections 9.1(b)(i), (iii), (v), (vi), (vii) or (viii), Seller will pay to Buyer, by wire transfer of immediately available funds to an account designated by Buyer, an amount equal to 60% of the Break-Up Fee upon the earlier to occur of (A) the closing of an Acquisition Proposal or the sale by Seller of the Station Assets (or any material portion thereof) other than to Buyer or its assigns (as permitted under this Agreement) and (B) the close of business on the fifth Business Day following such termination; and/or (i) pursuant to Sections 9.1(c)(i), (iii), (v), (vi), (vii) or (viii), Seller will pay to Buyer, by wire transfer of immediately available funds to an account designated by Buyer, an amount equal to 40% of the Break-Up Fee upon the earlier to occur of (A) the closing of an Acquisition Proposal or the sale by Seller of the Station Assets (or any material portion thereof) other than to Buyer or its assigns (as permitted under this Agreement) and (B) the close of business on the fifth Business Day following such termination

(c)     The Break-Up Fee and the return to Buyer of the Buyer's Deposit in accordance with Section 9.5, until indefeasibly paid in full in cash, will constitute an expense of a super priority expense claim specified in Sections 503(b) and 507(b) of the Bankruptcy Code in Seller's Chapter 11 case pending in the Bankruptcy Court.

(d)     Nothing in this Section 9.3 will be deemed to prevent or in any manner limit any claims for any equitable remedies available under this Agreement.

### 9.4     *Seller's Remedies; Return of Buyer's Deposit.*

(a)     If Seller terminates its obligation to consummate the Houston Closing or the Dallas Closing pursuant to Section 9.1(b)(ii) or (c)(ii), respectively, and at the time of such termination, Seller is not otherwise in breach of this Agreement, Buyer will not be entitled to receive the Break-Up Fee and Seller will have the right to an amount equal to (a) 60% of the Buyer's Deposit with respect to Section 9.1(b)(ii) and (b) 40% of the Buyer's Deposit with respect to Section 9.1(c)(ii).  Seller's receipt of an amount equal to the percentage of the Buyer's Deposit in accordance with the preceding sentence shall be the sole and exclusive remedy that Seller shall have in the event of such termination and shall constitute liquidated damages and a waiver of any and all other legal or equitable rights or remedies that Seller or the LPF may otherwise have as a result of such termination.  Seller agrees and acknowledges that such amount is a reasonable estimate of damages that Seller would suffer as a result of such termination.  In such event, Buyer and the LPF will provide joint written instructions to the Escrow Agent instructing the Escrow Agent to pay the remaining amount of the Buyer's Deposit (up to the applicable percentage) held by the Escrow Agent to Seller.  In the event this Agreement is terminated (x) pursuant to Section 9.1(a), Buyer and the LPF will provide joint written instructions to the Escrow Agent instructing the Escrow Agent to pay the remaining amount of the Buyer's Deposit to Buyer not later than the close of business on the fifth Business Day following such termination; (y) pursuant to Section 9.1(b)(i) or (iii)-(xi), Buyer and the LPF will provide joint written instructions to the Escrow Agent instructing the Escrow Agent to pay the remaining amount of the Buyer's Deposit (up to 60% of the Buyer's Deposit) to Buyer not later than the close of business on the fifth Business Day following such termination and (z) pursuant to Section 9.1(c)(i) or (iii)-(xi), Buyer and the LPF will provide joint written instructions to the Escrow Agent instructing the Escrow Agent to pay the remaining amount of the Buyer's Deposit (up to 40% of the Buyer's Deposit) to Buyer not later than the close of business on the fifth Business Day following such termination.

(b)     If Seller exercises its termination right pursuant to Section 9.1(f), Buyer will not be entitled to receive the Break-Up Fee and Seller will have the right to the Buyer's Deposit.  Seller's receipt of the Buyer's Deposit in accordance with the preceding sentence shall be the sole and exclusive remedy that Seller shall have in the event of such termination and shall constitute a waiver of any and all other legal or equitable rights or remedies that Seller or the LPF may otherwise have as a result of such termination.  Seller agrees and acknowledges that such amount is a reasonable estimate of damages that Seller would suffer as a result of such termination.  In such event, Buyer and the LPF will provide joint written instructions to the Escrow Agent instructing the Escrow Agent to pay the Buyer's Deposit held by the Escrow Agent to Seller not later than the close of business on the fifth Business Day following such termination.

## ARTICLE 10
## MISCELLANEOUS

**10.1**   *Fees and Expenses.*   Except as otherwise provided in this Agreement with respect to the Break-Up Fee, each Party will pay its own expenses incurred in connection with the authorization, preparation, execution and performance of this Agreement, including all fees and expenses of counsel, accountants, agents and representatives.

**10.2**   *Notices.*   All notices, demands and requests required or permitted to be given under the provisions of this Agreement will be (a) in writing, (b) delivered by personal delivery or sent by commercial delivery service or certified mail, return receipt requested, (c) deemed to have been given the date of personal delivery or the date set forth in the records of the delivery service or on the return receipt and (d) addressed as follows:

    (a)    If to Seller:

> Johnson Broadcasting, Inc.
> 8440 Westpark Drive
> Houston, TX 77063
> Attention:    Douglas Johnson

> with a copy to (which will not constitute notice):

> Andrews Kurth, LLP
> 600 Travis, Suite 4200
> Houston, TX 77002
> Attention:    Tad Davidson

> If to the LPF:

> Kalil & Co., Inc.
> 6363 N. Swan Road, Suite 200
> Tucson, AZ 85718
> Attention: Frank Higney

> with a copy to (which will not constitute notice):

> Thomas A. Zlaket PLLC
> 310 South Williams Boulevard, Suite 170
> Tucson, AZ 85711
> Attention: Thomas A. Zlaket, Sr.

(b)    If to Buyer:

UNA VEZ MAS, LP
703 McKinney Avenue, Suite 240
Dallas, TX  75202
Attention:    Terry Crosby and Randy Nonberg

with a copy to (which will not constitute notice):

Fulbright & Jaworski L.L.P.
2200 Ross Avenue, Suite 2800
Dallas, TX  75201
Attention:    Toby Gerber

or to any other or additional Persons and addresses as the Parties may from time to time designate in a writing delivered in accordance with this Section 10.2.

**10.3    *Benefit and Binding Effect.***  No Party may assign this Agreement without the prior written consent of the other Party, except that Buyer will have the right to assign its rights and obligations under this Agreement, in whole or in part, to an Affiliate of Buyer without the consent of Seller, the LPF or the Bankruptcy Court.  This Agreement will be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns.

**10.4    *Further Assurances.***  Subject to the terms and conditions of this Agreement, from time to time prior to, at and after each of the Houston Closing Date and the Dallas Closing Date, each Party will use commercially reasonable efforts to take, or cause to be taken, all such actions and to do or cause to be done, all things necessary, proper or advisable under Applicable Law to consummate and make effective the transactions contemplated by this Agreement.

**10.5    *Governing Law; Venue.***  This Agreement and the rights and obligations of the Parties hereunder will be governed by, and construed and enforced in accordance with, the Bankruptcy Code, and to the extent that the Bankruptcy Code does not address the matter at hand, then in accordance with the laws of the State of Texas without regard to its conflict of law rules.  Any action or proceeding seeking to enforce any provision of, or based on any right arising out of, this Agreement may be brought by either Party in the Bankruptcy Court, and each of the Parties consents to the jurisdiction of such court (and of the appropriate appellate courts) in any action or proceeding and waives any objection to venue laid therein.  Process in any action or proceeding referred to in this Section may be served on either party hereto anywhere in the world.

**10.6    *Waiver of Compliance; Consents.***    Except as otherwise provided in this Agreement, any failure of any of the Parties to comply with any obligation, representation, warranty, covenant, agreement or condition herein may be waived by the Party entitled to the benefits thereof only by a written instrument signed by the Party or granting such waiver, but such waiver will not operate as a waiver of, or estoppel with respect to, any subsequent or other failure.  Whenever this Agreement requires or permits consent by or on behalf of any Party, such

65317456.8 / 10614547

consent will be given in writing in a manner consistent with the requirements for a waiver of compliance as set forth in this Section 10.6.

10.7    *Severability.*  If any provision of this Agreement will be invalid or unenforceable to any extent, the remainder of this Agreement and the application of such provision to other Persons or circumstances will not be affected thereby and will be enforced to the greatest extent permitted by Applicable Law so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any Party.  Upon such determination that any term or other provision is invalid or unenforceable, the Parties will negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in an acceptable manner to the end that the transactions contemplated hereby are fulfilled to the greatest extent possible.

10.8    *Specific Performance.*  The Parties recognize and agree that the Station Assets are unique and that if, prior to either the Houston Closing and/or the Dallas Closing, Seller breaches this Agreement and refuses to perform under the provisions hereof, Buyer would be damaged irreparably and the award of monetary damages alone would not be adequate to compensate Buyer for its injury.  Buyer will therefore be entitled to obtain specific performance of the terms of this Agreement, and to injunctive or other equitable relief as remedies or any such breach or failure to perform and will not be required to (a) plead or prove irreparable harm or lack of an adequate remedy at law or (b) post any bond.  If any action for specific performance is brought by Buyer to enforce this Agreement, Seller will waive the defense that there is adequate remedy at law.

10.9    *Entire Agreement.*  This Agreement, the Schedules and Exhibits hereto, and all documents, certificates and other documents to be delivered by the Parties pursuant hereto, collectively represent the entire understanding and agreement between Buyer and Seller with respect to the subject matter of this Agreement.   This Agreement supersedes all prior negotiations between the Parties and cannot be amended, supplemented or changed except by an agreement in writing that is signed by the parties hereto.

10.10    *Counterparts; Delivery of Signature Pages.*  This Agreement may be executed in multiple counterparts, each of which will be deemed an original, but all of which together will constitute one and the same document.  Each Party agrees that the delivery of this Agreement by facsimile, portable document format (pdf) or other electronic transmission will be deemed to be an original of this Agreement so transmitted.

*[Signature Page Follows]*

Case 08-36583   Document 349-1   Filed in TXSB on 10/19/09   Page 44 of 45

**IN WITNESS WHEREOF,** this Asset Purchase Agreement has been executed by the duly authorized officers of Buyer and Seller.

UNA VEZ MAS, LP

By: UNA VEZ MAS GP, LLC, its general partner

By:
Name:   Randy E. Nonberg
Title:   President

JOHNSON BROADCASTING INC.

AND

JOHNSON BROADCASTING OF DALLAS, INC.

By:   _____
Name:  Frank Higney
Title:   in the capacity as Limited Purpose Fiduciary

65317456.8 / 10614547      *[Signature Page to Asset Purchase Agreement]*

**IN WITNESS WHEREOF**, this Asset Purchase Agreement has been executed by the duly authorized officers of Buyer and Seller.

UNA VEZ MAS, LP

By: UNA VEZ MAS GP, LLC, its general partner

By: _____
Name: _____
Title: _____

JOHNSON BROADCASTING INC.

AND

JOHNSON BROADCASTING OF DALLAS, INC.

By: _____
Name: Frank Higney
Title:   in the capacity as Limited Purpose Fiduciary

*[Signature Page to Asset Purchase Agreement]*

**Exhibit A-1**

## EXHIBIT A

## DEFINED TERMS

**Acquisition Proposal** means any proposal or offer from any Person other than Buyer or its Affiliates or permitted assigns for the acquisition, transfer, purchase or other disposition of the Station Assets (or any material portion thereof), including (a) the acquisition, transfer, purchase or other disposition of any equity interests of Seller, (b) any business combination involving or otherwise relating to Seller, (c) any offer or proposal to restructure all or any portion of the liabilities of Seller, or (d) any other similar transaction, the consummation of which would reasonably be expected (i) to prevent or materially delay the transactions contemplated by this Agreement or (ii) to dilute materially the benefits to Buyer of such transactions.

**Affiliate** means, with respect to any Person, any other Person that, directly or indirectly through one or more intermediaries, Controls, is Controlled by or is under common Control with such Person.

**Agreement** has the meaning set forth in the Preamble.

**Applicable Law** means any applicable constitution, treaty, statute, rule, regulation, ordinance, order, directive, code, interpretation, judgment, decree, injunction, writ, determination, award, permit, license, authorization, directive, requirement, ruling or decision of, agreement with, or by a Governmental Authority.

**Assignment Application** has the meaning set forth in Section 6.1(b).

**Auction** has the meaning set forth in Section 6.11.

**Bankruptcy Code** has the meaning set forth in the Recitals.

**Bankruptcy Court** means the United States Bankruptcy Court in the Southern District of Texas, Houston Division.

**Bidding Procedures Order** means an order in the form of Exhibit E and subject only to such changes as Buyer in its sole discretion may consent to in writing providing, among other things (a) for approval of Buyer as the "stalking horse" bidder; (b) for procedures and requirements pursuant to which competitive bids for the Station Assets may be submitted by other potential bidders and considered by Seller, which, in addition to customary bid qualifications, will include (i) a minimum initial overbid increment in the amount of the Minimum Overbid and subsequent overbid increments of $100,000 and (ii) the requirement that the successful bidder's cash deposit will not be released or applied until the Break-Up Fee has been paid in full to Buyer; (c) that a prospective bidder must be a Qualified Bidder to submit a bid package; and (d) for a requirement that the order approving the sale of the Station Assets and the documents related to such transaction pursuant to Sections 363 and 365 of the Bankruptcy Code be entered by no later then November 2, 2009.

**Break-Up Fee** has the meaning set forth in Section 9.3(a).

Case 08-36583   Document 349-2   Filed in TXSB on 10/19/09   Page 3 of 75

**Business Day** means any day excluding Saturdays, Sundays and any day that is a legal holiday under the laws of the United States or is a day on which federal banking institutions located in or around Dallas, Texas are authorized or required by law or other governmental action to close.

**Buyer** has the meaning set forth in the Preamble.

**Buyer's Deposit** has the meaning set forth in Section 2.4(a).

**Claim** means a claim as defined in Section 101(5) of the Bankruptcy Code.

**Code** means the Internal Revenue Code of 1986, as amended.

**Communications Laws** means the Communications Act of 1934, as amended, or any successor statute or statutes thereto, and all rules, regulations, written policies, orders and decisions of the FCC thereunder, in each case as from time to time in effect.

**Contracts** means all contracts, leases, non-governmental licenses and other agreements (including leases for personal or real property, employment agreements and trade agreements), written or oral (including any amendments and other modifications thereto).

**Control** means having the power to direct the affairs of a Person by reason of either (a) owning or controlling the right to vote a sufficient number of shares of voting stock or other voting interest of such Person or (b) having the right to direct the general management of the affairs of such Person by contract or otherwise.

**Conversion Plan** has the meaning set forth in Section 6.12.

**Cure Costs** means the liabilities and obligations of Seller that must be paid or otherwise satisfied to cure all defaults by Seller in accordance with Section 365 of the Bankruptcy Code under the Contracts at the time of assignment thereof to, and the assumption thereof by, Buyer as provided herein.

**Dallas Allocation** has the meaning set forth in Section 2.6.

**Dallas Assignment and Acceptance Agreement** has the meaning set forth in Section 8.3(b)(i).

**Dallas Assignment and Assumption Agreement** has the meaning set forth in Section 8.3(b)(i).

**Dallas Assignment Application** has the meaning set forth in Section 6.1(b).

**Dallas Bill of Sale** has the meaning set forth in Section 8.3(b)(i).

**Dallas Closing** means the consummation of the purchase and sale of the Dallas Station Assets pursuant to this Agreement in accordance with the provisions of Article 8.

**Dallas Closing Date** has the meaning set forth in Section 8.1(b).

**Dallas Closing Payment** has the meaning set forth in Section 2.4(c)(i).

**Dallas FCC Licenses** means the licenses, permits or other authorizations, including any applications therefor, issued or granted by the FCC to Seller and used or intended to be used in the operation of the Dallas Station, including those set forth in Schedule 3.4, and including the rights in and to the Dallas Station's call signs.

**Dallas Purchase Price** has the meaning set forth in Section 2.4(c).

**Dallas Section 6.9 Escrow Amount** has the meaning set forth in Section 2.4(c)(ii).

**Dallas Station** has the meaning set forth in the Recitals.

**Dallas Station Assets** has the meaning set forth in the Recitals.

**Dallas Termination Date** has the meaning set forth in Section 9.1.

**Deposit Escrow Agreement** has the meaning set forth in Section 2.4(a).

**Digital Upgrade** has the meaning set forth in Section 6.12.

**DMA** has the meaning set forth in Section 3.4(d).

**DTV** has the meaning set forth in Section 3.4(c).

**DTV Construction Permits** has the meaning set forth in Section 3.4(c).

**Encumbrances** means, with respect to any asset, any and all Claims, Liens and other interests, including rights of first refusal, equities, or similar third party rights of any kind or nature whatsoever in respect of such asset.

**Escrow Agent** has the meaning set forth in Section 2.4(a).

**Excluded Assets** has the meaning set forth in Section 2.2.

**FAA** has the meaning set forth in Section 3.4(e).

**FCC** has the meaning set forth in the Recitals.

**FCC Approval** has the meaning set forth in Section 6.1(c).

**FCC Consent** means action by the FCC (including action duly taken by the FCC's staff pursuant to delegated authority) granting its consent to the assignment of the FCC Licenses by Seller to Buyer as contemplated by this Agreement.

**FCC Licenses** means the Houston FCC Licenses and the Dallas FCC Licenses.

**Final Order** means an action by the FCC that has not been reversed, stayed, enjoined, set aside, annulled or suspended, and with respect to which no requests or applications are pending

for administrative or judicial review, reconsideration, appeal, or stay, and the time for filing any such request or application, and the time for the FCC to set aside the action on its own motion, has expired.

**Financing** has the meaning set forth in Section 6.13.

**Financing Commitment** has the meaning set forth in Section 6.13.

**Governmental Authority** means any government, any governmental entity, department, commission, board, agency or instrumentality and any court, tribunal or judicial or arbitral body, whether federal, state or local.

**Houston Allocation** has the meaning set forth in Section 2.6.

**Houston Assignment and Acceptance Agreement** has the meaning set forth in Section 8.3(a)(i).

**Houston Assignment and Assumption Agreement** has the meaning set forth in Section 8.3(a)(i).

**Houston Assignment Application** has the meaning set forth in Section 6.1(b).

**Houston Bill of Sale** has the meaning set forth in Section 8.3(a)(i).

**Houston Closing** means the consummation of the purchase and sale of the Houston Station Assets pursuant to this Agreement in accordance with the provisions of Article 8.

**Houston Closing Date** has the meaning set forth in Section 8.1(a).

**Houston Closing Payment** has the meaning set forth in Section 2.4(b)(i).

**Houston FCC Licenses** means the licenses, permits or other authorizations, including any applications therefor, issued or granted by the FCC to Seller and used or intended to be used in the operation of the Houston Station, including those set forth in Schedule 3.4, and including the rights in and to the Houston Station's call signs.

**Houston Purchase Price** has the meaning set forth in Section 2.4(b).

**Houston Section 6.9 Escrow Amount** has the meaning set forth in Section 2.4(b)(iii).

**Houston Station** has the meaning set forth in the Recitals.

**Houston Station Assets** has the meaning set forth in the Recitals.

**Houston Termination Date** has the meaning set forth in Section 9.1.

**Independent Auditor** has the meaning set forth in Section 2.5(c).

**JBDI** has the meaning set forth in the Preamble.

A-4

**JBI** has the meaning set forth in the Preamble.

**Leases** has the meaning set forth in Section 3.5(a).

**Lien** means, with respect to any asset, any mortgage, lien, pledge, charge, security interest, or restriction of any kind, whether statutory or otherwise, in respect of such asset.

**LPF** has the meaning set forth in the Preamble.

**LPF's Knowledge** means the actual knowledge of the LPF and the knowledge the LPF would have obtained in the ordinary course of his duties as LPF (as set forth in the LPF Order), which will be deemed to include the knowledge that he could obtain through discussions with Douglas Johnson, senior executives, or attorneys of Seller with knowledge of or responsibility for the subject matter in question.

**LPF Order** has the meaning set forth in the Recitals.

**Material Adverse Effect** means an adverse effect that is or would reasonably be expected to (a) be material to business, operation or financial condition of the Stations and the Station Assets, taken together as a whole, financially or otherwise or (b) prevent or materially delay or materially impair the ability of Seller to complete the sale of the Station Assets to Buyer.

**Minimum Overbid** means an amount equal to the Break-Up Fee, plus $100,000, which minimum overbid equals $800,000.

**MVPD** means multichannel video distribution system, which includes cable television systems, satellite master antenna television systems, open video systems, broadband radio service, direct broadcast satellite service, multichannel multipoint distribution service and multipoint distribution service.

**Party or Parties** has the meaning set forth in the Preamble.

**Permitted Liens** means (a) liens for Taxes not yet due and payable; (b) liens for property Taxes not delinquent; and (c) any Liens disclosed in Schedule 3.4, 3.5, or 3.6.

**Person** means an individual, corporation, association, partnership, joint venture, trust, estate, limited liability company, limited liability partnership or other entity or organization.

**Post-Transition Facilities** has the meaning set forth in Section 3.4(c).

**Purchase Agreement** has the meaning set forth in the Preamble.

**Qualified Bidder** means a prospective bidder who has submitted to Seller and the LPF a bid package at least seven days prior to the auction date scheduled by the Bankruptcy Court which consists of: (a) an executed confidentiality agreement; (b) a bid in an amount which exceeds Buyer's offer by an amount at least equal to the Minimum Overbid; (c) submit a bid on substantially the same terms and subject to the same conditions set forth in this Agreement,

except only as to such bidder's identity, and the amount of the purchase price; (d) a cash deposit equal to 5% of such bid; and (e) evidence demonstrating the financial wherewithal, reasonably satisfactory to Seller and the LPF, to close the transactions.

**Real Property** has the meaning set forth in Section 3.5(a).

**Related Party** has the meaning set forth in Section 9.2(a)(i).

**Required Consents** means any and all consents, approvals, waivers, clearances and estoppels, if applicable, that may require consent of a third Person in order for Seller to consummate its obligations hereunder, including the sale of the Station Assets to Buyer.

**Sale Approval Order** means an order in the form substantially similar to Exhibit D and subject only to such changes as Buyer in its sole discretion may consent to in writing pursuant to Sections 105, 363, 365 and other applicable provisions of the Bankruptcy Code, among other things, (a) authorizing and approving the sale to Buyer pursuant to this Agreement of the Station Assets, and approving the terms of this Agreement, (b) authorizing and approving the assignment by Seller, and the assumption by Buyer of the executory contracts and unexpired leases at Buyer's discretion, (c) finding that Buyer extended in good faith and is entitled to the protections afforded under Bankruptcy Code Section 364(e) and that the ten-day stay requirement of Fed. R. Bankr. P. 6004(h) is waived, (d) finding Buyer is acting in good faith, and is entitled to the protections of a good faith purchaser under Section 363(m) of the Bankruptcy Code, and (e) containing such other findings and provisions consistent with applicable Law as may be reasonably requested by Buyer.

**Sale Motion** has the meaning set forth in Section 6.10(a).

**Section 6.9 Escrow Agreement** has the meaning set forth in Section 2.4(b)(iii).

**Seller** has the meaning set forth in the Preamble.

**Station Assets** has the meaning set forth in the Recitals.

**Stations** has the meaning set forth in the Recitals.

**Tax** means any federal, state, local or foreign income, gross receipts, windfall profits, severance, property, production, sales, use, license, excise, franchise, capital, transfer, employment, withholding or other tax or governmental assessment, together with any interest, additions or penalties with respect thereto and any interest in respect of such additions or penalties.

**Tax Return** means any tax return, declaration of estimated tax, tax report or other tax statement or any other similar filing required to be submitted by Seller relating to the Stations to any Governmental Authority with respect to any Tax.

**Termination Date** has the meaning set forth in Section 9.1..

**Tower Facilities** has the meaning set forth in Section 3.6(a).

**Transfer Taxes** has the meaning set forth in <u>Section 2.8</u>.

**WARN Act** means the Worker Adjustment and Retraining Notification Act.