IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

```
- - - - - - - - - - - - - - - - - - - - - - - - - - - -   x
In re:                                    :   Chapter 11
                                          :
JOHNSON BROADCASTING, INC., et al.,       :   Case No. 08-36583
                                          :
              Debtors.                    :   Jointly Administered
- - - - - - - - - - - - - - - - - - - - - - - - - - - -   x
```

## SECOND AMENDED DISCLOSURE STATEMENT FOR THE DEBTORS' FIRST AMENDED JOINT CHAPTER 11 PLAN

John J. Sparacino
Timothy A. Davidson II
ANDREWS KURTH LLP
600 Travis, Suite 4200
Houston, TX 77002
(713) 220-4200 Telephone
(713) 220-4285 Facsimile

ATTORNEYS FOR JOHNSON BROADCASTING, INC
AND JOHNSON BROADCASTING OF DALLAS, INC.

January 31, 2011

**THIS IS NOT A SOLICITATION OF ACCEPTANCES OR REJECTIONS OF THE PLAN. ACCEPTANCES OR REJECTIONS OF THE PLAN MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THIS DOCUMENT IS BEING SUBMITTED TO THE BANKRUPTCY COURT FOR APPROVAL BUT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT.**

HOU:3090171.3

**DISCLAIMER**

THIS SECOND AMENDED DISCLOSURE STATEMENT (THE "DISCLOSURE STATEMENT") AND ITS RELATED DOCUMENTS ARE BEING USED IN CONNECTION WITH THE SOLICITATION OF VOTES ACCEPTING THE JOINT CHAPTER 11 PLAN FOR JOHNSON BROADCASTING, INC ("JBI") AND JOHNSON BROADCASTING OF DALLAS, INC. ("JBD" AND COLLECTIVELY, THE "DEBTORS"), DATED JANUARY 31, 2011 (AS MAY BE FURTHER AMENDED, THE "PLAN") PROPOSED BY THE DEBTORS.

THIS DISCLOSURE STATEMENT CONTAINS SUMMARIES OF CERTAIN PROVISIONS OF THE PLAN, STATUTORY PROVISIONS, DOCUMENTS RELATED TO THE PLAN, EVENTS IN THE CHAPTER 11 CASES AND FINANCIAL INFORMATION. THIS DISCLOSURE STATEMENT IS NOT INTENDED TO REPLACE A CAREFUL AND DETAILED REVIEW AND ANALYSIS OF THE PLAN OR SUCH STATUTORY PROVISIONS, DOCUMENTS OR FINANCIAL INFORMATION, BUT IS RATHER INTENDED ONLY TO AID AND TO SUPPLEMENT SUCH REVIEW. THIS DISCLOSURE STATEMENT IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE MORE DETAILED PROVISIONS SET FORTH IN THE PLAN (WHICH IS ATTACHED HERETO AS EXHIBIT A). IN THE EVENT OF A CONFLICT BETWEEN THE PLAN AND THIS DISCLOSURE STATEMENT, THE PROVISIONS OF THE PLAN SHALL GOVERN. ALL HOLDERS OF CLAIMS AND EQUITY INTERESTS IN VOTING CLASSES ARE ENCOURAGED TO REVIEW THE FULL TEXT OF THE PLAN AND TO READ CAREFULLY THIS ENTIRE DISCLOSURE STATEMENT, INCLUDING ALL EXHIBITS ATTACHED HERETO, BEFORE DECIDING WHETHER TO VOTE TO ACCEPT OR TO REJECT THE PLAN.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF, AND THE DELIVERY OF THIS DISCLOSURE STATEMENT SHALL NOT, UNDER ANY CIRCUMSTANCES, CREATE ANY IMPLICATION THAT THE INFORMATION CONTAINED HEREIN IS CORRECT AT ANY TIME SUBSEQUENT TO THE DATE HEREOF. THE PLAN PROPONENTS DO NOT WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED HEREIN, INCLUDING THE FINANCIAL INFORMATION, IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.

THE SOLICITATION PERIOD PURSUANT TO THIS DISCLOSURE STATEMENT WILL EXPIRE AT 5:00 P.M. (CENTRAL TIME) ON MARCH 3, 2011 (THE "VOTING DEADLINE"). TO BE COUNTED, BALLOTS MUST BE ACTUALLY RECEIVED IN ACCORDANCE WITH THE VOTING INSTRUCTIONS BY DEBTORS' COUNSEL ON OR BEFORE THE VOTING DEADLINE. PLEASE SEE SECTION I.B OF THIS DISCLOSURE STATEMENT FOR VOTING INSTRUCTIONS. BALLOTS WILL BE ACCEPTED VIA FACSIMILE OR ELECTRONIC MAIL.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND RULE 3016 OF THE BANKRUPTCY RULES AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAW OR OTHER NON-BANKRUPTCY LAW. HOLDERS OF

CLAIMS AND EQUITY INTERESTS SHOULD NOT CONSTRUE THE CONTENTS OF THIS DISCLOSURE STATEMENT AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL OR TAX ADVICE.   EACH SUCH HOLDER SHOULD, THEREFORE, CONSULT WITH ITS OWN LEGAL, BUSINESS, FINANCIAL AND TAX ADVISORS AS TO ANY SUCH MATTERS CONCERNING THE SOLICITATION, THE PLAN, AND THE TRANSACTIONS CONTEMPLATED THEREBY.

AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND OTHER ACTIONS OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT SHALL NOT BE CONSTRUED AS AN ADMISSION, STIPULATION OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS.    THIS DISCLOSURE STATEMENT SHALL NOT BE ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING.

IF THE BANKRUPTCY COURT CONFIRMS THE PLAN AND IT BECOMES EFFECTIVE, ALL HOLDERS OF CLAIMS AND EQUITY INTERESTS (INCLUDING THOSE WHO REJECTED OR WHO ARE DEEMED TO HAVE REJECTED OR ACCEPTED THE PLAN AND THOSE WHO DID NOT SUBMIT BALLOTS TO ACCEPT OR TO REJECT THE PLAN) SHALL BE BOUND BY THE TERMS OF THE PLAN.

## TABLE OF CONTENTS

DISCLAIMER ............................................................................................................................ ii

I.  INTRODUCTION ............................................................................................................. 1
    A.  General ................................................................................................................. 1
    B.  Voting Instructions and Procedures ..................................................................... 1
        1.  Voting Procedures, Ballots and Voting Deadline ..................................... 1
        2.  Voting Record Date ................................................................................... 2
        3.  Incomplete Ballots ..................................................................................... 3
        4.  Defects, Irregularities, Etc. ....................................................................... 3
        5.  Withdrawal of Ballot .................................................................................. 3
    C.  Confirmation Hearing and Summary of Plan ....................................................... 4
    D.  Recommendation of Debtors ................................................................................ 4

II. CERTAIN EVENTS PRECEDING THE DEBTORS' CHAPTER 11 FILINGS ............ 4
    A.  Business, Corporate and Financial Overview ...................................................... 4
    B.  Significant Pre-Petition Debt Obligations ........................................................... 5
        a.  The Merrill Credit Agreement ................................................................... 5
        b.  The IFC Capitalized Lease ........................................................................ 5
        c.  The Johnson Relatives' Loans ................................................................... 6
    C.  The Mandatory Transition to Digital Television .................................................. 6
    D.  Other Events Leading to Chapter 11 Filing ......................................................... 6

III. EVENTS DURING THE CHAPTER 11 CASES ............................................................. 6
    A.  Continuation of Business and Joint Administration ............................................. 6
    B.  IFC Settlement ..................................................................................................... 6
    C.  Use of Cash Collateral ......................................................................................... 7
    D.  FCC Fees and STA Costs ..................................................................................... 8
    E.  The Limited Purpose Fiduciary ............................................................................ 8
    F.  Debtors Employment of Mission Capital Group, LLC ......................................... 8
    G.  DTV Build-Out ..................................................................................................... 8
    H.  Sales And Marketing Process ............................................................................... 9

IV. SUMMARY OF THE PLAN ........................................................................................... 9
    A.  Introduction .......................................................................................................... 9
    B.  Sale Alternative Confirmation ............................................................................. 10
        1.  Stalking Horse Bidder for Sale Alternative Confirmation ........................ 10
    C.  Classification of Claims ...................................................................................... 13
    D.  Treatment of Claims and Equity Interests and Summary of Distributions
        Under the Plan ...................................................................................................... 14
        1.  Administrative Expense Claims ................................................................ 14
        2.  Priority Tax Claims .................................................................................... 15
        3.  JBI Administrative Expense Claim ............................................................ 15
        4.  Summary of Classification and Treatment of Holders of Allowed
            Claims and Equity Interests that are Placed in Classes ............................. 15

| D. | | Distribution Provisions ..................................................................... | 20 |
|---|---|---|---|
| | 1. | Distributions.................................................................................. | 20 |
| | 2. | Distributions of Cash .................................................................... | 20 |
| | 3. | Distributions on a Subsequent Distribution Date........................... | 20 |
| | 4. | Distributions on the Final Distribution Date.................................. | 20 |
| | 5. | Delivery of Distributions and Undeliverable Distributions ............ | 20 |
| | 6. | Time Bar to Cash Payments and Disallowances.............................. | 21 |
| | 7. | Minimum Distributions.................................................................. | 21 |
| | 8. | Transactions on Business Days....................................................... | 21 |
| | 9. | Distributions After Allowance ....................................................... | 21 |
| | 10. | Disputed Payments......................................................................... | 21 |
| | 11. | No Distribution in Excess of Allowed Amount of Claim................. | 21 |
| E. | | Means for Execution of the Plan .......................................................... | 22 |
| | 1. | Cancellation of Equity Interests and Re-Issuance of New Common Stock ............................................................................................... | 22 |
| | 2. | Dissolution of Corporate Entities................................................... | 22 |
| | 3. | Vesting of Property of Each Estate in Each Liquidating Debtor ............ | 22 |
| | 4. | Plan Agent...................................................................................... | 22 |
| | 5. | Further Orders................................................................................ | 25 |
| | 6. | Post-Effective Date Reports, Final Decree .................................... | 25 |
| | 7. | Discharge of Plan Agent ................................................................ | 26 |
| | 8. | Corporate Action............................................................................ | 26 |
| | 9. | Release of Liens ............................................................................. | 26 |
| | 10. | Restructuring Transactions ............................................................ | 26 |
| | 11. | Exemption from Certain Transfer Taxes and Recording Fees.................. | 27 |
| | 12. | Withholding and Reporting Requirements ...................................... | 27 |
| | 13. | Periodic Reports and United States Trustee's Fees ........................ | 27 |
| | 14. | Assignment and Prosecution of Rights of Action........................... | 27 |
| | 15. | Provisions Relating to Default ....................................................... | 29 |
| | 16. | Closing of the Debtors' Cases........................................................ | 29 |
| | 17. | Settlement with Related Parties ..................................................... | 29 |
| F. | | Conditions Precedent to Effectiveness of Plan .................................... | 30 |
| | 1. | Conditions to the Effective Date.................................................... | 30 |
| | 2. | Waiver of Conditions ..................................................................... | 30 |
| H. | | Treatment of Executory Contracts and Unexpired Leases .................... | 31 |
| | 1. | Rejection of Executory Contracts and Unexpired Leases................ | 31 |
| | 2. | Bar Date for Filing Rejection Claims ............................................. | 31 |
| | 3. | Provisions Relating to Assumption Cure Claims............................. | 31 |
| I. | | Procedures for Resolving and Treating Disputed Claims...................... | 31 |
| | 1. | Objections to Claims....................................................................... | 31 |
| | 2. | No Distribution Pending Determination of Allowance of Disputed Claims; Distributions to be Made on Undisputed Balances of Partially Disputed Claims ................................................................ | 32 |
| | 3. | Reserve Accounts for Disputed Claims .......................................... | 32 |
| | 4. | Investment of Disputed Claims Reserve.......................................... | 32 |
| | 5. | Allowance and Payment ................................................................. | 32 |

|       | 6.  | Release of Excess Funds from Disputed Claims Reserve | 32 |
|       | 7.  | Estimation | 33 |
| J.    |     | Modification of Plan | 33 |
| K.    |     | Allocation of Plan Distributions Between Principal and Interest | 33 |
| L.    |     | Post-Confirmation Actions, Reports and Final Decree | 33 |
|       | 1.  | Reports of Distribution | 33 |
|       | 2.  | Final Report | 34 |
|       | 3.  | Request for Post-Confirmation Notices and Filings | 34 |

V.    CONFIRMATION OF THE PLAN ..... 34

| A. |    | Introduction | 34 |
| B. |    | Voting | 34 |
| C. |    | Acceptance | 35 |
| D. |    | Confirmation of the Plan | 35 |
|    | 1. | Best Interests of Holders of Claims and Equity Interests | 37 |
|    | 2. | Feasibility | 38 |
|    | 3. | Acceptance by Impaired Classes | 38 |
|    | 4. | Cram Down | 39 |
|    | 5. | Classification of Claims | 39 |
| E. |    | Effect of Confirmation of the Plan | 40 |
|    | 1. | Revesting of Assets | 40 |
|    | 2. | Discharge of the Debtors | 40 |
|    | 3. | No Waiver of Discharge | 41 |
|    | 4. | Binding Effect | 41 |
|    | 5. | Term of Injunctions or Stays | 41 |
|    | 6. | Setoffs | 41 |
|    | 7. | Exculpation | 41 |
|    | 8. | Indemnification | 42 |

II.    CERTAIN RISK FACTORS TO BE CONSIDERED ..... 42

| A. | Risk that Distributions will be Less than Estimated by the Debtors | 42 |
| B. | Risk of Non-Confirmation of the Plan | 43 |
| C. | Non-Consensual Confirmation of the Plan | 43 |
| D. | Post-Closing Adjustments May Reduce the Sales Proceeds | 43 |
| E. | The FCC May Not Grant the Debtors' Licenses to Broadcast | 43 |

II.    CERTAIN TAX CONSEQUENCES OF THE PLAN ..... 43

III.    CONCLUSION AND RECOMMENDATION ..... 45

## EXHIBITS TO DISCLOSURE STATEMENT

Exhibit A       -       Debtors' Joint Chapter 11 Plan

Exhibit B       -       Liquidation Analysis

Exhibit C       -       Rights of Action

# I.    INTRODUCTION

## A.    General

Johnson Broadcasting, Inc. ("JBI") and Johnson Broadcasting of Dallas, Inc. ("JBD", and with JBI, the "Debtors") filed petitions for relief under chapter 11 of title 11 of the United States Code (as amended, the "Bankruptcy Code") on October 13, 2009 (the "Petition Date").

The Debtors submit this disclosure statement (this "Disclosure Statement") pursuant to section 1125 of the Bankruptcy Code, for use in the solicitation of votes on the Debtors' Joint Chapter 11 Plan (the "Plan"). A copy of the Plan is attached as Exhibit A to this Disclosure Statement. All capitalized terms not otherwise defined in this Disclosure Statement shall have the meanings set forth in the Plan.

This Disclosure Statement sets forth certain information regarding the Debtors' prepetition operating and financial history, their need to seek chapter 11 protection, significant events that have occurred during their chapter 11 Cases, and the alternatives for either the liquidation or reorganization of the Debtors under the Plan. This Disclosure Statement also describes terms and provisions of the Plan, including certain alternatives to the Plan, certain effects of confirmation of the Plan, and the manner in which distributions will be made under the Plan. In addition, this Disclosure Statement discusses the confirmation process and the voting procedures that holders of Claims and Interests entitled to vote under the Plan must follow for their votes to be counted.

## B.    Voting Instructions and Procedures

### 1.    Voting Procedures, Ballots and Voting Deadline

With respect to Classes of Claims and Equity Interests that are Impaired under the Plan, each holder of an Allowed Claim or Interest in such a Class will receive this Disclosure Statement, the order approving the Disclosure Statement, the Plan, the notice of the Confirmation Hearing and a Ballot for voting the acceptance or rejection of the Plan (unless deemed to reject the Plan).

Under the Plan, all holders of Claims against the Debtor in Classes 2, 3, 5, 6 and 7 (the "Voting Classes") are Impaired and entitled to vote on the Plan. Holders of Claims in Class 1 DIP Lender Claims and Class 4 Priority Claims are Unimpaired under the Plan and are deemed to have accepted the Plan. For a description of the Classes of Claims and Equity Interests and their treatment under the Plan, see Article 6, "Treatment of Classes of Claims and Equity Interests."

Only Persons who hold Claims or Equity Interests on the Record Date (as defined below) are entitled to receive a copy of this Disclosure Statement. Only persons who hold Claims in the Voting Classes on the Record Date are entitled to vote on whether to accept the Plan.

Separate pre-addressed return envelopes have been supplied for the Ballots. Holders of Allowed Claims and Allowed Equity Interests in the Voting Classes should take care

HOU:3090171.3

to use the proper pre-addressed envelope to ensure that Ballots are returned to the proper address. PLEASE CAREFULLY FOLLOW THE DIRECTIONS CONTAINED ON EACH ENCLOSED BALLOT.  ALL VOTES TO ACCEPT OR TO REJECT THE PLAN MUST BE CAST BY USING THE BALLOT ENCLOSED WITH THIS DISCLOSURE STATEMENT.  In order for a Ballot to be counted, it must be completed, signed and sent to Counsel for the Debtors (the "Balloting Agent") **so as to be received by the Voting Deadline (5:00 p.m. Central Time on** March 3, 2011) at the following address:

Andrews Kurth LLP
Attention: Joseph Rovira
600 Travis, Suite 4200
Houston, TX 77002

If you are a holder of an Allowed Claim or Allowed Equity Interest in a Voting Class and (i) did not receive a Ballot, (ii) received a damaged Ballot, (iii) lost your Ballot, (iv) have any question about balloting procedures, or (v) wish to obtain, at your own expense, (unless otherwise specifically required by Bankruptcy Rule 3017(d)), an additional copy of the Plan or this Disclosure Statement, please contact:

Andrews Kurth LLP
Attention: Joseph Rovira
600 Travis, Suite 4200
Houston, TX 77002

ONLY PROPERLY COMPLETED AND SIGNED BALLOTS RECEIVED BY THE BALLOTING AGENT PRIOR TO THE VOTING DEADLINE WILL BE COUNTED FOR PURPOSES OF DETERMINING WHETHER EACH VOTING CLASS HAS ACCEPTED THE PLAN.  ANY BALLOTS RECEIVED AFTER THE VOTING DEADLINE WILL NOT BE COUNTED ABSENT THE EXPRESS WRITTEN CONSENT OF THE DEBTORS.  BALLOTS RECEIVED BY FACSIMILE OR ELECTRONIC MAIL WILL BE COUNTED.  The Debtors will prepare and file with the Bankruptcy Court a certification of the results of the balloting with respect to the Plan.

**Your vote on the Plan is important.  The Bankruptcy Code requires as a condition to confirmation of a plan that each class that is impaired under such plan vote to accept such plan, unless the "cram down" provisions of the Bankruptcy Code are satisfied.** *See* **Section V.D.4, "Cram Down."**

### 2.    Voting Record Date

The record date for voting on the Plan is 5:00 p.m. (prevailing Central time) on March 3, 2011 (the "Record Date").  Only holders of Claims and Equity Interests in the Voting Classes as of the Record Date are entitled to vote to accept or reject the Plan.

### 3.       Incomplete Ballots

Any Ballot received that is not signed or does not indicate either an acceptance or a rejection of the Plan shall be an invalid Ballot and shall not be counted for purposes of determining acceptance or rejection of the Plan.

### 4.       Defects, Irregularities, Etc.

Unless otherwise directed by the Bankruptcy Court, all questions as to the validity, form, eligibility (including time of receipt), acceptance, and revocation or withdrawal of Ballots will be determined by the Debtors in their sole discretion, whose determination will be final and binding.  Unless the Ballot being furnished is timely filed by the Voting Deadline, together with any other documents required by such Ballot, the Debtors may reject such Ballot as invalid and, therefore, decline to use it in connection with seeking confirmation of the Plan by the Bankruptcy Court.  In the event of a dispute with respect to a Ballot, any vote to accept or reject the Plan cast with respect to such Ballot will not be counted for purposes of determining whether the Plan has been accepted or rejected, unless the Bankruptcy Court orders otherwise. The Debtors reserve the right to reject any and all Ballots not in proper form.  The Debtors further reserve the right to waive any defects or irregularities or conditions of delivery as to any particular Ballot.  The interpretation (including the Ballot and the respective instructions thereto) by the Debtors, unless otherwise directed by the Bankruptcy Court, will be final and binding on all parties.  Unless waived, any defects or irregularities in connection with delivery of a Ballot must be cured within such time as the Debtors (or the Bankruptcy Court) determine.  Neither the Debtors nor any other person will be under any duty to provide notification of defects or irregularities with respect to deliveries of Ballots nor will any of them incur any liabilities for failing to provide such notification.  Unless otherwise directed by the Bankruptcy Court, delivery of such Ballots will not be deemed to have been made until such irregularities have been cured or waived.

### 5.       Withdrawal of Ballot

All properly completed, valid Ballots will be irrevocable upon the Voting Deadline.  Prior to the Voting Deadline, any holder of a Claim who has delivered a valid Ballot may withdraw its vote by delivering a written notice of withdrawal to the Balloting Agent so as to be received by the Balloting Agent before the Voting Deadline.  To be valid, the notice of withdrawal must (a) describe the Claim to which it relates, (b) be signed by the party who signed the Ballot to be revoked, and (c) be received by the Balloting Agent by the Voting Deadline. Withdrawal of a Ballot can only be accomplished pursuant to the foregoing procedure.  Prior to the Voting Deadline, any holder of a Claim who has delivered a valid Ballot may change its vote by delivering to the Balloting Agent properly completed subsequent Ballot so as to be received before the Voting Deadline.  In the case where more than one timely, properly completed Ballot for the same Claim(s) is received by the Voting Deadline, only the Ballot that bears the latest date will be counted.  After the Voting Deadline, a vote of the holder of a Claim may only be changed or withdrawn with the authorization of the Bankruptcy Court upon a showing of "cause" pursuant to Bankruptcy Rule 3018(a).

### C.    Confirmation Hearing and Summary of Plan

The Debtors sold substantially all of their assets, are liquidating, and have no further business operations. Such sale was approved by the order of the Bankruptcy Court on December 21, 2009, and subsequently closed on December 29, 2010. The Plan provides for the distribution of the cash sale proceeds pursuant the rules of priority as set forth in the Bankruptcy Code.

**The Bankruptcy Court will hold a hearing on confirmation of the Plan (the "Confirmation Hearing") commencing at 2:30 p.m. prevailing Central time on March 7, 2011, before the Honorable Jeff Bohm, United States Bankruptcy Judge for the Southern District of Texas, Houston Division, Courtroom 600, 515 Rusk Avenue, Houston, Texas 77002.**

The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice, except for an announcement of the adjourned date made at the Confirmation Hearing. The Confirmation Hearing may be continued from time to time as necessary. At the Confirmation Hearing, the Bankruptcy Court will (i) determine whether the requisite votes have been obtained for each of the Voting Classes, (ii) hear and determine objections, if any, to the Plan and to confirmation of the Plan that have not been previously disposed of, (iii) determine whether the Plan meets the confirmation requirements of the Bankruptcy Code, and (iv) determine whether to confirm the Plan.

Any objection to confirmation of the Plan must be made in writing and must specify in detail the name and address of the objector, all grounds for the objection and the amount of the Claim held by the objector. Any such objections must be filed and served upon the Persons designated in the notice of the Confirmation Hearing, in the manner and by the deadline described therein.

### D.    Recommendation of Debtors

The Debtors recommend that holders of Claims entitled to vote on the Plan vote to **ACCEPT** the Plan.

## II.    CERTAIN EVENTS PRECEDING THE DEBTORS' CHAPTER 11 FILINGS

### A.    Business, Corporate and Financial Overview

JBI owned and operated KNWS-TV, a commercial UHF television station licensed to Katy, Texas, within the Houston, Texas designated market area ("DMA"). JBI built the station and put it on the air in 1993. JBI is licensed for analog television service on UHF Channel 51 and digital television service on UHF Channel 52. KNWS-TV is an independent station.

JBD owned and operated KLDT-DT (collectively with KNWS-TV, the "Stations"), a commercial television station licensed to Lake Dallas, Texas, within the Dallas-Fort Worth, Texas DMA. KLDT-DT operates on a digital-only basis, having sold its analog channel to

Qualcomm and flash-cut to digital in January 2007. The station broadcasts on full-power digital Channel 54. KLDT-DT is an independent station.

JBI is wholly-owned by Douglas R. Johnson ("Johnson"). Johnson owns approximately 85% of JBD and the remaining equity is owned by various of Johnson's family members and the station manager. Johnson is the sole director of each Debtor.

The Debtors derive their revenues primarily from paid programming and from local, regional, and national advertising on their television stations. The advertising rates charged by the Debtors' television stations for advertising during a particular program depend upon: (i) the programs popularity with viewers that advertisers wish to reach; (ii) the number of advertisers competing for the available time, (iii) the size and demographic make-up of the market served by the station; and (iv) the availability of alternative advertising media in the market area.

In the operation of their business, the Debtors employed approximately 24 employees. The Debtors' employees conducted substantially all administrative functions related to the operation of the Debtors' business including, but not limited to, human resources, engineering, permitting, accounting, logistics and other functions related to the stations. After the closing of the sale, the Debtors are no longer an operating business and have only a few employees remaining to oversee the liquidation of the Debtors assets.

## B.    Significant Pre-Petition Debt Obligations

### a.    The Merrill Credit Agreement

As of the Petition Date, JBI was a party to that certain WCMA Line of Credit and Security Agreement dated as of April 30, 2002 (the "Line of Credit Agreement") and that Term Note dated as of April 30, 2002 (the "Term Note" and, collectively with the Line of Credit Agreement, the "Merrill Credit Agreement"), by and among JBI as borrower, Johnson, as obligor, and Merrill Lynch Commercial Finance Corp., as assignee of Merrill Lynch Business Finance Corp. ("Merrill") as lender. Pursuant to the Merrill Credit Agreement, Merrill agreed to extend loans to the Debtors in an aggregate principal amount of $5,553,000.00, secured by a lien on substantially all of JBI's assets. As of the Petition Date, the Debtors owed approximately $4,201,377 under the Merrill Credit Agreement. There is interest and attorneys' fees accruing post-Petition Date under the Merrill Credit Agreement.

### b.    The IFC Capitalized Lease

On or around May 18, 2006, the Debtors entered into a master lease agreement and three equipment leases (collectively, the "IFC Leases") with IFC Credit Corporation ("IFC"). Prior to the Petition Date, the Debtors failed to make certain of the monthly payments due under the IFC Lease. IFC accelerated the amounts due under the IFC Lease and sought an injunction prohibiting the Debtors from using the leased equipment. The injunction hearing in federal court in Illinois was scheduled to be held the day following the Petition Date.

### c.       The Johnson Relatives' Loans

As of the Petition Date, JBD was also a party to certain credit agreements, by and among JBD as borrower, and certain relatives of Doug Johnson, as lenders (collectively, the "Relatives' Loans"). These loans are purportedly secured by, essentially, all of the assets of JBD. The liens are unperfected and the purported security interests are subject to avoidance. The prepetition outstanding amount of the Relatives' Loans is in the approximate aggregate amount of $5.2 million.

## C.       The Mandatory Transition to Digital Television

Due to a mandatory transition from analog to digital television broadcasting mandated by the Federal Communications Commission (the "FCC"), the Debtors were required to begin construction of a full power digital television transmission facility. The Debtors, as well as all television broadcasters, are under mandate by federal statute and implementing FCC reports and orders to have these facilities constructed (the "DTV Transition") on or before February 17, 2009 (the "Initial DTV Transition Date"). However, the Debtors were able to obtain special temporary authority ("STA") permitting the Debtors to broadcast past the Initial DTV Transition Date on a low digital power. The DTV Transition required significant capital expenditures of the Debtors.

## D.       Other Events Leading to Chapter 11 Filing

In addition to the DTV Transition, several factors, including recent economic forces and a reduction in advertising in general, have caused a decline in the Debtors' cash flow. This decline has caused the Debtors to fall behind in satisfying their obligations.

## III.       EVENTS DURING THE CHAPTER 11 CASES

## A.       Continuation of Business and Joint Administration

On the Petition Date, the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code (the "Petitions"). Subsequent to the Petition Date, the Debtors have continued to operate as debtors-in-possession subject to the supervisions of the Bankruptcy Court. By order of the Court, the Debtors' chapter 11 cases have been jointly administered.

## B.       IFC Settlement

On November 25, 2008, IFC filed a motion seeking to compel Debtors to assume and cure or reject the IFC Leases.[1] The Debtors objected to the motion,[2] but continued to negotiate a

---

[1]       *Motion to Compel Assumption or Rejection of Executory Contract* [Docket No. 69].

[2]       *Objection to the Motion of IFC Credit Corporation to Compel Assumption or Rejection of Executory Contract* [Docket No. 81], filed December 12, 2008.

settlement with IFC. On January 16, 2009, the Court entered an agreed order whereby Debtors assumed the IFC Leases and agreed to pay certain cure amounts.[3]

On July 27, 2009, IFC filed for bankruptcy protection in the Northern District of Illinois. The Debtors objected to the allowance of the IFC proofs of claim filed against each debtor based on the terms of the agreed order. On November 11, 2009, after a hearing on the Debtors objection to the IFC proofs of claim, the Court entered an Order Disallowing Claims of IFC Credit Corporation [Docket No. 387].

### C.    Use of Cash Collateral

Initially, the Debtors attempted to negotiate a consensual cash collateral agreement with Merrill. However, before an agreement could be reached, the Court required that the Debtors file a motion for approval to use cash collateral. Debtors filed their *Motion for Interim and Final Order Authorizing Debtors to Use Cash Collateral and Scheduling Final Hearing* [Docket No. 56] (the "Cash Collateral Motion") on November 17, 2008. The Court entered the *First Interim Order Authorizing Use of Cash Collateral* [Docket No. 63] (the "First Interim Cash Collateral Order") after a hearing on November 21, 2008. A *Second Interim Order Authorizing Use of Cash Collateral* [Docket No. 92] (the "Second Interim Cash Collateral Order") was entered on December 29, 2008, after a hearing held on December 23, 2008. The Court entered its *Final Order Authorizing Use of Cash Collateral* [Docket No. 129] (the "Final Cash Collateral Order") after a hearing on January 30, 2009. Additionally, throughout the pendency of these cases, Debtor and Merrill have reached agreements allowing Debtor to use cash collateral to pay certain necessary expenses.

Pursuant to the *Order Regarding Debtors' Expedited Motion for Order Authorizing Use of Cash Collateral to Pay Costs Related to DTV Conversion*, discussed below, the Debtors were allowed to continue to use Merrill's cash collateral pursuant to an agreed budget through December 2009.

On November 25, 2009, the Debtors filed a Motion Authorizing Debtors to Continue Use of Cash Collateral [Docket No. 404]. After submission of an agreed order with Merrill, the Court entered an order granting the Debtors' Motion to Continue Use of Cash Collateral [Docket No. 419] on December 15, 2009. By the Court's order, the Debtors' authority to use cash collateral is continued through and until April 1, 2010.

On March 23, 2010, the Debtors filed a Motion Authorizing Debtors to Continue Use of Cash Collateral [Docket No. 495]. After submission of an agreed order with Merrill, the Court entered an order granting the Debtors' Motion to Continue Use of Cash Collateral [Docket No. 498] through December 31, 2010. Subsequent to closing of the sale, the JB paid off the pre-petition claim of Merrill and there are no longer any restrictions on use of cash collateral for either of the Debtors.

---

[3]     *Agreed Order Resolving Motion of IFC Credit Corporation to Compel Assumption or Rejection of Executory Contract* [Docket No. 119].

### D.      FCC Fees and STA Costs

The Debtors filed an *Expedited Motion Under 11 U.S.C. §363 and Fed. R. Bankr. P. 4001 For Entry of Order Authorizing Debtors to Use Cash Collateral to Pay Costs Related to DTV Transition* [Docket No. 106] on January 13, 2009.  The Court granted the motion, allowing the debtors to pay certain costs associated with the Debtors' application for STA with the FCC.[4] The FFC granted the STAs for each Debtor allowed Debtors to continue broadcasting beyond the Initial DTV Transition Date.

In addition to the costs and fees associated with obtaining the STAs, the Debtors were required to pay certain pre-petition regulatory fees in order to avoid being "red lighted" by the FCC.  Thus, on January 9, 2009, the Debtors filed their *Motion for Payment of Prepetition FCC Regulatory Fees* [Docket No. 99].  The Court granted this motion in its *Order Granting Debtors' Expedited Motion for Payment of Prepetition FCC Regulatory Fees* [Docket No. 108], entered January 13, 2009.  The Debtors paid the 2008 FCC regulatory fees and timely paid the 2009 FCC regulatory fees.  The Debtors have also timely paid all 2010 FCC regulatory fees.

### E.      The Limited Purpose Fiduciary

On January 13, 2009, Merrill filed a motion asking the Court to appoint a Chapter 11 trustee.[5]  Debtors opposed the motion, but cooperated  with Merrill to develop a mutually acceptable alternative to the appointment of a Chapter 11 trustee.  As such, on February 26, 2009, the Court entered the LPF Order.[6]

Under the LPF Order, Frank Higney, as Limited Purpose Fiduciary ("LPF") of the Debtors, was granted authority to market the Debtors' assets, select a stalking-horse purchaser, and execute a stalking-horse asset purchase agreement (the "Stalking Horse APA").  The LPF selected Una Vez Mas, LP as the stalking-horse purchaser (the "Stalking Horse"), and entered into the Stalking Horse APA, executed on October 9, 2009.  The Sale process is described in detail below.

### F.      Debtors Employment of Mission Capital Group, LLC

Pursuant to the LPF Order, the Debtors were provided an alternative to seek exit financing or a plan investor.  The Debtors selected Mission Capital Group, LLC to assist them in locating DIP and/or exit financing to support a reorganization of the Debtors under chapter 11. While the Debtors explored a variety of options to provide exit financing, the Debtors are proceeding with the sale process.

### G.      DTV Build-Out

---

[4]      *Order Regarding Debtors' Expedited Motion for Order Authorizing Use of Cash Collateral to Pay Costs Related to DTV Conversion* [Docket No. 118], entered January 16, 2009.

[5]      *Motion to Appoint Trustee* [Docket No. 109].

[6]      *Agreed Order Appointing Limited Purpose Fiduciary – Frank Higney of Kalil & Company*, [Docket No. 151].

**KNWS**

As of the Petition Date, JBI broadcasts a low digital power signal pursuant to a STA issued by the FCC for KNWS (the Houston television station).  During this low power operation period, JBI was required to complete the construction of its full power digital television operations.  Accordingly, as discussed above, the Debtors sought approval of JBI's plans for its full power DTV build-out for KNWS-DT47 (the "KNWS DTV Plan").  Upon the Debtors' motion to approve the KNWS DTV Plan, the Bankruptcy Court (i) approved the KNWS DTV Plan; (ii) authorized JBI to enter into a broadcast/antenna lease agreement with USFR Tower Operating L.P. ("USFR"); (iii) authorized JBI to enter into a purchase agreement to purchase an Axcera analog transmitter from USFR, (which will be converted to full power digital power transmitter); and (iv) approved the use of cash collateral to pay costs associated with the KNWS DTV Plan and USFR agreements.

JBI generated sufficient cash flow to fund the KNWS DTV Plan, which was completed in January 2011.

**KLDT**

As of the Petition Date, JBD broadcasts a low digital power signal pursuant to a STA issued by FCC for KLDT (the Dallas television station).  During this low power operation period, JBD was required to complete the construction of its full power digital television operations.  Accordingly, the Debtors sought approval of JBD' plans for its full power DTV build-out for KLDT-DT39 (the "KLDT DTV Plan").  Upon Debtors' motion, the Court (i) approved the KLDT DTV Plan; (ii) authorized JBD to enter into an amended broadcasting lease agreement with Richland Dallas Tower, LLC ("Richland Dallas"); and (iii) authorized JBD to incur postpetition debtor-in-possession financing to pay the costs associated with the KLDT DTV build-out.

The postpetition debtor-in-possession financing approved for JBD funded a $3 million payment to a Richland Dallas affiliate on a "turn key" basis whereby that affiliate will purchasing and installing the equipment necessary for to complete the KLDT DTV Plan permitting KLDT to broadcast at full DTV power.  The construction of the full power facility and transition to full power broadcast was completed in August 2010.

H.    **Sales And Marketing Process**

Prior to the Petition Date the Debtors retained the media brokerage firm of Kalil & Co., Inc. ("Kalil") to assist in valuing and marketing the stations and offering them for sale in the open market.  Kalil made efforts to market and sell numerous assets of the Debtors including but not limited to the Station Assets.  Kalil employment on behalf of the Debtors' estates was terminated in the LPF Order.  As discussed above, pursuant to the LPF Order, Frank Higney continued these marketing efforts as the LPF after the entry of the LPF Order and he ultimately selected the Stalking Horse.  The sale process is discussed below in detail.

IV.    **SUMMARY OF THE PLAN**

A.    **Introduction**

Set forth in this Section is a description of the basic terms of the Plan. This description is not intended, nor should it be relied upon, as a substitute for a careful review of the actual terms of the Plan, a complete copy of which is attached hereto as <u>Exhibit A</u>.

## B.    Sale Alternative Confirmation

The Debtors have chosen to move forward with the Sale Alternative. The "<u>Sale Alternative</u>" shall mean a Plan that provides for the distribution of Sale Proceeds to creditors pursuant to the priorities set forth in the Bankruptcy Code.

### 1.    Stalking Horse Bidder for Sale Alternative Confirmation

Pursuant to the authority granted in the Fiduciary Order, on October 9, 2009, the Limited Purpose Fiduciary executed a Stalking Horse APA under which the Debtors would sell the Station Assets (as defined in the Stalking Horse APA) to Una Vez Mas Houston LLC (the "<u>Stalking Horse Bidder</u>" or "<u>UVM</u>") for approximately $14,825,000.00 (the "<u>Stalking Horse Purchase Price</u>"), subject to the proposed bidding procedures (the "<u>Bidding Procedures</u>") and the Bankruptcy Court's approval of the following:

***The Stalking Horse APA:***

a.    <u>General Terms</u>.   The Stalking Horse Bidder would acquire the Station Assets.

b.    <u>Bankruptcy Court Approval</u>.   The sale of the Station Assets would be subject to approval by the Bankruptcy Court and competitive bidding pursuant to the Bidding Procedures.

c.    <u>FCC Applications</u>.   The to the sale of the Station Assets shall file an application with the FCC requesting that the FCC consent to the assignment of the FCC licenses for KNWS-TV and KLDT-DT (collectively, the "<u>Stations</u>") from the Debtors to Stalking Horse Bidder.

d.    <u>Purchase Price</u>.   The Purchase Price to be paid by the Stalking Horse Bidder for the Station Assets would be $14,825,000.00. The Houston Purchase Price (as defined in the Stalking Horse APA) to be paid by the Stalking Horse Bidder would be $9,000,000.00. The Dallas Purchase Price (as defined in the Stalking Horse APA) to be paid by the Stalking Horse Bidder would be $5,425,000.00. The Purchase Price is subject to certain adjustments set forth in the Stalking Horse APA. The purchase price was subsequently amended to $24,800,000.00 as further described below.

e.    <u>Deposit</u>.   In accordance with the Stalking Horse APA, the Stalking Horse Bidder will pay $1,000,000.00 into the Escrow Account (as defined in the Stalking Horse APA) as a deposit (the "<u>Stalking Horse Deposit</u>"). Upon closing of the sale of the Station Assets (the "<u>Station Asset Closing</u>"), or if the Stalking Horse APA is terminated prior to Station Assset Closing because of the Stalking Horse Bidder's breach of the Stalking Horse APA, the Debtors would be entitled

to that percentage of the Stalking Horse Deposit as provided in Article 9.4 of the Stalking Horse APA. Retention of the Stalking Horse Deposit would constitute the Debtors' sole recourse in such event.

      f.    <u>Termination</u>.   The Stalking Horse APA contains certain termination provisions.

***Auction Process:***

      a.    The Stalking Horse Bidder's acquisition of the Station Assets was subject to a bidding procedure and auction whereby other qualified bidders were provided an opportunity to offer a greater amount of cash than the Stalking Horse Bidder's purchase price. The auction was held on December 18, 2009 at the offices of Andrews Kurth LLP. Along with the Stalking Horse Bidder, one other qualified bidder participated in the auction.

      b.    After several rounds of bidding, the Debtors and LPF selected the Stalking Horse Bidder as having provided the highest and best bid with an all cash bid of $24,800,000.00. Of this amount, approximately $14,880,000 has been allocated for the purchase of substantially all of the assets of JBI, and $9,920,000.00 has been allocated for the purchase of substantially all of the assets of JBD.

      c.    On December 21, 2009, a hearing was held to approve the selection of the Stalking Horse Bidder as the winner of the auction and to approve the sale of the Debtors' assets. After the hearing, the Court entered an order approving the asset purchase agreement and authorizing the sale of substantially all of the Debtors' assets to the Stalking Horse Bidder (the "<u>Sale Order</u>") [Docket No. 426] as further described in the Stalking Horse APA.

***Closing of the Sale***

Subsequent to Bankruptcy Court approval of the sale, the Debtors and UVM filed an application to transfer the Debtors' broadcast licenses to UVM with the FCC. The transfer of the broadcast licenses was a condition to closing of the sale. Spanish Broadcasting, Inc. ("<u>SBI</u>"), the losing bidder at the auction, filed an objection to application to transfer licenses based on certain foreign ownership provisions of the FCC and concerns over UVM's ability to satisfy such requirements. The objection filed by SBI triggered an FCC review process. During the review process, the Debtors continued to operate their business.

On September 24, 2010, the FCC entered an order approving the transfer of the broadcast licenses of JBI and JBD to UVM. The FCC order has since become a final, non appealable order. On December 29, 2010, the Debtor closed the sale of substantially all of its assets to UVM. Upon closing of the sale, JBI received $14,280,000.00 cash for the sale of its assets, while JBD received $9,520,000.00 cash for the sale of its assets. Subsequent to closing and after satisfaction of the Debtors' obligations to make certain cure payments in connection with the closing of the sale, JBI received an additional $600,000.00 and JBD received an additional $400,000.00 cash which had been held in escrow pending payment of cure amounts required by the APA.

HOU:3090171.3

-11-

Moreover, subsequent to closing of the sale to UVM, the Debtors made the following payments: (i) JBD paid $3,342,914.00 to Richland Towers in full and complete satisfaction of Richland's post-petition debtor-in-possession loan; (ii) JBI paid $4,324,214.75 to Merrill in full and complete satisfaction of its pre-petition secured claim and court approved expenses and attorneys fees related thereto; (iii) JBI paid $366,827.53 to USFR as a cure payment required pursuant to the terms of the APA relating to a transmitter provided by USFR in relation to the full power DTV build-out of KNWS; (iv) JBI paid $421,204.93 to Andrews Kurth LLP for professional fees previously approved by order of the Bankruptcy Court; and (v) JBD paid $280,803.29 to Andrews Kurth LLP for professional fees previously approved by order of the Bankruptcy Court.  The remainder of the sales proceeds are being held by the Debtors and used to continue to fund ongoing wind down operations as the Debtors work towards confirmation of the Plan.  All such available proceeds will be distributed pursuant to the Plan.

### Post Closing Adjustment Procedure

Prior to closing of the sale, UVM expressed concerns that certain equipment which was to be included in the sale of the Debtors' assets was missing.  Moreover, UVM expressed concerns that the value of the broadcast license of JBD had been reduced as a result JBD broadcasting on a channel that was not the FCC approved channel.  Prior to closing, JBD addressed the issue and switched to broadcasting on the proper channel.  However, UVM has asserted that the value of the assets for JBD was reduced as a result of broadcasting on the wrong channel.

In order the address the concerns of UVM, the Court held a hearing on November 4, 2010 at the request of the LPF.  The Debtors, the LPF, and UVM agreed to a post-closing adjustment procedure, allowing the sale to close and fund while giving UVM and the LPF additional time to determine the proper value, if any, of a price adjustment to address the issues raised by UVM relating to missing equipment and JBD broadcasting on the channel that was not the FCC approved channel.  On November 4, 2010, the Court entered an Order Establishing Procedure for Post-Closing Adjustments (the "Closing Adjustments Procedure Order") setting forth procedures for UVM and the Debtors to agree to the appropriate level of any adjustments to the purchase price (the "Adjustment Procedures").

Pursuant to the Adjustment Procedures, JBI is required to set aside and reserve $780,000.00 for possible downward adjustments to the purchase price of the assets for JBI.  Additionally, JBD is required to set aside and reserve $1,070,000.00 for possible downward adjustments to the purchase price of the assets of JBD.  The Debtors have complied with the Closing Adjustments Procedure Order and set up the required reserves.

Pursuant to Closing Adjustments Procedure Order, in the event that the LPF and UVM reach an agreement on a post-closing adjustment, the LPF and UVM are directed to file a motion seeking approval of the agreement on any post-closing price adjustment with the Court.  Such motion will be subject to applicable Bankruptcy Rules for notice and hearing and parties-in-interest will have an opportunity to object.  Moreover, in the event that the LPF and UVM are not able to reach an agreement on post-closing adjustments within 30 days after the closing, which was December 29, 2010, the LPF and UVM are directed to file a motion with the Court setting forth the reasons for disagreement, and the Court will conduct an evidentiary hearing to

determine the proper amount, if any, of any post-closing price adjustment. Any such motion will also be subject to applicable Bankruptcy Rules for notice and hearing, and parties-in-interest will be given an opportunity to object.

As of the date of filing this Disclosure Statement, the LPF and UVM have not reached an agreement on any post-closing price adjustments, and have not filed a motion with the Court. The Adjustment Procedures could result in a downward price adjustment of the sales proceeds received for either JBI or JBD, thus affecting the distribution to creditors under the Plan. The ultimate amount of any adjustments to be made pursuant to the Adjustment Procedures is unknown at this time.

### C.    Classification of Claims

Section 1122 of the Bankruptcy Code provides that, except for certain claims classified for administrative convenience, a plan may place a claim or interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class. The Bankruptcy Code also requires that a plan provide the same treatment for each claim of a particular class unless the holder of a particular claim agrees to a less favorable treatment of its claim. The Debtors believe that the Plan complies with this standard. The Plan divides Claims against and Equity Interests in the Debtors into the following Classes:

Class 1 – DIP Lender Claims

Class 2 – MLCFC Secured Claims

Class 3 – Other Secured Claims

Class 4 – Priority Claims

Class 5 – General Unsecured Claims

Class 6 – Subordinated Claims

Class 7 – Equity Interests

For a description of the treatment of the Claims and Equity Interests and a summary of distributions under the Plan, *see* Section IV.D, "Treatment of Claims and Equity Interests and Summary of Distributions under the Plan."

A Claim or Equity Interest is classified in a particular Class only to the extent that the Claim or Equity Interest qualifies within the description of that Class and is classified in other Classes to the extent that any remainder of the Claim or Equity Interest qualifies within the description of such other Classes. A Claim or Equity Interest is also classified in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim or Equity Interest is a Claim or Equity Interest in that Class and has not been paid in full, released or otherwise satisfied prior to the Effective Date.

**D.    Treatment of Claims and Equity Interests and Summary of Distributions Under the Plan**

Under the Plan, Claims against and Equity Interests in the Debtors are divided into different Classes.  Only Allowed Claims and Allowed Equity Interests are entitled to receive distributions under the Plan.  The following is a description of the Plan's treatment of Claims against and Equity Interests in the Debtors.  Administrative Expense Claims, Priority Tax Claims, and the JBI Administrative Expense Claim are not classified under the Plan.

**1.    Administrative Expense Claims**

**a.    Allowed Administrative Expense Claims**

Subject to the provisions contained in Section 3.2 of the Plan, unless otherwise agreed in writing by the Plan Agent and the holder of an Allowed Administrative Expense Claim, the Plan Agent shall pay to each holder of an Allowed Administrative Expense Claim an amount equal to its Allowed Administrative Expense Claim on the latest of (a) the Effective Date or as soon thereafter as is practicable, (b) 30 days after the date on which such Administrative Expense Claim becomes an Allowed Administrative Expense Claim by the entry of a Final Order, and (c) the date the Plan Agent is otherwise obligated to pay such Administrative Expense Claim in accordance with the terms and provisions of the particular transactions giving rise to such Claim, the terms and provisions of the Plan and any orders of the Bankruptcy Court relating thereto.

**b.    Requests for Allowance of Administrative Expense Claims**

Except as expressly set forth to the contrary in the Plan, each Person, including each Professional, shall file an application for an allowance of an Administrative Expense Claim in conformity with the following:

(i)    Professionals.    All Professionals shall file a final application for the allowance of a Fee Claim on or before forty-five (45) days following the Effective Date.  Objections to any Fee Claim must be filed and served on the Liquidating Debtors, the Plan Agent and the requesting Professional no later than twenty (20) days after the filing of the applicable request for payment of the Fee Claim.

(ii)    **Other Administrative Expense Claimants**.  All holders of Administrative Expense Claims other than Professionals and holders of ordinary course trade payable shall file an application for the allowance of an Administrative Expense Claim with the Bankruptcy Court on or before thirty (30) days following the Effective Date.  Holders of Administrative Expense Claims, including such Persons asserting a Claim under § 503(b)(9) of the Bankruptcy Code, who do not file a request by such deadline shall be forever barred from asserting such Claims against the Debtors, the Liquidating Debtors or their respective property and assets (whether cash or otherwise).

2.    **Priority Tax Claims**

      a.    **Schedule of Payments**

Each holder of an Allowed Priority Tax Claim shall be paid in full, in Cash, as soon as practicable following the later of (a) the Effective Date, (b) the date on which such Claim becomes an Allowed Claim, and (c) such other date as agreed by such holder and the Plan Agent.

      b.    **Other Provisions Concerning Treatment of Priority Tax Claims**

Notwithstanding the provisions of Section 3.3 of the Plan, the holder of an Allowed Priority Tax Claim will not be entitled to receive any payment on account of any penalty arising with respect to or in connection with the Allowed Priority Tax Claim, except as Allowed under § 507(a)(8)(G) of the Bankruptcy Code.  Other than as Allowed under § 507(a)(8)(G) of the Bankruptcy Code, any such Claim or demand for any such penalty (i) will be subject to treatment in Class 6 pursuant to § 726(a)(4) of the Bankruptcy Code and (ii) the holder of an Allowed Priority Tax Claim will not assess or attempt to collect such penalty from the Debtors, the Liquidating Debtors or their property.

3.    **JBI Administrative Expense Claim**

The Allowed JBI Administrative Expense Claim shall be paid in full, in Cash, as soon as practicable following the Effective Date by the Plan Agent from the JBD Estate to the JBI Estate.  At the Confirmation Hearing, the Debtors shall provide evidence, and seek a determination by the Bankruptcy Court, of the Allowed Amount of any JBI Administrative Expense Claim.

4.    **Summary of Classification and Treatment of Holders of Allowed Claims and Equity Interests that are Placed in Classes**

The following table sets forth a brief summary of the classification and treatment of Claims and Equity Interests and the estimated distributions to the holders of Allowed Claims that are placed in Classes under the Plan.  The information set forth in the tables is for convenience of reference only.  Each holder of a Claim or Equity Interest should refer to Article VI of the Plan, "Treatment of Claims and Equity Interests," for a full understanding of the classification and treatment of Claims and Equity Interests provided under the Plan.  The estimates set forth in the table may differ from actual distributions due to, among other things, variations in the amount of Allowed Claims, the existence and resolution of Disputed Claims and certain risk factors potentially impacting recoveries under the Plan, including those described in Section VII below.  Unless otherwise noted, these estimates are as of October 19, 2009.

| *Class Description* | *Treatment Under the Plan* |
|---|---|
| Administrative Claims<br><br>Estimated Amount: $2,300,000.00 | *Unimpaired.* |

| Class Description | Treatment Under the Plan |
|---|---|
| Priority Tax Claims<br><br>Estimated Amount:<br><br>JBI: $430,627.73<br><br>JBD: $194,800.49<br><br>(the Debtors anticipate that Priority Tax Claims will be significantly reduced by amendments to claims, schedules, and claim objections). | *Unimpaired.* |
| Class 1 – DIP Lender Claims<br><br>Estimated Amount: $3,342,914.00 | *Unimpaired.*<br><br>If not previously satisfied in full, the holder of the Allowed DIP Lender Claims shall be paid in Cash in full by the Plan Agent from the JBD Sale Proceeds on or as soon as practicable following the Effective Date, unless otherwise agreed by the holder. This amount has been paid in full pursuant to Bankruptcy Court Order. |
| Class 2 – MLCFC Secured Claims<br><br>Estimated Amount: $4,324,214.75 | *Impaired.*<br><br>If not previously satisfied in full, on or as soon as practicable following the Effective Date or as provided in the Sale Order, Plan Agent shall pay to the holders of the Allowed MLCFC Secured Claim the lesser of the following amounts: (a) one hundred percent (100%) of the Sale Proceeds attributable to the MLCFC Collateral, subject to the rights of any senior Lien holders, or (b) Cash in the full amount of the Allowed MLCFC Secured Claim. Any MLCFC Deficiency Claim shall receive treatment in Class 5 of the Plan. This amount has been paid in full pursuant to Bankruptcy Court order. |

| Class Description | Treatment Under the Plan |
|---|---|
| Class 3 – Other Secured Claims<br><br>Estimated Amount:<br><br>JBI: $217,088.60<br><br>JBD: None<br><br>(the Debtors anticipate that Priority Tax Claims will be significantly reduced by amendments to claims, schedules, and claim objections). | *Impaired.*<br><br>On or as soon as practicable following the later of (i) the Effective Date, and (ii) the date such Claim becomes an Allowed Claim, the Plan Agent shall pay to each holder of an Allowed Other Secured Claim the lesser of the following amounts: (a) one hundred percent (100%) of the Sale Proceeds attributable to the Collateral securing such Allowed Other Secured Claim, subject to the rights of any senior Lien holders, and (b) Cash in the full amount of such Claim. Any Deficiency Claims shall receive treatment in Class 5 of the Plan. |
| Class 4 – Priority Claims<br><br>Estimated Amount:<br><br>For JBI $3,000.00<br><br>For JBD $0 | *Unimpaired.*<br><br>Holders shall be paid in Cash in full by the Plan Agent on or as soon as practicable following the later of (a) the Effective Date, and (b) the date on which such Claim becomes an Allowed Claim. |

| Class Description | Treatment Under the Plan |
|---|---|
| Class 5 – General Unsecured Claims<br><br>Estimated Amount:<br><br>[*For JBI $3,500,000.00][7]<br><br>[*For JBD $8,327,935.31][8]<br><br>[Estimated amounts may be further reduced by claim objections and amendments to the schedules.] | Impaired.<br><br>Each holder of an Allowed General Unsecured Claim shall receive its Pro Rata share, up to the Allowed Amount of such Claimant's Allowed Claim, of Liquidating JBI or JBD Assets, as applicable, remaining following (i) full payment of, or full reservation for, Allowed Administrative Claims, Allowed Priority Claims, Allowed DIP Lender Claims, Allowed MLCFC Claims, Allowed Other Secured Claims and Allowed Priority Tax Claims, each to the extent payable from the JBI Estate or JBD Estate, as applicable, pursuant to the Plan, and (ii) funding of the Plan Administration Reserve. As soon as practicable following (i) and (ii) above, the Plan Agent shall make an initial Pro Rata Distribution in accordance with Class 5, in an amount determined in the reasonable discretion of the Plan Agent. The Plan Agent shall make subsequent Pro Rata Distributions in accordance with this Class 5 at such times and in such amounts as determined in the reasonable discretion of the Plan Agent. |

---

[7] The estimated amount of the claim does not include the claim filed by Melanie Johnson ("Melanie") against JBI (Claim No. 70 in Case No. 08-36583) which was filed January 27, 2011 in the amount of $7,662,713.27. Such claim was filed nearly 2 years after the applicable bar date and the Debtors believe it has no factual or legal merit. On January 28, 2011, the Debtors objected to the claim of Melanie. Counsel for Melanie has represented that even if this claim is allowed, any distribution made on the claim will be subordinate to all non-insider claims against JBI. To the extent the claim filed by Melanie is ultimately allowed and not subordinate to all non-insider claims against JBI, recovery the amount of unsecured claims against JBI could be increased and recovery to unsecured creditors of JBI could be reduced. Additionally, tw telecom filed a claim against JBI in the amount of $1,627,160.00 for alleged rejection damages which is currently subject to ongoing settlement discussions between tw telecom and JBI. JBI and tw telecom have agreed to a stipulation whereby tw telecom stipulates that for purposes of voting on the Debtors plan, the amount of tw telecom's claim against JBI is $333,568.89, and the parties will set a reserve in the amount of $333,568.98, subject to possible increase for fees and expenses owed under the various agreements between tw telecom and JBI. As such, only $333,568.89 was included in the calculation of unsecured claims against JBI, but such amount could be increased or decreased depending on the results of the settlement discussions or litigation between tw telecom and JBI.

[8] The estimated amount of the claim does not include the claim filed by Melanie Johnson ("Melanie") against JBD (Claim No. 17 in Case No. 08-36585) which was filed January 27, 2011 in the amount of $7,662,713.27. Such claim was filed nearly 2 years after the applicable bar date and the Debtors believe it has no factual or legal merit. On January 28, 2011, the Debtors objected to the claim of Melanie. Counsel for Melanie has represented that even if this claim is allowed, any distribution made on the claim will be subordinate to all non-insider claims against JBD. To the extent the claim filed by Melanie is ultimately allowed and not subordinated to all non-insider claims against JBD, recovery the amount of unsecured claims against JBD could be increased and recovery to unsecured creditors of JBD could be reduced. Moreover, various family members of Douglas Johnson

| Class Description | Treatment Under the Plan |
|---|---|
| Class 6 – Subordinated Claims<br><br>Estimated Amount:<br><br>[*For JBI $6,430,741.00]<br><br>[*For JBD $1,828,239.00]<br><br>(These estimates assume approval of the settlement with Douglas Johnson). | *Impaired.*<br><br>Each holder of an Allowed General Unsecured Claim shall receive its Pro Rata share, up to the Allowed Amount of such Claimant's Allowed Claim, of Liquidating JBI or Liquidating JBD Assets, as applicable, remaining following (i) full payment of, or full reservation for, Allowed Administrative Claims, Allowed Priority Claims, Allowed DIP Lender Claims, Allowed MLCFC Claims, Allowed Other Secured Claims, Allowed Priority Tax Claims and Allowed General Unsecured Claims, each to the extent payable from the JBI Estate or JBD Estate, as applicable, pursuant to the Plan, and (ii) funding of the Plan Administration Reserve. As soon as practicable following (i) and (ii) above, the Plan Agent shall make an initial Pro Rata Distribution in accordance with Class 6, in an amount determined in the reasonable discretion of the Plan Agent. The Plan Agent shall make subsequent Pro Rata Distributions in accordance with Class 6 at such times and in such amounts as determined in the reasonable discretion of the Plan Agent. |
| Class 7 – Equity Interests | *Impaired.*<br><br>All Equity Interests shall be canceled as of the Effective Date. Each holder of an Allowed Equity Interest in JBI or JBD shall retain a residual interest in the Liquidating JBI Assets or Liquidating JBD Assets, as applicable, in the event that all Allowed Claims against JBI or JBD, as applicable, are paid in full pursuant to this Plan |

Holders of Claims and Equity Interests in Classes 2, 3, 5, 6 and 7 are Impaired by the Plan. Under § 1126(f) of the Bankruptcy Code, holders of Claims in Class 1 and Class 4 are conclusively deemed to have accepted the Plan, and the votes of such holders will not be solicited.

---

(the "Johnson Family") filed claims against JBD asserting secured status in the approximate amount of $5,854,252.00. The Johnson Family and JBD have discussed the Johnson Family claims and the Debtors anticipate that the Johnson Family will stipulate and agree that such claims should be treated as general unsecured claims, and as such, the Johnson Family Claims are included in this estimated amount.

### D.     Distribution Provisions

#### 1.     Distributions

All Distributions under the Plan shall be made by the Plan Agent pursuant to the terms and conditions contained in the Plan; *provided, however*, that no Distribution shall be made on behalf of any Claim which may be subject to disallowance under § 502(d) of the Bankruptcy Code.

#### 2.     Distributions of Cash

All Distributions of Cash to be made by the Plan Agent pursuant to the Plan shall be made by a check or wire transfer from the Plan Agent's account (including Liquidating Debtor accounts under the control of the Plan Agent) maintained in accordance with the Plan.

#### 3.     Distributions on a Subsequent Distribution Date

Pursuant to the provisions set forth in the Plan, to the extent that cash or other assets are available subsequent to the Initial Distribution Date, the Plan Agent shall, on a subsequent date (a "Subsequent Distribution Date"), distribute such Cash or other assets to the holders of Claims entitled to Distributions under the Plan that were Allowed on the Effective Date or subsequently have become Allowed Claims on or before the Subsequent Distribution Date in accordance with the schedules, treatment and priority of Claims established by the Plan.

#### 4.     Distributions on the Final Distribution Date

Pursuant to the provisions set forth in the Plan, to the extent that cash or other assets are available subsequent to the Initial Distribution Date, any Subsequent Distribution Date and after the liquidation of any and all assets to be distributed under the Plan, the Plan Agent shall establish a final distribution date (the "Final Distribution Date") upon which the Plan Agent shall distribute such Cash or other assets to the holders of Claims entitled to Distributions under the Plan that were Allowed on the Effective Date or subsequently have become Allowed Claims on or before the Final Distribution Date in accordance with the treatment and priority of Claims established by the Plan.

#### 5.     Delivery of Distributions and Undeliverable Distributions

Distributions to the holder of an Allowed Claim shall be made at the address of such holder as set forth on the Schedules unless superseded by the address as set forth on the Proof of Claim filed by such holder or by a written notice to the Plan Agent providing actual knowledge to the Plan Agent of a change of address. If any holder's Distribution is returned as undeliverable, no further Distributions to such holder shall be made unless and until the Plan Agent is notified in writing within six months of the Distribution date of such holder's then current address, at which time all Distributions shall be made to such holder, without interest. All Claims for undeliverable Distributions shall be made within six months after the date such undeliverable Distribution was initially made. If any Claim for an undeliverable Distribution is not timely made as provided herein, such Claim shall be forever barred with prejudice. After such date, all unclaimed property shall be applied first to satisfy the costs of administering and

fully consummating the Plan, then for Distribution in accordance with the Plan, and the holder of any such Claim shall not be entitled to any other or further Distribution under the Plan on account of such undeliverable Distribution or such Claim.

### 6.    Time Bar to Cash Payments and Disallowances

Checks issued by the Plan Agent in respect of Allowed Clams shall be void if not negotiated within six months after the date of issuance thereof.  Requests for reissuance of any check shall be made to the Plan Agent by the holder of the Allowed Claim to whom such check originally was issued, on or before the expiration of six months following the date of issuance of such check.  After such date, (a) all funds held on account of such void check shall be applied first to satisfy the costs of administering and fully consummating the Plan, then for Distribution in accordance with the Plan, (b) the Claim of the holder of any such void check shall be disallowed, and (c) such Claimant shall not be entitled to any other or further Distribution on account of such Claim.

### 7.    Minimum Distributions

If a Distribution to be made to a holder of an Allowed Claim on any Distribution Date, excluding the Final Distribution Date, would be $100.00 or less, notwithstanding any contrary provision of the Plan, no Distribution will be made to such Claimant.

### 8.    Transactions on Business Days

If the Effective Date or any other date on which a transaction, event or act may occur or arise under the Plan shall occur on Saturday, Sunday or other day that is not a Business Day, the transaction, event or act contemplated by the Plan to occur on such day shall instead occur on the next day which is a Business Day.

### 9.    Distributions After Allowance

Distributions to each holder of a Disputed Claim, to the extent that such Claim ultimately becomes Allowed, shall be made in accordance with the provisions of the Plan governing the Class of Claims to which such holder belongs.

### 10.    Disputed Payments

If any dispute arises as to the identity of a holder of an Allowed Claim who is to receive any Distribution, the Plan Agent may, in lieu of making such Distribution to such Person, make such Distribution into an escrow account until the disposition thereof shall be determined by the Bankruptcy Court or by written agreement among the interested parties to such dispute.

### 11.    No Distribution in Excess of Allowed Amount of Claim

Notwithstanding anything to the contrary herein, no holder of an Allowed Claim shall receive in respect of such Claim any Distribution in excess of the Allowed amount of such Claim.

E.    **Means for Execution of the Plan**

    1.    **Cancellation of Equity Interests and Re-Issuance of New Common Stock**

On the Effective Date all of the then existing Equity Interests in the Debtors shall be canceled, and each Liquidating Debtor shall authorize and issue 1,000 shares of its common stock, $1.00 par value (the "New Common Stock") to the Plan Agent.  The Plan Agent shall be the record owner of the New Common Stock of each Liquidating Debtor, which shall constitute 100% of the issued and outstanding shares of capital stock in each Liquidating Debtor.  The Plan Agent shall hold the New Common Stock for the benefit of the holders of Allowed Claims and Allowed Equity Interests against each respective Debtor.  The Plan Agent shall vote such shares at all appropriate times to elect the Plan Agent as the sole director and officer of each Liquidating Debtor and otherwise to implement the terms and provisions of the Plan.

    2.    **Dissolution of Corporate Entities**

Each Liquidating Debtor shall be dissolved and its corporate existence terminated, without further corporate action, upon the final decree closing these Cases become a Final Order, unless the Cases are later re-opened or are deemed reinstated for the purpose of effectuating the Plan.  The Confirmation Order shall be deemed the appropriate authorization, to the extent required under state law, authorizing the Plan Agent to file a certificate of dissolution upon entry of a final decree in the Cases.

    3.    **Vesting of Property of Each Estate in Each Liquidating Debtor**

On the Effective Date, (i) the Liquidating JBI Assets shall vest in Liquidating JBI, free and clear of any liens, claims and encumbrances, except as otherwise provided in the Plan, and (ii) the Liquidating JBD Assets shall vest in Liquidating JBD, free and clear of any liens, claims and encumbrances, except as otherwise provided in the Plan.

    4.    **Plan Agent**

        a.    **Identity From and After the Effective Date**

Karen Nicolaou, or another person to be designated by the Debtors and approved by the Bankruptcy Court at the Confirmation Hearing, shall serve as the Plan Agent pursuant to the Plan, until death, resignation or discharge or the appointment of a successor Plan Agent in accordance with the Plan, at which point such successor Plan Agent shall be the Plan Agent.  The Plan Agent shall be the sole officer, director and shareholder of each Liquidating Debtor.

        b.    **Responsibilities and Powers of the Plan Agent**

In the exercise of its authority on behalf of the Debtors and Liquidating Debtors, the Plan Agent shall have, consistent with other provisions of the Plan, the following responsibilities and powers:

(i)      make all Distributions contemplated under the Plan;

(ii)     establish and maintain any reserves called for under the Plan, and such other reserves as determined to be prudent and/or necessary;

(iii)    enter into any agreement required by or consistent with the Plan and perform any obligations thereunder (including any Professionals retained by the Debtors during the Chapter 11 Cases);

(iv)     participate as a party-in-interest in any proceeding before the Bankruptcy Court, or other court of competent jurisdiction, involving the Debtors, the Liquidating Debtors or the Chapter 11 Cases;

(v)      employ such professionals, agents or employees as deemed necessary to carry out the provisions of the Plan and pay reasonable compensation to such persons from assets of the Estates;

(vi)     carry out and enforce the provisions of the Plan and consummate the Plan;

(vii)    propose any amendment, modification or supplement to the Plan;

(viii)   exercise such other powers and duties as are necessary or appropriate in the Plan Agent's discretion to accomplish the purposes of the Plan;

(ix)     pursue any Rights of Action on behalf of the Debtors and Liquidating Debtors and compromise or settle any Rights of Action in a manner consistent with the Plan;

(x)      open and maintain bank accounts as necessary to effectuate the Plan, including accounts in the name of the Liquidating Debtors;

(xi)     carry insurance coverage, including fiduciary insurance, as is normal and customary and in such amounts as deemed advisable;

(xii)    maintain appropriate records and account books relating to the consummation of the Plan, including records of all Distributions made or contemplated under the Plan and all transactions undertaken by the Plan Agent, acting as Plan Agent; and

(xiii)   exercise such other powers and duties as are necessary or appropriate in the Plan Agent's discretion to accomplish the purposes of the Plan:

(A)     management of and control over each of the Liquidating Debtors;

(B) consistent with maintaining the value and liquidating the residual assets of the Liquidating Debtors, invest funds of the Estates consist with the guidelines established by the Office of the United States Trustee;

(C) sale or dispose of assets of the Liquidating Debtors, including abandon any assets of the Liquidating Debtors that are burdensome and of no benefit;

(D) act in the name of or in the place of the Debtors and/or Liquidating Debtors in any action before the Bankruptcy Court and/or any other judicial or administrative body;

(E) pay all taxes, make all tax withholdings and file all tax returns and tax information returns and make tax elections by and on behalf of each of the Liquidating Debtors;

(F) pay all lawful expenses, debts, charges and liabilities of the Liquidating Debtors;

(G) protect and defend any assets of the Liquidating Debtors;

(H) maintain the Debtors' and the Liquidating Debtors' records; and

(I) file dissolution documents with the appropriate governmental agencies to dissolve the Liquidating Debtors as applicable or necessary filing entry of a Final Decree.

**c.      No Bankruptcy Court Approval**

Except as otherwise provided in the Plan, the Plan Agent may perform any of its responsibilities and exercise any of its powers, including its compromise and settlement powers without seeking or obtaining Bankruptcy Court approval.

**d.      Compensation of Plan Agent and its Professionals**

In addition to reimbursement for the actual out-of-pocket expenses incurred, the Plan Agent and any employees or professionals engaged or retained by the Plan Agent, shall be entitled to reasonable compensation for services rendered.  The compensation of the Plan Agent will be calculated on a per hour basis using the Plan Agent's standard and customary billing rates.  The Plan Agent's professionals shall be entitled to reimbursement for out-of-pocket expenses incurred and reasonable compensation for services rendered on the same economic terms as is normal and customary for such professionals.  The Plan Agent and all professionals employed by the Plan Agent shall be entitled to payment of their post-Effective Date fees and expenses from the Liquidating Debtors on a monthly basis without further notice to or action or approval of the Bankruptcy Court.

### e.      Resignation

The Plan Agent may resign as Plan Agent under the Plan by an instrument in writing signed by the Plan Agent and filed with the Bankruptcy Court. Such resignation shall become effective ninety (90) days following the giving of such notice or upon the earlier appointment of a successor Plan Agent.

### f.      Removal

The Plan Agent (including any successor Plan Agent) may be removed at any time with or without cause by the Bankruptcy Court. Any party in interest may apply to the Bankruptcy Court for an order removing the Plan Agent for cause, with the determination of cause left to the reasonable discretion of the Bankruptcy Court.

### g.      Appointment of Successor Plan Agent

In the event of the death, resignation or removal (prospective or otherwise) of the Plan Agent, any party in interest, any professional for the Plan Agent, the Plan Agent and/or the United States Trustee may seek to designate a successor Plan Agent, and the Bankruptcy Court shall appoint a successor Plan Agent. Any successor Plan Agent appointed hereunder shall execute, acknowledge and deliver to the Bankruptcy Court and to the retiring Plan Agent an instrument duly accepting such appointment and agreeing to be bound by the terms of the Plan and thereupon such successor Plan Agent, without further act, deed or conveyance, shall become vested with all of the rights, powers, trusts and duties of the Plan Agent.

### h.      Plan Administration Reserve

As soon as practicable following the Effective Date, the Plan Agent shall establish and fund from the Liquidating Debtors the Plan Administration Reserve account in an amount reasonably determined to be sufficient to adequately satisfy estimated costs, fees and expenses of the administration of (not including the satisfaction of Claims and Interests) of the Plan. The Plan Agent may from time to time, in its reasonable discretion, adjust the amount held in the Plan Administration Reserve. Notwithstanding the existence of the Plan Administration Reserve, the actual costs, fees and expenses of the administration of the Plan shall be payable by the Liquidating Debtors unless otherwise provided by the Plan.

### 5.      Further Orders

Upon motion by the Plan Agent, the Bankruptcy Court may enter such other and further orders as may be necessary or appropriate to facilitate the consummation of the Plan.

### 6.      Post-Effective Date Reports, Final Decree

The Plan Agent shall file and serve upon the United States Trustee periodic status reports in substantially the form provided by the United States Trustee from the Effective Date until entry of a final decree, unless otherwise ordered by the Bankruptcy Court.

HOU:3090171.3

-25-

After the Debtors' Estates are fully administered, the Plan Agent shall file an application for a final decree closing each Case, and shall serve the application together with a proposed final decree on the master service list.

### 7.      Discharge of Plan Agent

Upon the final decree closing each Case becoming a Final Order, the Plan Agent shall be discharged and released from all further duties arising from or relating to the Plan and the Liquidating Debtors.  Upon entry of a final decree closing the Cases, the Plan Agent and its professionals shall be released or discharged from all claims arising from their actions prior to entry of the final decree except for liability that results from bad faith, willful misconduct or gross negligence.

### 8.      Corporate Action

Each of the matters provided for under the Plan involving the corporate structure of the Debtors or corporate action to be taken by or required of the Debtors, shall, as of the Effective Date, be deemed to have occurred and be effective as provided herein, and shall be authorized, approved and, to the extent taken prior to the Effective Date, ratified in all respects without any requirement of further action by shareholders, creditors, officers or directors of any of the Debtors or the Liquidating Debtors.

### 9.      Release of Liens

Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, on the Effective Date and concurrently with the applicable Distributions made pursuant to Article 6 of the Plan, all mortgages, deeds of trust, Liens or other security interests against the property of the Estates vesting in the Liquidating Debtors will be fully released and discharged, and all of the rights, title and interests of any holder of such mortgages, deeds of trust, Liens or other security interests, including any rights to any collateral thereunder, will revert to the Liquidating Debtors and their successors and assigns.  As of the Effective Date, the Liquidating Debtors shall be authorized to file on behalf of creditors Form UCC-3s or other forms as may be necessary to implement the provisions of Section 7.10 of the Plan.

### 10.      Restructuring Transactions

The Plan Agent on behalf of the Liquidating Debtor is authorized to take such actions as may be necessary or appropriate to effect the relevant Plan transactions.  Such actions may include:  (a) the execution and delivery of appropriate agreements or other documents of merger, consolidation or reorganization containing terms that are consistent with the terms of the Plan and that satisfy the requirements of applicable law; (b) the execution and delivery of appropriate instruments of transfer, assignment, assumption or delegation of any property, right, liability, duty or obligation on terms consistent with the terms of the Plan; (c) the filing of appropriate organizational documents with the appropriate governmental authorities under applicable law; and (d) all other actions that the Plan Agent determines are necessary or appropriate, including the making of filings or recordings in connection with the relevant Plan transaction.

HOU:3090171.3

### 11.     Exemption from Certain Transfer Taxes and Recording Fees

Pursuant to § 1146(a) of the Bankruptcy Code, any transfers from a Debtor to the Liquidating Debtor or to any other Person or entity pursuant to the Plan, or any agreement regarding the transfer of title to or ownership of any of the Debtors' real or personal property, will not be subject to any document recording tax, stamp tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording tax, or other similar tax or governmental assessment, and the Confirmation Order will direct the appropriate state or local governmental officials or agents to forego the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

### 12.     Withholding and Reporting Requirements

In connection with the Plan, the Plan Agent on behalf of the Liquidating Debtors shall (a) comply with all applicable withholding and reporting requirements imposed by any federal, state or local taxing authority; (b) timely file all tax returns as required by law to be filed; (c) continue to engage accountants or such other professionals to prepare and file all tax returns as required by law to be filed; (d) take such other actions as are reasonably necessary, including the allocation of sufficient funds, to file such returns; and (e) shall timely pay all taxes arising under any requirements or tax returns applicable to the Plan.

### 13.     Periodic Reports and United States Trustee's Fees

The Debtors' obligation of filing monthly financial reports with the United States Trustee shall pass to and become the obligation of the Liquidating Debtors and the Plan Agent as applicable and such obligation shall continue following Confirmation until the obligation to pay the United States Trustee's fees required to be paid pursuant to 28 U.S.C. § 1930(a)(6) ends, except such monthly reports will be filed periodically. The Plan Agent shall be responsible for satisfying this obligation on behalf of the Liquidating Debtors. The Plan Agent shall prepare, sign, and file all Post-Confirmation reports and shall pay any U.S. Trustee's fees due and owing from the funds of the Liquidating Debtors. Copies of such reports shall be served on the United States Trustee and on any Claimant requesting continued service of same.

### 14.     Assignment and Prosecution of Rights of Action

Pursuant to and in accordance with §§ 105(a), 1123(b)(3), and 1141(b) of the Bankruptcy Code and except as provided below, upon the entry of the Confirmation Order, all Rights of Action shall be, and hereby are reserved, retained, and vested in the Liquidating Debtors for the benefit of holders of Allowed Claims and Allowed Equity Interests pursuant to the terms of the Plan. All Rights of Action shall survive and continue Post-Confirmation, free and clear of all liens, claims, interests, encumbrances, defenses of res judicata, waiver, laches and estoppel, for investigation, prosecution, enforcement, settlement, abandonment, adjustment, or collection by the Liquidating Debtors for the benefit of the holders of the Allowed Claims and Allowed Equity Interests. The Plan Agent shall be authorized and have standing to pursue Rights of Action on behalf of, and in the name of, the Liquidating Debtors.

### a.    Notice to Prosecutable Targets

Without limiting the generality of the foregoing subparagraph (a), all Claimants and other parties in interest are hereby expressly advised and notified that the Liquidating Debtors shall have the right to investigate, prosecute, enforce, settle, adjust, collect, or otherwise dispose of the Rights of Action. (A) ALL CLAIMANTS, PERSONS, ENTITIES, AND OTHER PARTIES WHO RECEIVED DIRECTLY OR INDIRECTLY, PAYMENTS, OFFSETS, RECOUPMENTS AND/OR REBATES, OR TRANSFERS OF PROPERTY FROM THE DEBTORS WITHIN THE ONE (1) YEAR PERIOD PRECEDING THE PETITION DATE OR WITHIN SUCH LONGER PERIOD OF TIME AS MAY APPLY UNDER APPLICABLE LAW INCLUDING, WITHOUT LIMITATION, PERSONS INCLUDED IN THE "LIST OF RIGHTS OF ACTION TARGETS," WHICH INCLUDES A LIST OF PAYMENTS MADE WITHIN 180 DAYS PRIOR TO THE PETITION DATE ATTACHED AS EXHIBIT "C" TO THIS DISCLOSURE STATEMENT ARE HEREBY NOTIFIED THAT THEY MAY BE SUBJECT TO SUIT TO RECOVER ANY PREFERENCES, FRAUDULENT TRANSFERS, OR OTHER AVOIDABLE TRANSFERS AND TO PURSUE ANY RIGHTS OF ACTION. The inclusion of a Person in, or the omission of a Person from, Exhibit C to this Disclosure Statement does not mean that a decision has been made to assert, or not to assert, a Rights of Action against such Person. At this time, no determination has been made to pursue any particular Rights of Action. (B) In addition, all current and former officers, directors, shareholders, members, employees, partners, investors, agents, attorneys, accountants, equity holders, responsible parties and any other professional Person are hereby notified that they may be subject to an action under applicable law as a result of any action or inaction, decision or lack of decision or transaction or non-transaction, made or incurred Pre-Petition that resulted, directly or indirectly, in the commencement of the Cases ("Derivative Claims").  The Liquidating Debtors shall review the Debtors' books and records, including the payments listed in Exhibit C to this Disclosure Statement, and other available information to determine whether any Rights of Action should be filed by the Liquidating Debtors

### b.    Reservation of Rights of Action

The Liquidating Debtors specifically reserve the Rights of Action and, by setting forth notice to each currently known potential target of such a Rights of Action, expressly reserves such rights to survive beyond Confirmation, the finality of Confirmation, and all other legal effects of such Confirmation, provided, however, this reservation shall not mean and shall not be construed to mean that the exclusion of any Person from Exhibit C frees, releases or exonerates any Person from a Rights of Action by way of any defenses, and the Liquidating Debtors, the Plan Agent and their respective counsel shall have the right to investigate, pursue, prosecute and collect any unknown, but later discovered, Rights of Action against any Person.

### c.    Notice in Confirmation Order

The Court shall include in the Confirmation Order appropriate provisions incorporating the terms set forth in Section 7.15 of the Plan including, but not by way of limitation, the survival of the Rights of Action from the defense of res judicata, waiver, laches, and estoppel as to the Rights of Action and any other unknown but later discovered Claim or

Claims after Confirmation and the approval of a grant of derivative jurisdiction for the Liquidating Debtors to prosecute the Rights of Action on behalf of the Debtors.

### d.  Discretion to Pursue or Settle and Immunity of the Parties

The Liquidating Debtors and the Plan Agent as applicable shall have discretion to pursue or not to pursue, to settle or not to settle, or to try or not to try, and/or to appeal or not to appeal the Rights of Action as they determine in the exercise of their business judgment and without any further approval of the Bankruptcy Court thereof.  The Liquidating Debtors, the Plan Agent, and their respective attorneys or other professionals shall have no liability for the outcome of their decisions.

### 15.  Provisions Relating to Default

Upon and after the Effective Date, the following provisions shall be applicable to the Liquidating Debtors:

### a.  Default of Plan

The Plan shall go into "default" upon the occurrence of any one or more of the following events: (a) the Liquidating Debtors' material failure to file their periodic reports as required by the Plan or (b) the Liquidating Debtors' substantial and material failure to comply with any of the provisions of the Plan.

### b.  Remedies in Case of Default

Upon default, any Claimant shall have the right to report such default to the Bankruptcy Court and seek an appropriate remedy, which can include dismissal, conversion, or such other remedy decided by the Court in its discretion as being in the best interest of holders of Allowed Claims under the Plan; provided, however, that any default that is cured by the Liquidating Debtors or Plan Agent shall not constitute cause for continued pursuant of remedies pursuant to Section 7.16 of the Plan.

### 16.  Closing of the Debtors' Cases

If, after the Effective Date, the Cases are closed, such closing, (a) shall not alter, amend, revoke, or supersede the terms of the Plan, (b) shall not affect any rights of the Debtors, the holders of Claims or Equity Interests or the treatment of any other Person under the Plan, (c) shall continue to cause the terms of the Plan to remain binding on all Persons, (d) shall cause all orders of the Court to remain in full force and effect, and (e) shall cause the Bankruptcy Court to retain all jurisdiction set forth in Article 13 of the Plan.

### 17.  Settlement with Related Parties

Pursuant to Bankruptcy Rule 9019 and in consideration for the distributions, release and other benefits provided for under the Plan, (i) any claims filed against or scheduled by JBI in favor of Douglas Johnson shall be treated as Class 6A – Subordinated Claims Against JBI and (ii) any claims filed against or scheduled by JBD in favor of Douglas Johnson shall be

treated as Class 6B – Subordinated Claims Against JBD.  Pursuant to Section 1123(b)(3) of the Bankruptcy Code and in consideration for such treatment of Douglas Johnson's claims, the Debtors, on their own behalf and as representatives of their respective Estates, release their claims filed against Douglas Johnson in his individual chapter 11 bankruptcy case.  The Debtors' settlement with Douglas Johnson set forth in Section 7.18 of the Plan is also subject to Douglas Johnson receiving approval of the settlement terms in his individual chapter 11 bankruptcy case.

Pursuant to Section 1123(b)(3) of the Bankruptcy Code, to the extent Class 5A unsecured creditors are paid in full under the Plan, the scheduled intercompany Claim owed from JBD to JBI shall be deemed satisfied and shall not receive distribution under the Plan.  The entry of the Confirmation Order will constitute the Bankruptcy Court's approval, as of the Effective Date, of these compromises and settlements and the Bankruptcy Court's finding that such compromises or settlements are in the best interests of the Debtors and their Estates and are fair, equitable and reasonable.

## F.  Conditions Precedent to Effectiveness of Plan

### 1.  Conditions to the Effective Date

The Effective Date will not occur, and the Plan will not be consummated unless and until the following conditions have been satisfied or duly waived pursuant to Section 11.2 of the Plan:

a.  The Confirmation Order, with the Plan and all exhibits and annexes to each, shall have been entered by the Bankruptcy Court, and shall be a Final Order, and no request for revocation of the Confirmation Order under § 1144 of the Bankruptcy Code shall have been made, or, if made, shall remain pending; provided, however, that if the Confirmation Order has not become a Final Order because a notice of appeal has been timely filed and the parties are not stayed or enjoined from consummating the Plan, Section 11.1(a) of the Plan shall be deemed satisfied unless the effect of the appeal could reasonably be expected to be adverse to the business, operations, property, condition (financial or otherwise) or prospects of the Liquidating Debtors.

b.  All actions, documents and agreements necessary to implement the Plan shall be in form and substance reasonably satisfactory to the Debtors and shall have been effected or executed as applicable.

### 2.  Waiver of Conditions

The conditions set forth in Section 11.1 of the Plan may be waived by the Debtors, without any notice to any other parties-in-interest or the Bankruptcy Court and without a hearing.

### H.     Treatment of Executory Contracts and Unexpired Leases

#### 1.     Rejection of Executory Contracts and Unexpired Leases

Except as otherwise provided in the Confirmation Order, pursuant to §§ 365(a) and 1123(b)(2) of the Bankruptcy Code, all remaining Executory Contracts and Unexpired Leases as such terms are used in Section 365 of the Bankruptcy Code that exist between the Debtors and any entity shall be deemed rejected as of the Effective Date, except for any Executory Contract or Unexpired Lease (i) that has been assumed, assumed and assigned or rejected pursuant to an order of the Bankruptcy Court entered prior to the Effective Date, or (ii) as to which a motion for approval of the assumption, assumption and assignment or rejection has been filed prior to the Effective Date.  Any claims arising from the rejection of an Executory Contract or Unexpired Lease ("Rejection Claims") shall be classified in Class 5 under the Plan.

#### 2.     Bar Date for Filing Rejection Claims

A Proof of Claim asserting a Rejection Claim shall be filed with the Plan Agent on or before the thirtieth (30th) day after the Effective Date or be forever barred from assertion of any Rejection Claim against and payment from the Liquidating Debtors.

#### 3.     Provisions Relating to Assumption Cure Claims

Any monetary amounts by which any executory contract and unexpired lease to be assumed under the Plan is in default shall be satisfied, under section 365(b)(1) of the Bankruptcy Code, by the applicable Debtor on or before the Effective Date; provided, however, if there is a dispute regarding (i) the nature or amount of any Cure, (ii) the ability of a Liquidating Debtor or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the contract or lease to be assumed, or (iii) any other matter pertaining to assumption, Cure such dispute shall be resolved at the Confirmation Hearing.

### I.     Procedures for Resolving and Treating Disputed Claims

#### 1.     Objections to Claims

The Plan Agent on behalf of the Liquidating Debtors shall have the exclusive right to object to Claims including but not limited to objections regarding the allowance, classification or amount of Claims, subject to the procedures and limitations set forth in the Plan, the Bankruptcy Rules, and the Bankruptcy Code; *provided, however*, that the deadline for the Liquidating Debtors Plan Agent to file objections to Claims shall be ninety (90) days after the Effective Date, unless further extended by the Bankruptcy Court upon notice to the holders of the 20 largest General Unsecured Claims and all others requesting notice pursuant to Bankruptcy Rule 2002.  All such objections shall be litigated to a Final Order except to the extent the Liquidating Debtors and Plan Agent, in their discretion, elect to withdraw any such objection or compromise, settle or otherwise resolve any such objection, in which event the Liquidating Debtors and Plan Agent may settle, compromise or otherwise resolve any Disputed Claim without approval of the Bankruptcy Court.

2.      **No Distribution Pending Determination of Allowance of Disputed Claims; Distributions to be Made on Undisputed Balances of Partially Disputed Claims**

No proceeds shall be distributed under the Plan on account of any Disputed Claim, unless and until such Claim becomes an Allowed Claim; *provided, however,* that, except as otherwise required by § 502(d) of the Bankruptcy Code, if a Claim is partially disputed, contingent or unliquidated but the balance of the Claim is undisputed, liquidated and not contingent (the "Undisputed Balance"), then distribution shall be made to the holder of the Claim on such Undisputed Balance and distribution shall be withheld on the part of the Claim that is disputed, unliquidated, or contingent unless and until such part becomes an Allowed Claim.

3.      **Reserve Accounts for Disputed Claims**

On or prior to the Initial Distribution Date and each Subsequent Distribution Date, the Plan Agent shall reserve Cash in an aggregate amount sufficient to pay each holder of a Disputed Claim (a) the amount of Cash that such holder would have been entitled to receive under the Plan if such Claim had been an Allowed Claim on the Initial Distribution Date, or (b) such lesser amount as the Court may estimate or may otherwise order (the "Disputed Claims Reserve")

4.      **Investment of Disputed Claims Reserve**

The Plan Agent shall be permitted, from time to time, to invest all or a portion of the Cash in the Disputed Claims Reserve in United States Treasury Bills (or in a fund that invests substantially all of its assets in United States Treasury securities), interest-bearing certificates of deposit, tax exempt securities or investments permitted by § 345 of the Bankruptcy Code, using prudent efforts to enhance the rates of interest earned on such Cash without inordinate risk.  All interest earned on such Cash shall be held in the Disputed Claims Reserve and, after satisfaction of any expenses incurred in connection with the maintenance of the Disputed Claims Reserve, including taxes payable on such interest income, if any, shall be transferred out of the Disputed Claims Reserve and shall be used by the Liquidating Debtors in accordance with the Plan.

5.      **Allowance and Payment**

Except as otherwise provided herein, if, on or after the Effective Date, any Disputed Claim becomes an Allowed Claim, the Plan Agent shall, within 30 days after the date on which such Disputed Claim becomes an Allowed Claim or as soon thereafter as is practicable or upon a Subsequent Distribution Date, distribute from the Disputed Claims Reserve to the holder of such Allowed Claim the amount of distributions that such holder would have been entitled to receive under the Plan if such Claim had been an Allowed Claim on the Effective Date.

6.      **Release of Excess Funds from Disputed Claims Reserve**

If at any time or from time to time after the Effective Date, there shall be Cash in the Disputed Claims Reserve in an amount in excess of the amount which the Plan Agent is required at such time to reserve on account of Disputed Claims under the Plan or pursuant to any

order of the Bankruptcy Court, the Plan Agent may release such funds from the Disputed Claims Reserve to the Liquidating Debtors as such Cash will be distributed pursuant to the Plan.

### 7.    Estimation

The Plan Agent or Liquidating Debtors may, at any time, request that the Bankruptcy Court estimate any Disputed Claim pursuant to § 502(c) of the Bankruptcy Code regardless of whether there has been a previous objection to such Claim, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time, including during litigation concerning any objection to such Claim.  In the event that the Bankruptcy Court estimates any Disputed Claim, that estimated amount may constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court.  If the estimated amount constitutes a maximum limitation on such Claim, the Plan Agent or the Liquidating Debtors may elect to pursue any supplemental proceedings to object to any ultimate payment of such Claim.  All of the aforementioned Claims objection, estimation and resolution procedures are cumulative and not necessarily exclusive of one another.  On and after the Confirmation Date, Claims which have been estimated subsequently may be compromised, settled, withdrawn or otherwise resolved without further order of the Bankruptcy Court as provided in the Plan.

### J.    Modification of Plan

The Debtors may propose amendments to or modifications of the Plan under § 1127 of the Bankruptcy Code at any time prior to the entry of the Confirmation Order.  After the Confirmation Date, the Liquidating Debtors may remedy any defects or omissions or reconcile any inconsistencies in the Plan or in the Confirmation Order in such manner as may be necessary to carry out the purposes and intent of the Plan so long as the interests of Claimants are not materially and adversely affected.

### K.    Allocation of Plan Distributions Between Principal and Interest

To the extent that any Allowed Claim entitled to a distribution under the Plan is composed of indebtedness and accrued but unpaid interest thereon, such distribution shall, for United States federal income tax purposes, be allocated to the principal amount of the Claim first and then, to the extent the consideration exceeds the principal amount of the Claim, to accrued but unpaid interest.

### L.    Post-Confirmation Actions, Reports and Final Decree

After the Effective Date, the following events shall occur:

### 1.    Reports of Distribution

The Plan Agent shall file with the Bankruptcy Court periodic reports of recoveries on Prosecutable Claims and disbursements to holders of Allowed Claims under the Plan, with a copy to the United States Trustee, and any Claimant who requests a copy of same.

### 2.     Final Report

Upon completion of all distributions provided for herein, the Plan Agent shall file a report of final distribution with the Bankruptcy Court, with service on the United States Trustee, and any Claimant who requests a copy of same.

### 3.     Request for Post-Confirmation Notices and Filings

After the Effective Date, no Claimant will be served any notices, motions, reports or other filings in the Bankruptcy Court except as set forth in Section 14.5 of the Plan. Any Claimant or other party-in-interest who desires service of post-Effective Date notice(s) required in the Plan must deliver a written request to the Liquidating Debtors and the Plan Agent requesting service of such notices.

## V.     CONFIRMATION OF THE PLAN

### A.     Introduction

The Bankruptcy Code requires a bankruptcy court to determine whether a plan complies with the technical requirements of chapter 11 of the Bankruptcy Code before such plan can be confirmed. It requires further that a disclosure statement concerning such plan is adequate and includes information concerning all payments made or promised by the plan proponent in connection with the plan.

If the Plan is confirmed, the Debtors expect the occurrence of the Effective Date to depend on when the Plan is confirmed. Confirmation of the Plan will not occur until the Debtors have closed on the sale of their assets, which are subject to FCC approval prior to transfer of the broadcasting licenses.

To confirm the Plan, the Bankruptcy Court must find that the requirements of the Bankruptcy Code have been met. Thus, even if the requisite vote is achieved for the Voting Classes, the Bankruptcy Court must make independent findings respecting the Plan's conformity with the requirements of the Bankruptcy Code before it may confirm the Plan. Some of these statutory requirements are discussed below.

### B.     Voting

Pursuant to the Bankruptcy Code, only holders of Allowed Claims or Equity Interests that are Impaired under the terms and provisions of the Plan and that receive distributions thereunder are entitled to vote for acceptance or rejection of the Plan. A holder of a Claim or Equity Interest whose legal, equitable, or contractual rights are altered, modified or changed by the proposed treatment under the Plan or whose treatment under the Plan is not provided for in section 1124 of the Bankruptcy Code is considered Impaired. Pursuant to section 1126(f) of the Bankruptcy Code, holders of Claims that are Unimpaired are conclusively presumed to have accepted the Plan and are not entitled to vote.

Votes on the Plan will be counted only with respect of Allowed Claims that (i) belong to a Voting Class or (ii) are otherwise permitted by the Bankruptcy Code to vote.

C.      **Acceptance**

The Bankruptcy Code defines acceptance of a plan by an impaired class of claims as acceptance by holders of at least two-thirds in dollar amount, and more than one-half in number, of claims of that class that actually vote.  The Bankruptcy Code defines acceptance of a plan by an impaired class of interests as acceptance by holders of at least two-thirds in dollar amount of interests of that class that actually vote.   Acceptance of a plan need only be solicited from holders of claims or interests whose claims or interests are impaired and not deemed to have rejected the Plan.  Except in the context of a "cram down" pursuant to section 1129(b) of the Bankruptcy Code, as a condition to confirmation of a plan the Bankruptcy Code requires that, with certain exceptions, each class of impaired claims or interests accepts the plan.

In the event the requisite vote is not obtained as to a particular Class or Classes of Claims or Equity Interests, the Debtors have the right, assuming that at least one Class of Impaired Claims or Equity Interests has accepted the Plan, to request confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code.   Section 1129(b) permits confirmation of a plan notwithstanding rejection by one or more classes of impaired claims or interests if the bankruptcy court finds that the plan does not "discriminate unfairly" and is "fair and equitable" with respect to the rejecting class or classes.   This procedure is commonly referred to in bankruptcy parlance as "cram down."  As such, if any Voting Class votes to reject the Plan the Debtors will request confirmation of the Plan under section 1129(b) of the Bankruptcy Code. The Debtors will proceed with a section 1129(b) cram down if all classes do not vote to accept the Plan.

D.      **Confirmation of the Plan**

At the Confirmation Hearing, the Bankruptcy Court will determine whether the requirements of section 1129(a) of the Bankruptcy Code have been satisfied with respect to the Plan.  Section 1129(a) of the Bankruptcy Code requires that, among other things, for a plan to be confirmed:

- The plan satisfies the applicable provisions of the Bankruptcy Code.

- The proponent of the plan has complied with the applicable provisions of the Bankruptcy Code.

- The plan has been proposed in good faith and not by any means forbidden by law.

- Any payment made or promised by the proponent under the plan for services or for costs and expenses in, or in connection with, the chapter 11 case, or in connection with the plan and incident to the case, has been disclosed to the bankruptcy court, and any such payment made before the confirmation of the plan is reasonable, or if such payment is to be fixed after confirmation of the plan, such payment is subject to the approval of the bankruptcy court as reasonable.

- The proponent of the plan has disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the plan, as a director, officer or trustee of the debtor, an affiliate of the debtor participating in the plan with the debtor, or a successor to the

debtor under the plan.   The appointment to, or continuance in, such office of such individual must be consistent with the interests of creditors and with public policy and the proponent must have disclosed the identity of any insider that the Liquidating Debtors will employ or retain, and the nature of any compensation for such insider.

- With respect to each class of impaired claims or interests, either each holder of a claim or interest in such class has accepted the plan, or will receive or retain under the plan on account of such claims or interests, property of a value, as of the effective date of the plan, that is not less than the amount that such holder would receive or retain if the debtor were liquidated on such date under chapter 7 of the Bankruptcy Code.

- Each class of claims has either accepted the plan or is not impaired under the plan, subject to the cramdown provisions of the Bankruptcy Code.

- Except to the extent that the holder of a claim has agreed to a different treatment of such claim, the plan provides that allowed administrative claims and priority claims (other than tax claims) will be paid in full on the effective date and that priority tax claims will receive on account of such claims deferred cash payments, over a period not exceeding six (6) years after the date of assessment of such claim, of a value, as of the effective date, equal to the allowed amount of such claim.

- If a class of claims is impaired, at least one (1) impaired class of claims has accepted the plan, determined without including any acceptance of the plan by any insider holding a claim in such class.

- Confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan.

Subject to receiving the requisite votes in accordance with section 1129(a)(8) of the Bankruptcy Code and the "cram down" of Impaired Classes voting against the Plan or not receiving any distribution under the Plan, the Debtors believe that (i) the Plan satisfies all of the statutory requirements of chapter 11 of the Bankruptcy Code, (ii) the Debtors have complied or will have complied with all of the requirements of chapter 11, and (iii) the Plan has been proposed in good faith.

Set forth below is a more detailed summary of the relevant statutory confirmation requirements.

1.      **Best Interests of Holders of Claims and Equity Interests**

The "best interests" test requires that a bankruptcy court find either that all members of each impaired class have accepted the plan or that each holder of an allowed claim of each impaired class of claims will receive or retain under the plan on account of such claim property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of the Bankruptcy Code on such date.

To estimate what members of each Impaired Class of Claims or Equity Interests would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code, the Bankruptcy Court must first determine the aggregate dollar amount that would be available if each of the Debtors' chapter 11 cases were converted to a chapter 7 case under the Bankruptcy Code and the Debtors' assets were liquidated by a chapter 7 trustee (the "Liquidation Value"). The Liquidation Value of the Debtors would consist of the net proceeds from the disposition of the Debtors' assets, augmented by any cash held by the Debtors.

The Liquidation Value available to holders of Unsecured Claims and Equity Interests would be reduced, first, by the claims of holders of Secured Claims to the extent of the value of their collateral and, second, by the costs and expenses of liquidation, as well as by other administrative expenses and costs of both the chapter 7 case and the chapter 11 cases.  Costs of liquidation under chapter 7 of the Bankruptcy Code would include the compensation of a trustee, as well as of counsel and other professionals retained by the trustee, asset disposition expenses, all unpaid expenses incurred in the chapter 11 cases that are allowed in the chapter 7 case, litigation costs and claims arising from the operations of the Debtors during the pendency of the chapter 11 cases.  The liquidation itself could trigger certain Priority Claims, such as claims for severance pay.

The information contained on Exhibit B hereto provides a summary of the Liquidation Values of the Debtors' assets, on a consolidated basis, assuming a chapter 7 liquidation in which a trustee appointed by the Bankruptcy Court would liquidate the Debtors' assets.  As more fully described on Exhibit B, the liquidation analysis is based on a number of estimates and assumptions that are subject to significant uncertainties, including estimates and assumptions relating to the proceeds of sales of assets, the timing of such sales, the costs of liquidation and certain tax matters.  While the Debtors believe that these estimates and assumptions are reasonable for the purpose of preparing hypothetical chapter 7 liquidation analyses, no assurance exists that such estimates and assumptions would be valid if the Debtors were, in fact, to be liquidated.

Based on the liquidation analyses set forth on Exhibit B, the Debtors believe that holders of Claims will receive greater value as of the Effective Date under the Plan than such holders would receive under a chapter 7 liquidation.

In actual liquidations of the Debtors, distributions to holders of Claims would be delayed by the chapter 7 process. This delay would materially reduce the amount determined on a present value basis available for distribution to creditors. The hypothetical chapter 7 liquidations of the Debtors are assumed to commence on or around December 31, 2009 and to be completed within 12 months thereafter. The Liquidation Analysis, which is presented on a consolidated basis for the Debtors, resulting in the elimination of any intercompany claims, assumed that distributions are made by the chapter 7 trustee following commencement of the liquidation and completed within twelve months thereafter. As a result, the Debtors believe the value of the liquidation distributions on a present value basis determined as of the projected Effective Date would be less than the value distributable under the Plan to each Class of Claims including, but not limited to, all Secured Claims.

In sum, the Debtors believe that chapter 7 liquidations of the Debtors would result in a substantial diminution in the value to be realized by holders of Claims, as compared to the proposed distributions under the Plan because of, among other factors: (a) the failure to maximize the going concern value of the Debtors' assets; (b) the liquidation of assets at a distressed value in chapter 7; (c) the liquidation of assets during a financial crisis; (d) additional costs and expenses involved in the appointment of a trustee, attorneys, accountants and other professionals to assist the trustee in the chapter 7 cases; (e) additional expenses and Claims, including potential Administrative Expense Claims and Priority Claims, that may arise from the cessation of operations and the conversion of the chapter 11 cases to chapter 7; and (f) the substantial time that would elapse before entities would receive any distribution in respect of their Claims. Consequently, the Debtors believe that the Plan will provide a substantially greater ultimate return to holders of Claims than would chapter 7 liquidations.

### 2.    Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of a plan should not be likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtors or any successor to the Debtors unless such liquidation or reorganization is proposed in the Plan. For purposes of determining whether the Plan meets this requirement, the Debtors have analyzed their ability to meet their respective obligations under the Plan.

### 3.    Acceptance by Impaired Classes

A class is impaired under a plan unless, with respect to each claim of such class, the plan (i) leaves unaltered the legal, equitable and contractual rights to which the claim entitles the holder of such claim or interest; or (ii) notwithstanding a demand for accelerated payment (a) cures any default and reinstates the maturity of the obligation; (b) compensates the holder of such claim for damages incurred on account of reasonable reliance on contractual provisions; and (c) does not otherwise alter legal, equitable or contractual rights. A class that is not impaired under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances to such class is not required.

With respect to the Plan, holders of Claims in Class 4 are Unimpaired and are deemed to have accepted the Plan. Holders of Claims in Classes 2, 3, 5, and 6 and Equity

HOU:3090171.3

Interests in Class 7 are impaired and are deemed to have rejected the Plan by virtue of receiving no distributions thereunder.

### 4.     Cram Down

A plan is accepted by an impaired class of claims or interests if holders of at least two-thirds in dollar amount and a majority in number of claims or interests in that class vote to accept the plan. Only those holders of claims or interests who actually vote (and are entitled to vote) to accept or to reject a plan count in this tabulation. The Bankruptcy Code contains provisions for confirmation of a plan even if it is not accepted by all impaired classes, as long as at least one impaired class of claims has accepted it. These so-called "cramdown" provisions are set forth in section 1129(b) of the Bankruptcy Code. The Plan may be confirmed under the cramdown provisions if, in addition to satisfying the other requirements of section 1129 of the Bankruptcy Code, it (a) is "fair and equitable" and (b) "does not discriminate unfairly" with respect to each Class of Claims and Equity Interests that is impaired under, and has not accepted, the Plan. The "fair and equitable" standard, also known as the "absolute priority rule," requires, among other things, that unless a dissenting class of unsecured claims or interests receives full compensation for its allowed claims or interests, no holder of allowed claims or interests in any junior class may receive or retain any property on account of such claims or interests.

With respect to a dissenting class of secured claims, the "fair and equitable" standard requires that holders either (i) retain their liens and receive deferred cash payments with a value as of the effective date of the Plan equal to the value of their interest in property of the applicable estate or (ii) receive the indubitable equivalent of their secured claims.

The "fair and equitable" standard has also been interpreted to prohibit any class senior to a dissenting class from receiving under a plan more than 100% of its allowed claims.

The requirement that the Plan not "discriminate unfairly" means, among other things, that a dissenting Class must be treated substantially equally with respect to other Classes of equal rank. The Debtors do not believe that the Plan unfairly discriminates against any Class that may not accept or otherwise consent to the Plan.

The Debtors intend to seek "cram down" of the Plan on any impaired Class that does not vote to accept the Plan. Nevertheless, there can be no assurance that the Bankruptcy Court will determine that the Plan meets the requirements of section 1129(b) of the Bankruptcy Code.

### 5.     Classification of Claims

The Debtors believe that the Plan meets the classification requirements of the Bankruptcy Code that require that a plan place each claim into a class with other claims that are "substantially similar."

HOU:3090171.3

E.      **Effect of Confirmation of the Plan**

1.      **Revesting of Assets**

Except as otherwise explicitly provided in the Plan, on the Effective Date all property comprising the Estates (including Rights of Action) shall revest in each of the Debtors and, ultimately, in the Liquidating Debtors, free and clear of all Claims, Liens and Equity Interests of holders of Claims and Equity Interests (other than as expressly provided herein).  As of the Effective Date, each of the Liquidating Debtors and the Plan Agent as applicable may operate its business and use, acquire, and dispose of property and settle and compromise Claims without supervision of the Bankruptcy Court, free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than those restrictions expressly imposed by the Plan and the Confirmation Order.

2.      **Discharge of the Debtors**

Pursuant to § 1141(d) of the Bankruptcy Code and, except as otherwise specifically provided in the Plan or in the Confirmation Order, the rights afforded and the payments and distributions to be made and the treatment under the Plan shall be in complete exchange for, and in full and unconditional settlement, satisfaction, discharge, and release of any and all existing debts and Claims of any kind, nature, or description whatsoever against the Debtors, the Liquidating Debtors, their property, the Debtors' assets, or the Estates, and shall effect a full and complete release, discharge, and termination of all Liens, security interests, or other claims, interests, or encumbrances upon all of the Debtors' assets and property.  Further, all Persons are precluded from asserting, against any of the Debtors or the Liquidating Debtors or their respective successors, or any property that is to be distributed under the terms of the Plan, any Claims, obligations, rights, causes of action, or liabilities based upon any act, omission, transaction, or other activity of any kind or nature that occurred prior to the Effective Date, other than as expressly provided for in the Plan, or the Confirmation Order, whether or not (a) a Proof of Claim based upon such debt is filed or deemed filed under § 501 of the Bankruptcy Code; (b) a Claim based upon such debt is Allowed; or (c) the Claimant based upon such debt has accepted the Plan.  Except as otherwise provided in the Plan or the Confirmation Order, all Claimants arising prior to the Effective Date shall be permanently barred and enjoined from asserting against the Liquidating Debtors or any of the Debtors, or their successors or property, or the Debtors' assets, any of the following actions on account of such Claim: (i) commencing or continuing in any manner any action or other proceeding on account of such Claim against the Liquidating Debtors, any of the Debtors, or the property to be distributed under the terms of the Plan, other than to enforce any right to distribution with respect to such property under the Plan; (ii) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree, or order against the Liquidating Debtors, the Debtors or any of the property to be distributed under the terms of the Plan, other than as permitted under sub-paragraph (i) above; (iii) creating, perfecting, or enforcing any Lien or encumbrance against property of the Liquidating Debtors, any of the Debtors, or any property to be distributed under the terms of the Plan; (iv) asserting any right of setoff, subrogation, or recoupment of any kind, directly or indirectly, against any obligation due any Debtor, the Liquidating Debtors, their assets or any other property of the Debtors, the Liquidating Debtors, or any direct or indirect transferee of any property of, or successor in interest to, any of the foregoing Persons; and (v) acting or proceeding in any

manner, in any place whatsoever, that does not conform to, or comply with, the provisions of the Plan. The foregoing discharge, release and injunction are an integral part of the Plan and are essential to its implementation. Each of the Debtors and the Liquidating Debtors shall have the right to independently seek the enforcement of the discharge, release and injunction set forth in Section 12.2 of the Plan. The provisions of this section shall be fully applicable and enforceable as to Equity Interests and the holders of Equity Interests in the event that the Sale Alternative is confirmed.

### 3.    No Waiver of Discharge

Provided that Debtors are seeking confirmation of the Plan under the Finance Alternative Option, and except as otherwise specifically provided in the Plan, nothing in the Plan shall be deemed to waive, limit, or restrict in any way the discharge granted to the Debtors upon Confirmation of the Plan by § 1141 of the Bankruptcy Code.

### 4.    Binding Effect

As of the Effective Date, the Plan shall be binding upon and inure to the benefit of the Debtors, the Liquidating Debtors, all Claimants and holders of Equity Interests, other parties-in-interest and their respective heirs, successors, and assigns.

### 5.    Term of Injunctions or Stays

Unless expressly modified or lifted by the Bankruptcy Court, all injunctions or stays provided for in the Cases pursuant to sections 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until 30 days after the Final Distribution Date.

### 6.    Setoffs

Except with respect to Claims specifically Allowed under the Plan, the Debtors or the Liquidating Debtors, as applicable, may, but shall not be required to, set off against any Claim, and the payments or other distributions to be made pursuant to the Plan in respect of such Claim, claims of any nature whatsoever that the Debtors may have against such Claimant; but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors or the Liquidating Debtors of any such claim that the Debtors or the Liquidating Debtors may have against such Claimant.

### 7.    Exculpation

Neither (a) the Plan Agent or any of its employees, officers, directors, agents, representatives, affiliates, attorneys, financial advisors, or any other professional persons employed by it, nor (b) each Professional for the Debtors or any of their employees, officers, directors, agents, representatives, affiliates, attorneys, financial advisors, or any other professional persons employed by any of them (the persons identified in (a) and (b) are collectively referred to as "Protected Persons," shall have or incur any liability to any Person or Entity under any theory of liability for any act or omission occurring on or after the Petition Date in connection with or related to the Debtors, the Cases or the Estates, including but not limited to

HOU:3090171.3

(i) formulating, preparing, disseminating, implementing, confirming, consummating or administering the Plan (including soliciting acceptances or rejections thereof); or (ii) the disclosure statement or any contract, instrument, release or other agreement or document entered into or any action take or omitted to be taken in connection with the Plan except for acts constituting willful misconduct or gross negligence and in all respects such Protected Persons shall be entitled to rely in good faith upon the advice of counsel.  In any action, suit or proceeding by any Person contesting any action by, or non-action of, any Protected Person as constituting willful conduct or gross negligence or not being in good faith, the reasonable attorneys' fees and costs of the prevailing party will be paid by the losing party; and as a condition to going forward with such action, suit or proceeding at the outset thereof all parties thereto will be required to provide appropriate proof and assurances of their capacity to make such payments of reasonable attorneys' fees and costs in the event they fail to prevail

### 8.     Indemnification

The Liquidating Debtors shall indemnify each Person identified as a Protected Person against any and all costs and expenses (including attorneys' fees) incurred by any of them in defending against post-Confirmation Date claims that are based on actions allegedly taken (or not taken) by them in their respective capacities relating to the Debtor, the Liquidating Debtors or the Plan; provided, however, that no Protected Person shall be entitled to indemnification under the Plan for the costs and expenses of defending a cause of action in which it is ultimately judicially determined that such Protected Person was grossly negligent or acted fraudulently or with willful misconduct in performing such Protected Person's duties hereunder or under any Final Order of the Bankruptcy Court or applicable law.  Any Protected Person entitled to indemnification under this Section 12.8 shall have a priority distribution right that is senior to the holders of Allowed Claims in Classes 4, 5, 6 and 7.  The Plan Agent may use Liquidating Debtors' assets (as an expense of consummating the Plan) to purchase indemnification insurance to satisfy any potential indemnification claims that may arise under Section 12.8 of the Plan.

## II.     CERTAIN RISK FACTORS TO BE CONSIDERED

**HOLDERS OF CLAIMS AGAINST AND EQUITY INTERESTS IN THE DEBTORS SHOULD READ AND CONSIDER CAREFULLY THE RISK FACTORS SET FORTH BELOW, AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT (AND THE DOCUMENTS DELIVERED TOGETHER HEREWITH AND INCORPORATED BY REFERENCE), PRIOR TO VOTING TO ACCEPT OR TO REJECT THE PLAN.  THESE RISK FACTORS SHOULD NOT, HOWEVER, BE REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN AND ITS IMPLEMENTATION.**

### A.     Risk that Distributions will be Less than Estimated by the Debtors

The distributions and recoveries for holders of Claims set forth in this Disclosure Statement are based on the Debtors' estimate of Allowed Claims as of October 19, 2009.  The Debtors project that the Claims asserted against them will be resolved in and reduced to an amount is significantly lower than their estimates and may seek an order or orders from the Bankruptcy Court estimating the maximum dollar amount of Allowed Claims and Disputed

Claims in various Classes or otherwise determining and fixing the amount of any Disputed Claims Reserve. There can be no assurance, however, that such estimates will prove accurate. In addition, if and to the extent the Debtors have underestimated the amount of any Allowed Claims or Disputed Claims, the Debtors could be required to redirect Cash to such Allowed Claims or Disputed Claims, resulting in, among other things, a potential reduction of cash available for operations. Therefore, the distributions discussed herein could significantly and materially differ from the actual distributions made under the Plan.

The Debtors reserve the right to object to the amount or classification of any Claim. Thus, the estimates set forth in this Disclosure Statement cannot be relied upon by any holder of a Claim whose Claim is subject to a successful objection. Any such holder may not receive the estimated distributions set forth herein.

### B.      Risk of Non-Confirmation of the Plan

If the Plan is not confirmed and consummated, there can be no assurance that the Debtors' chapter 11 cases will continue rather than be converted to a liquidation under chapter 7 of the Bankruptcy Code or that an alternative plan would be on terms as favorable to the holders of Allowed Claims as the terms of the Plan.

### C.      Non-Consensual Confirmation of the Plan

Pursuant to the "cram down" provisions of section 1129(b) of the Bankruptcy Code, the Bankruptcy Court can confirm the Plan without the acceptances of all Impaired Classes of Claims, so long as at least one Impaired Class of Claims has accepted the Plan.

### D.      Post-Closing Adjustments May Reduce the Sales Proceeds

As set forth in detail above, there is a Court approved process for possible post-closing adjustments to the sale proceeds and there may be downward adjustments. Any approved downward adjustments could result in recovery to creditors being reduced.

### E.      The FCC May Not Grant the Debtors' Licenses to Broadcast

The Debtors are broadcasting on digital low power STAs and FCC construction permits. The FCC may not grant any further extension of the STAs or construction permits. If the Stations are not fully built-out and broadcasting at full digital power at the time that the current STAs and construction permits expire, the FCC may not grant the Debtors their full digital power licenses. This would cause a dramatic reduction in the value of the Stations and could result in no recovery to any creditors.

## II.      CERTAIN TAX CONSEQUENCES OF THE PLAN

THE FOLLOWING DISCUSSION SUMMARIZES CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE IMPLEMENTATION OF THE PLAN TO THE DEBTORS AND HOLDERS OF CLAIMS. THIS DISCUSSION IS BASED ON THE INTERNAL REVENUE CODE OF 1986, AS AMENDED (THE "TAX CODE"), THE TREASURY REGULATIONS ISSUED (IN FINAL OR TEMPORARY FORM)

HOU:3090171.3

THEREUNDER, JUDICIAL DECISIONS AND CURRENT INTERNAL REVENUE SERVICE ("IRS") ADMINISTRATIVE DETERMINATIONS IN EFFECT AS OF THE DATE OF THIS DISCLOSURE STATEMENT. CHANGES IN THESE AUTHORITIES, WHICH MAY HAVE RETROACTIVE EFFECT, OR NEW INTERPRETATIONS OF EXISTING AUTHORITY MAY CAUSE THE FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN TO DIFFER MATERIALLY FROM THE CONSEQUENCES DISCUSSED BELOW. THE TAX CONSEQUENCES OF CERTAIN ASPECTS OF THE PLAN ARE UNCERTAIN DUE TO THE LACK OF APPLICABLE LEGAL AUTHORITY AND MAY BE SUBJECT TO ADMINISTRATIVE OR JUDICIAL INTERPRETATIONS THAT DIFFER FROM THE DISCUSSION BELOW. MOREOVER, NO RULINGS HAVE BEEN OR WILL BE REQUESTED FROM THE IRS AND NO LEGAL OPINIONS HAVE BEEN OR WILL BE REQUESTED FROM COUNSEL WITH RESPECT TO ANY TAX CONSEQUENCES OF THE PLAN.

THIS DISCUSSION DOES NOT COVER ALL ASPECTS OF FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO THE DEBTORS OR TO HOLDERS OF CLAIMS. FOR EXAMPLE, THE DISCUSSION PROVIDED BELOW DOES NOT ADDRESS ISSUES OF SPECIAL CONCERN TO CERTAIN TYPES OF TAXPAYERS, SUCH AS DEALERS IN SECURITIES, LIFE INSURANCE COMPANIES, FINANCIAL INSTITUTIONS, BANKS, SMALL BUSINESS INVESTMENT COMPANIES, MUTUAL FUNDS, REGULATED INVESTMENT COMPANIES, TAX EXEMPT ORGANIZATIONS AND FOREIGN TAXPAYERS. THE DISCUSSION, MOREOVER, IS LIMITED TO FEDERAL INCOME TAX CONSEQUENCES AND DOES NOT ADDRESS STATE, LOCAL OR FOREIGN TAXES.

THIS DISCUSSION IS INCLUDED FOR GENERAL INFORMATION ONLY. THE DEBTORS AND THEIR COUNSEL ARE NOT MAKING ANY REPRESENTATIONS REGARDING THE PARTICULAR TAX CONSEQUENCES OF CONFIRMATION AND CONSUMMATION OF THE PLAN WITH RESPECT TO THE DEBTORS, DIRECTORS OR OFFICERS OF THE DEBTORS OR HOLDERS OF CLAIMS. FURTHER, THE DEBTORS AND THEIR COUNSEL ARE NOT RENDERING ANY FORM OF LEGAL OPINION OR TAX ADVICE ON SUCH TAX CONSEQUENCES. THE TAX LAWS APPLICABLE TO CORPORATIONS (INCLUDING THE DEBTORS) IN BANKRUPTCY ARE EXTREMELY COMPLEX AND THE FOLLOWING SUMMARY IS NOT EXHAUSTIVE. FOR THESE REASONS, THE DISCUSSION IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND PROFESSIONAL TAX ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES OF EACH HOLDER OF A CLAIM. HOLDERS OF CLAIMS ARE URGED TO CONSULT WITH THEIR OWN TAX ADVISORS REGARDING THE FEDERAL, STATE, LOCAL, FOREIGN AND OTHER TAX CONSEQUENCES OF THE PLAN.

A Holder may be subject to backup withholding at applicable rates with respect to consideration received pursuant to the Plan, unless the holder (i) is a corporation or comes within another category of persons exempt from backup withholding and, when required, demonstrates this or (ii) provides a correct taxpayer identification number ("TIN") on Internal Revenue Service Form W-9 (or a suitable substitute form) and provides the other information and makes the representations required by such form and complies with the other requirements of the

backup withholding rules.   An otherwise exempt holder may become subject to backup withholding if, among other things, the holder (i) fails to properly report interest and dividends for federal income tax purposes or (ii) in certain circumstances, fails to certify, under penalty of perjury, that it has furnished a correct TIN.   A holder that does not provide a correct TIN also may be subject to penalties imposed by the IRS.

Backup withholding is not an additional tax.   The federal income tax liability of a person subject to backup withholding is reduced by the amount of tax withheld.   If withholding results in an overpayment of federal income tax, the holder may obtain a refund of the overpayment by properly and timely filing a claim for refund with the IRS.

The Debtors and Plan Agent may be subject to other withholding and information reporting obligations with respect to consideration distributed pursuant to the Plan and will comply with all such obligations and information reporting obligations.

### III.    CONCLUSION AND RECOMMENDATION

The Debtors believe that confirmation and implementation of the Plan is preferable to any of the alternatives described above because it will provide the greatest recoveries to holders of Claims.   In addition, other alternatives would involve delay, uncertainty and substantial additional administrative costs.   The Debtors urge holders of impaired Claims entitled to vote on the Plan to vote to accept the Plan and to evidence such acceptance by returning their ballots so that they will be received not later than 5:00 p.m., Houston time, on March 3, 2010

Dated:   January 31, 2011

Respectfully submitted,

Johnson Broadcasting, Inc. and Johnson
Broadcasting of Dallas, Inc., Debtors

By:   _____
        Name:  Douglas Johnson
        Title:  President of Johnson
        Broadcasting, Inc. and Johnson
        Broadcasting of Dallas, Inc.